# EXHIBIT G

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

FREDERICK (RIC) SCHIFF; GLENN BRAKEL; ) ALICE DICROCE; JOSEPH EMANUEL; BRIAN ) Case No. GREER; CLAYTON HARMSTON; STEVEN ) 4:19-cv-03260-YGR HASKELL; MICAH HOPE; DANIEL KELLY; ) ALEXANDER LENTZ; BRANDON McKELLEY; ) GERALD NEWBECK; DAVID O'KEEFFE; ) CHRISTOPHER RITTER; STEVEN UANG AND ) THOMAS WALSH, )

Plaintiffs, )

vs. ) Volume I

CITY AND COUNTY OF SAN FRANCISCO; ) GREG SUHR, INDIVIDUALLY; WILLIAM ) (BILL) SCOTT, INDIVIDUALLY; AND ) DOES 1-20, )

Defendants. ) Pages 1 - 131

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER
ZOOM VIDEOCONFERENCE DEPOSITION OF
CLAYTON HARMSTON
December 29, 2021

Reported by:
CLARE MACY, RPR, CSR #5256

---

JAN BROWN & ASSOCIATES
WORLDWIDE DEPOSITION & VIDEOGRAPHY SERVICES
701 Battery Street, 3rd Floor, San Francisco, CA 94111
(415) 981-3498 or (800) 522-7096

INDEX

| | PAGE |
|---|---|
| Examination by Mr. Cownan | 5 |
| Examination by Mr. Mullanax | 122 |
| Further Examination by Mr. Cownan | 126 |
| Reporter's Certificate | 131 |

INDEX OF EXHIBITS

| DEPOSITION NO. | | PAGE |
|---|---|---|
| Exhibit 1 | Plaintiff Clayton Harmston's Response to Defendants' Interrogatories, Set One | 49 |
| Exhibit 2 | One-page Claim Against the City and County of San Francisco dated 5-12-19; Bates No. CCSF 005284 | 110 |
| Exhibit 3 | EEOC Form 5 (11/09) with attached typewritten statement dated 5-12-19 | 111 |
| Exhibit 4 | Letter dated August 15, 2019 from Ron Mark of California State University to Chief William Scott; Bates No. RS0284 | 114 |
| Exhibit 5 | Letter dated August 22, 2019 from William Scott to Sergeant Clayton Harmston; Bates No. RS0285 | 114 |

(ALL EXHIBITS ARE CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER)

--oOo--

BE IT REMEMBERED that, pursuant to Notice of Deposition, and on Wednesday, December 29, 2021, commencing at the hour of 2:28 p.m., in San Francisco, California, before me, Clare Macy, a certified shorthand reporter in the State of California, there remotely appeared

CLAYTON HARMSTON,

called as a witness by the Defendants, who being by me first duly sworn, was thereupon examined and interrogated as is hereinafter set forth.

--oOo--

M. GREG MULLANAX, Attorney at Law, of Law Office of M. Greg Mullanax, 2140 N. Winery Avenue, Suite 101, Fresno, California 93703, appeared remotely as counsel on behalf of the Plaintiffs.
Tel: (559)420-1222 Fax: (559)354-0997
Email: greg@lawmgm.com

PETER A. COWNAN, Deputy City Attorney, of San Francisco City Attorney's Office, Fox Plaza, 1390 Market Street, Fifth Floor, San Francisco, California 94102-5408, appeared remotely as counsel on behalf of the Defendants.
Tel: (415)554-3863 Fax: (415)554-3849
Email: peter.cownan@sfcityatty.org

--oOo--

**working with the police commission and the POA to make changes.**

Q. In terms of -- There's a train- -- strike that.

Are you familiar with the training that's entitled or called CIT, which I believe stands for Crisis Intervention Training?

**A. Yes.**

Q. Is that a training that you have heard Chief Scott talk about?

**A. I'm sure he has in different venues.**

Q. My question is, do you recall him speaking about that training?

**A. Yes. I can recall him talking on the topic. I don't know what specifically he's said about it other than the policy changes that were going through, the training, things like that.**

Q. When you refer to policy changes, can you be more specific about what you mean?

**A. Well, for use of force, for instance, implementing time and distance, using deescalation techniques, these things were recommended and talked about during the DOJ review. And subsequently, state law has changed to reflect these changes statewide.**

Q. And I understand that there -- at least

currently or in recent past, there has been a CIT training and a PCIT training. Are you familiar with those two types of trainings?

**A. I've heard of CIT training. I don't know what PCIT is.**

Q. Okay. And again, I will represent to you, without knowing for sure, that one of them is a shorter course, and one of them is a longer course, if that makes any difference in terms of your recall.

**A. I remember --**

**(Simultaneous voices. Reporter interrupts.)**

MR. COWNAN: Q. Go ahead, sir.

**A. So yes. Now I do recall that in the academy there's, let's say, a 40-hour course, a more extensive course, so perhaps that's the PCIT that you're talking about. And then, the CIT is a one-day eight-hour course.**

Q. Are those trainings that you have taken?

**A. I remember taking the eight-hour condensed course.**

Q. And do you recall when you took that course?

**A. I believe I was a sergeant at Northern. I don't remember the year. I would have to look at my training record.**

Q. Okay. If I asked you in terms of which round

of promotion, would that refresh your recollection as to when you took it?

**A. I couldn't recall what round. I would -- If I was a sergeant at Northern, it would probably be maybe 2018 I took it. Like I said, I have to look at my training record.**

Q. Did you ever hear -- I was asking you about changes to the department and what statements Chief Scott was making. I want to switch and ask you, do you recall hearing Chief Scott speak about the promotion process at the department?

**A. Yes.**

Q. When was the first time that you can recall hearing Chief Scott speak about the promotion process?

**A. From my recollection, it would be after the first round of promotions.**

Q. And what do you recall -- what do you recall -- or strike that.

Do you recall the venue or the circumstance where he was speaking?

**A. I recall specifically it was at a POA meeting, and that would be the November meeting.**

Q. And this is the meeting in November 2017 at the Irish Cultural Center?

**A. Yes.**

Q. And you were in attendance at that meeting?

**A. I was.**

Q. Okay. Do you generally go to the general membership meetings that the POA has?

**A. The meetings in November, I usually do, yes.**

Q. Please educate me. I had assumed that there was only one meeting a year called the General Membership Meeting. Is that not the case?

**A. You're probably correct. I know that throughout the year there's board meetings specifically for the executive board. However, general members can show up to those as well. I don't go to those meetings. The only meeting for the POA that I show up on a regular, consistent basis would be the one in November.**

Q. Okay. And again, I had assumed that this was, sort of, like, a party holiday meeting, where people are getting together in a celebratory mood generally. Is that an accurate statement?

**A. I wouldn't say it's a holiday party. I know that they host it at -- or they used to, prior to COVID, host it at the Irish Cultural Center in November, because they want to get the maximum amount of people of the membership to attend. So they provide food and drinks, and they give away turkeys.**

**So I generally go to that meeting so I can get**

**my turkey.**
Q. Of course. The drinks that you're talking about are alcoholic drinks?
**A. Alcoholic and non.**
Q. And non.
And that day, Chief Scott came and spoke to the membership?
**A. He did.**
Q. Okay. Do you recall how far into the night Chief Scott came and spoke?
**A. I can't remember.**
Q. I presume -- well, strike that.
Am I correct that it was not at the beginning of the meeting?
**A. It was not at the very beginning, no.**
Q. Okay. If you had to give an approximation as to how many hours into the meeting, could you give it?
**A. No more than an hour, I would say.**
Q. And so when Chief Scott speaks, what do you recall -- how do you recall -- what do you recall him talking about?
**A. Well, when he first got there, since he's the new chief, he introduced himself. There was -- He was talking in generalities about him being here at the department and coming from LA, things of that nature.**

**And then, I can't recall exactly the stuff he said, but at some point it was opened up to questions from -- from the membership.**
Q. And what questions do you recall him being asked?
**A. Well, the main thrust was the promotions.**
Q. Do you recall if anyone was recording this meeting?
**A. I would have no idea if they were recording or not.**
Q. And what questions -- Who do you remember asking questions about promotions?
**A. I know that Marty Halloran asked some questions. Different members of the board asked questions. I can't remember the specific questions. And then, I remember there were some members in the audience that were asking questions as well.**
Q. Do you remember any of those questions at all that were asked of him?
**A. Not the specific questions. Just they were questions about the promotions, why people were skipped and why he went so far down the list to pick candidates, why he made these decisions. And generally, I remember one member, Sergeant Cronin, was very animated and very -- I wouldn't say angry, but very forceful in**

**wanting to know why a lot of people on specifically the sergeants list were skipped over for promotion. She was very, very animated and up- -- maybe upset, but not disrespectful.**
Q. Sergeant Cronin: What's his or her first name?
**A. Joan.**
Q. And what was the chief's response to these questions that you can recall?
**A. Well, it wasn't very articulate. I remember, kind of, a convoluted explanation. There was mention of the candidates as a whole were in a pool, and everybody's in that pool, and everybody's eligible, and he picks who he wants to pick based on the needs of the department. So we're all in a giant pool is what I gathered from his explanation.**
Q. Do you recall him talking about the Rule of 10 and its application?
**A. Vaguely. Like I said, it was a very convoluted and confusing explanation. He wasn't very articulate and clear. You could tell that he was -- I don't want to say not prepared, because everybody in the department was abuzz about the first round, and there were a lot of upset people. So he should have been prepared to answer these questions. But it wasn't very**

**clear to me his explanation for why he did what he did.**
Q. Would it be fair to characterize the interactions with Sergeant Cronin and others who were asking questions as adverse?
**A. Adversarial, you mean?**
Q. Sure. Yes.
**A. Well, I would say the members of the POA board were very deferential and respectful. And I don't want you to get the idea that Sergeant Cronin was disrespectful in any way. She was very -- very emotional. This -- You could tell that she had some friends that were affected by the first round adversely, so you could tell that she was -- this meant a lot to her, and she wanted answers.**
Q. And I presume that, from your earlier testimony, you felt the same way, that you felt upset about the promotions that had been announced just earlier, I think a month earlier, and wanted answers as well? Is that ac- -- Is that a fair assumption?
**A. That is fair.**
Q. Okay. Did you ask any questions yourself that night?
**A. No.**
Q. Okay. What else do you recall the chief saying, or what other questions, if anything, or have we

covered everything?

**A. I don't remember who posed the question, but it was something along the lines of what criteria do you use for making promotions?**

**And he went into, there's the list of people and how they rank on the list, and then, he explained more about this pool that we're all in, and then, he stated that he used race and gender as one of the components in his decision making.**

**And I remember that because I was standing next to a young patrol officer, female, who I didn't know, but you could tell she was pretty new in the department, and we both looked at each other shocked that he actually said that.**

Q. Do you recall, as you sit here today, what his exact words were in that regard?

**A. Something to the effect of he uses gender and race in making these decisions.**

Q. Did he explain what he meant by that?

**A. No. He, kind of, just said it and glossed over it. And everybody in the audience was looking around, like, "I can't believe he just said that."**

**Now, whether he realized he said what he said and just wanted to move on and keep going, I don't know. I'm not in his head. But it was one of those things**

**where he said it; everybody looked around like "I can't believe he just said that"; and then, the conversation just moved on.**

Q. Were there any follow-up questions on what he meant by that?

**A. Not that I remember.**

Q. That would be an unusual -- You've expressed that that's an unusual statement or everyone was surprised by that; fair?

**A. For sure. For sure.**

Q. Why didn't you want to ask a follow-up question?

**A. Well, the conversation went -- went in different directions. Had I stepped up to the podium -- mind you, this is -- October -- about a month after I got passed over. And I can tell you that, if I had stepped up to the podium, I probably would have said something inappropriate. I probably would have been very agitated, and I might have said something that I would have regretted.**

**And so I think that, in hindsight, looking back at it, it's the best decision that I made, that I just didn't -- didn't ask him a question, a follow-up question, because I was pretty hot. I was pretty angry, especially when he said that.**

Q. Sometimes -- strike that.

You were hot and angry going into that meeting?

**A. After he said gender and race in making his promotional decisions, that angered me.**

Q. What else did he say that he looked at when making promotional decisions?

**A. What he believes is the best fit for the department, the needs of the department and, like I said, "We're all in a giant pool together," I guess.**

**And it's funny, when he said that a few times, I just imagined in my head we're all at a resort somewhere, and we're all in a pool, and he'd just, kind of, taken who he thinks.**

**So it's just one of those things where he said it; it was like that's -- that's kind of ridiculous, we're all just in a pool. Okay. Great. Why don't we just submit our resumes, and then, he can just pick who he wants. Why even have a test?**

Q. After that meeting -- or strike that.

After the chief speaks -- Any other statements you remember him making about the promotional process that night?

**A. Well, I remember -- That night?**

Q. Correct.

**A. No.**

Q. Any other statements you can remember him making at all that night?

**A. No. After he was done addressing the audience, he was collected by his driver, and they left.**

Q. Who was his driver?

**A. That would be Lieutenant Tad Yamaguchi, who was promoted below me -- above me.**

Q. You know --

**A. From below me on the list.**

Q. You saw -- What's -- what's Tad's last name?

**A. Yamaguchi.**

Q. Mr. Yamaguchi was there that evening?

**A. Yes. He was the chief's driver.**

Q. And what I mean was, he was there at the meeting?

**A. Yes.**

Q. Were there any other deputy chiefs or assistant chiefs at the meeting, if you can recall?

**A. Not that I recall.**

Q. Was there any other command staff at the meeting that you can recall?

**A. Well, you mean, like, commanders?**

Q. Yes.

**A. Because when you say "command staff," that**

**means commanders and above.**

**No. I don't recall any command staff there.**

Q. After Chief Scott left, was there any other conversation during that meeting about his comments, specifically the promotion rounds and what the criteria was that he was looking at?

**A. The conversations that I can remember engaging in with different people is, "I can't believe he said that," and "How are we supposed to have any faith in this promotional process?"**

Q. Did anyone, do you recall, say that night that that would be illegal to make a decision based on race or gender?

**A. I can't recall that word being used, but it wouldn't surprise me if it was.**

Q. Was there any other conversation -- strike that.

After Chief Scott left, what else was on the agenda, if you recall?

**A. Just the normal things for the POA: What we're spending our money on; our legal defense stuff; going into the next year, what we're going to concentrate on. Just internal POA things.**

Q. And during any of those topics of conversation, did this issue come up again?

**A. No, because they were -- they were talking about POA issues.**

Q. And I want to be clear. To the extent that you can recall what Chief Scott's words were, is it correct to say that you believe he said he considers race and gender when he's making promotions?

**A. Yes. That's what I took from it.**

Q. And I guess my question is, I understand that's what you took from it. Do you recall specifically what he said?

**A. "Race and gender."**

Q. And what other words in connection with that? Let me ask you differently: He did not say that he makes decisions based on race and gender; is that correct?

**A. Correct. It was one of the things he considers when making appointments.**

Q. And he did not say that he -- whom -- which round or what rank or what individual he considered those factors for; is that correct?

**A. Well, we're talking about the first round, because this was November of 2017. So we can say for sure it's the first round. Now, individuals? Obviously, he didn't mention anybody individually. But we were all upset at the captains, lieutenants and**

**sergeants.**

Q. But he, I guess -- First, I just want to clarify. He did not talk about a specific rank; correct?

**A. The topic of conversation was the promotional process and the promotions that were just made, because there was quite a bit of anger amongst the membership, for specifically the lieutenant round and the sergeants, because you've got to understand, there were a lot more sergeant candidates in this pool that were skipped over.**

**So because so many of the sergeant candidates were skipped over, there was more anger with that. There was anger with the lieutenants list, but we're a smaller list, if you understand what I'm saying.**

Q. I think I do.

In terms of -- strike that.

Oh. Were you present for the dep- -- when Chief Scott testified in this case?

**A. Yes. I was at both depositions.**

Q. And did you hear his explanation for what he believes he said at that meeting?

**A. I'm sure I heard it, but I can't recall what his explanation was.**

Q. Okay. If Chief Scott says that he did not use those words or did not use those words to intend that

that is something he was relying on, race or general, to make decisions, would you believe that explanation?

**A. No. I believe what I heard. I believe my own ears.**

Q. I think it's a little -- What I'm asking is a little bit different. I understand your answer.

What I'm saying is that, if Chief Scott explained that he did not intend to convey that he relied on race and gender to make promotional decisions, would you believe that explanation?

**A. No.**

Q. And why not?

**A. I believe that he is trying to explain away what his actions were. I believe on -- in November he was being candid and telling the truth to the membership that he uses race and gender as one of the components in making his promotional decisions. It makes sense to me that in November of 2017 perhaps he believed that he was okay in doing that and that was quite proper to do that. Now he's trying to explain away when he's being held to answer for his actions.**

**So no, I don't believe him.**

Q. Do you -- Is it -- Would you agree that it's possible that he simply misspoke?

**A. I don't think so. I think he was being very**

MR. COWNAN: That's it. No questions. No more.

MR. MULLANAX: Okay. I have no more questions.

MR. COWNAN: We are done, sir.

THE REPORTER: Mr. Mullanax, do you want a copy of this transcript?

MR. MULLANAX: Yes, ma'am.

(Whereupon, the deposition was concluded at 5:58 p.m.)

____________________________________

CLAYTON HARMSTON



STATE OF CALIFORNIA ) SS.

I do hereby certify that the witness in the foregoing deposition was by me duly sworn to testify to the truth, the whole truth, and nothing but the truth in the within-entitled cause; that said deposition was taken at the time and place therein stated; that the testimony of the said witness was reported by me, a certified shorthand reporter and disinterested person, and was under my supervision thereafter transcribed into typewriting, and when so transcribed was carefully read to or by the said witness, and, being in every desire, was thereafter by the said witness duly subscribed; that if unsigned by the witness, signature has been waived in accordance with stipulation between counsel for the respective parties.

And I further certify that I am not of counsel or attorney for either or any of the parties to said deposition nor in any way interested in the outcome of the cause named in said caption.

IN WITNESS WHEREOF, I have hereunto set my hand this 18th day of January, 2022.

____________________________________

CLARE MACY, Certified Shorthand Reporter