# EXHIBIT J

## Page 1

```
 1            UNITED STATES DISTRICT COURT
 2                     FOR THE
 3            NORTHERN DISTRICT OF CALIFORNIA
 4
 5   FREDERICK (RIC) SCHIFF, et al.,
 6        Plaintiff,
 7        vs.              No. 4:19-cv-03260-YGR
 8   CITY and COUNTY of
     SAN FRANCISCO, et al.,
 9
          Defendant.
10   _____
11
12
13
14               * CONFIDENTIAL *
15        VIDEOCONFERENCE DEPOSITION OF
16                ANTHONY MONTOYA
17            Friday, January 7, 2022
18            2:01 p.m. - 2:44 p.m.
19                  Volume 1
20
21
22
23
24       JODI L. BOSETTI, CSR No. 11316, RPR
25
```

## Page 2

```
 1            APPEARANCES OF COUNSEL
 2
 3   For Plaintiffs Frederick (Ric) Schiff, et al.:
 4       M GREG MULLANAX LAW OFFICE
         BY:  M. GREG MULLANAX
 5       Attorney at Law
         2140 N. Winery Avenue, Suite 101
 6       Fresno, California 93703
         (559) 420-1222
 7       greg@lawmgm.com
 8
 9   For Defendant City and County of San Francisco:
10       OFFICE OF CITY ATTORNEY DENNIS HERRERA
         BY:  PETER A. COWAN
11       Deputy City Attorney
         1390 Market Street, 5th Floor
12       San Francisco, California 94102
         (415) 554-4700
13       peter.cownan@sfcityatty.org
14
15   For San Francisco POA:
16       RAINS LUCIA STERN ST. PHALLE & SILVER, PC
         BY:  ROCKNE A. LUCIA, JR.
17       Attorney at Law
         2300 Contra Costa Boulevard, Suite 500
18       Pleasant Hill, California 94523
         (925) 609-1699
19       rlucia@rlslawyers.com
20
21   Also Present:
22       RIC SCHIFF
         DAN KELLY
23       CLAYTON HARMSTON
         DAVID O'KEEFE
24
25
```

## Page 3

```
 1                     INDEX
 2
 3   WITNESS                         EXAMINATION
 4   ANTHONY MONTOYA
     Volume 1
 5
 6
 7        BY MR. MULLANAX              4, 33
 8        BY MR. COWNAN                 20
 9
10                   EXHIBITS
11   DEPOSITION                         PAGE
12   Exhibit A   First three pages of the POA   20
                 Journal from December of 2017
13
     Exhibit 2   Article written by Anthony Montoya   33
14               in the December 2019 POA Journal
15
16
17
18
19
20
21
22
23
24
25
```

## Page 4

```
 1   Videoconference, Friday, January 7, 2022
 2        2:01 p.m. - 2:44 p.m.
 3
 4        ANTHONY MONTOYA,
 5   having been administered an oath, was examined and
 6   testified as follows:
 7
 8             EXAMINATION
 9   BY MR. MULLANAX:
10      Q   Mr. Montoya, could you state your full name
11   for the record, please.
12      A   Yeah.  Anthony Michael Montoya,
13   M-O-N-T-O-Y-A.
14      Q   And you're currently employed by the San
15   Francisco Police Department, are you not?
16      A   Correct.
17      Q   And what is your current rank?
18      A   I'm a sergeant of police.
19      Q   Okay.  Sergeant Montoya, thank you for your
20   appearance here today.  I don't think we'll be here
21   very long, but I want to go over a couple of ground
22   rules with you before we get started.
23        My name is Greg Mullanax and I represent the
24   plaintiffs in this Schiff versus City and County of
25   San Francisco case regarding the promotions that were
```



ANTHONY MONTOYA Volume 1 Confidential                January 07, 2022
FREDERICK (RIC) SCHIFF vs SAN FRANCISCO                          5—8

---

Page 5

1 made back after Chief Scott got here, or maybe one of
2 them was before he got here, but from 2017, basically,
3 to 2019.
4        So we want to take your deposition.  And the
5 main thing to remember in your deposition today is
6 that your testimony today is under oath just as if you
7 were testifying in a court before a judge and a jury.
8 Do you understand that?
9    A  Yes.
10    Q  Okay.  And it looks like someone is trying to
11 connect.
12        And, also, Sergeant Montoya, if I ask a
13 question and you don't understand it, please let me
14 know and I'll be happy to reask it.  Do you agree to
15 do that?
16    A  Yes.
17    Q  Okay.  And also, in the deposition today, I
18 just want to find out what you know and I'm not going
19 to ask you to speculate or anything.  So if I ask you
20 a question that requires you to speculate or you don't
21 have any personal knowledge of it, just please let us
22 know.
23        And, also, if you want to take a break for
24 any reason, please let us know and we will stop and
25 take a break.  Is that okay?

---

Page 6

1    A  Yes.
2    Q  Okay.  First of all, I'll just ask you some
3 brief background.  When did you join the San Francisco
4 Police Department?
5    MR. LUCIA:  Hold on.  There's somebody on the
6 call and I don't know who that is.  Could we just
7 figure that out?
8    MR. MULLANAX:  Sure.
9    MR. LUCIA:  It says "iPhone."
10    MR. COWNAN:  That's Ric Schiff.
11    MR. LUCIA:  Oh, is it.  Okay.  All right.
12    MR. MULLANAX:  Is that everybody, Clayton and
13 Ric?
14    MR. COWNAN:  Yeah.
15 BY MR. MULLANAX:
16    Q  Sergeant Montoya, I was going to ask you,
17 when did you first start with the San Francisco Police
18 Department?
19    A  September of 1994.
20    Q  And have you been with the police department
21 ever since?
22    A  Yes.
23    Q  And are you currently the president of the
24 San Francisco Police Officers Association?
25    A  Yes.

---

Page 7

1    Q  And we'll call it the SFPOA.  But what is the
2 SFPOA?
3    A  It is the union that represents the rank and
4 file members of the San Francisco Police Department.
5 We represent officers all the way up to the rank of
6 captain.
7    Q  Okay.  And then when did you become president
8 of the POA?
9    A  February of 2018.
10    Q  And did you have a leadership position in the
11 POA back in November of 2017?
12    A  Yes.
13    Q  And what was that position?
14    A  I was the vice president.
15    Q  Okay.  I'm going to ask you a little bit
16 about your duties.  What are your duties with the POA
17 in your position when you were vice president?
18    A  Really to kind of assist the president in the
19 day-to-day operations.  The vice president doesn't
20 have full-time release like a president does, so I
21 maintained my patrol duties within the police
22 department.  So I was kind of a conduit from patrol to
23 the president and back and forth.
24    Q  Okay.  And in your position as president,
25 what are your duties?

---

Page 8

1    A  As president, I'm responsible for the
2 day-to-day operations of the association, supervising
3 and monitoring POA staff, attending meet and confers
4 with the City, just all kinds of general union duties
5 are my position.
6    Q  Now, is that a full-time position?
7    A  Yes, I have a full-time release from the
8 police department to the association.
9    Q  Okay.  Now, back in -- I want to take your
10 attention back to 2017.  Around January 2017, is it
11 your recollection that was about the time that Chief
12 Scott was appointed chief of the San Francisco Police
13 Department?
14    A  Yeah, I believe he was named chief in
15 January, but didn't like take over until March, I
16 believe --
17    Q  Okay.
18    A  -- something like that.
19    Q  And we're here on the promotional cases.  And
20 they're around the promotions of, I think, sergeants
21 and lieutenants back in November or October of 2017.
22 Do you recall those rounds of promotions?
23    A  I recall promotions were made.  I couldn't
24 tell you what the exact timelines were.
25    Q  Okay.  There was a meeting.  What I want to

---



**Page 9**

1 get to eventually is the meeting that the POA had on
2 November 16th, 2017, at the Irish Cultural Center, and
3 it was a meeting in which Chief Scott appeared. Do
4 you recall that meeting?
5    A Yes.
6    Q And was that a general membership meeting?
7    A Yes.
8    Q Do you recall Chief Scott appearing at the
9 meeting?
10    A Yes.
11    Q And were promotions one of the issues that
12 was going to be discussed at the meeting?
13    A Yes.
14    Q At the time of the meeting in November of
15 2017, were the promotions a hot topic around the POA
16 and members of the POA?
17    A Yes.
18    Q And why was that?
19    A To give a little context, I've never seen a
20 promotional process that wasn't emotional or
21 controversial on some level. But what was most
22 strikingly different about this one was what we would
23 call "first-day appointments," meaning the first batch
24 of members to get promoted. We've never seen that
25 much, I'll call it, jumping around. Typically on what

**Page 10**

1 I call first-day appointments, we really have seen
2 past chiefs kind of promote people in rank order. So
3 let's say you have 50 positions, you would typically
4 take the first 50 candidates, barring an exceptional
5 reason why somebody should be disqualified, and then
6 throughout the life of the list is when you would see
7 the chiefs kind of use their discretion to maybe jump
8 around a little bit with promotions.
9    Q Was that the way it was -- I think the
10 predecessor before Chief Scott was Chief Greg Suhr; is
11 that correct?
12    A Yeah, I think Toney Chaplain was the intern
13 chief --
14    Q Oh, that's right.
15    A -- prior to Bill Scott coming. But Greg Suhr
16 was the full-time chief, the regular chief prior to
17 his departure around May of 2016.
18    Q Now, were the promotions that you just
19 described, that you said that had been kind of
20 traditionally held, was that the way they were done
21 under Chief Suhr?
22    A Yes.
23    Q Okay.
24    MR. COWNAN: I'm just going to interject for the
25 record that a couple of questions ago Plaintiff Dan

**Page 11**

1 Kelly signed on to the deposition. That's all.
2    MR. MULLANAX: Can I take one second? I will be
3 right back.
4    MR. COWNAN: Let's go off the record.
5    (Recess.)
6    MR. MULLANAX: And I forgot if I had a question
7 pending or not.
8    MR. COWNAN: You did not.
9 BY MR. MULLANAX:
10    Q So did you have any discussions with
11 Chief Scott, prior to the POA meeting in November of
12 2017, about the promotional issue?
13    A Not that I can remember.
14    MR. MULLANAX: Now I'm going to show you, I
15 guess, what we'll mark as Exhibit 1. I'm going to
16 share the screen.
17 BY MR. MULLANAX:
18    Q Can you see this? I'm going to go to the
19 first page of it. Can you see this --
20    A Yes.
21    Q -- here on the screen? I don't know how
22 clear it's showing up on your screen, but it's the
23 first three pages of the POA journal from December of
24 2017. Do you recognize that as being the case?
25    A Yeah. The only thing I see is the front

**Page 12**

1 page, which is usually dedicated to the president's
2 message.
3    Q Right. And then if I scroll down, on page 2,
4 it starts the minutes of the membership meeting on
5 November 16th of 2017. Can you see that?
6    A Yes.
7    Q And then I'll just scroll down just so you
8 can see the whole exhibit. It goes down to the end of
9 page 3. And you can see where it is submitted by Rick
10 Andreotti, who was the secretary at the time. Do you
11 see that?
12    A Yes.
13    Q Okay. I'm going go back up to page 2 of the
14 thing. And I'm going to zero in on where the minutes
15 talk about the presentation by Chief Scott.
16    Now, first of all, do you recall, was he
17 invited to come to this meeting or did he ask to come
18 to this meeting?
19    A He was invited.
20    Q And does the chief typically appear at the
21 general membership meetings of the POA?
22    A I wouldn't say it's typical. You know, they
23 are invited. It depends on if there's a particular
24 issue we want them to discuss, the reason we would do
25 that. And chiefs have come to the regular board

ANTHONY MONTOYA Volume 1 Confidential                    January 07, 2022
FREDERICK (RIC) SCHIFF vs SAN FRANCISCO                  13—16

1  meetings, which typically is just smaller and just has
2  the board of directors.  But the general membership
3  meeting allows them to interact with probably the
4  largest group of members at a given time, due to the
5  fact that it's held in a larger location and is
6  usually attended by a good portion of the members.
7     Q   Okay.  And on here, if we scroll down on
8  page 2 we see "Promotions."  And it says, "Chief Scott
9  reminded members that he has an open-door policy for
10 anyone who did not get promoted and he stated that the
11 Rule of 10 will continue and that not everyone on the
12 promotional list will get promotions.  More promotions
13 will come in the future."
14        Do you remember Chief Scott saying this?
15    A   Something along those lines.  And in all
16 fairness, that's kind of his standard response when it
17 comes to promotions in general.  But I do remember him
18 saying stuff like that.  It reflects in the minutes
19 there.
20    Q   And you've heard him make similar statements
21 in other occasions?
22    A   Yes.
23    Q   Okay.  Then if we go to the last column on
24 page 2, it says "President Halloran."  Who is
25 President Halloran?

1     A   He's a retired sergeant inspector, Marty
2  Halloran, who was my predecessor.
3     Q   And so it says, "President Halloran asked the
4  chief to explain the Rule of 10 and how he picked one
5  promotional candidate over another.  Chief Scott
6  explained the Rule of 10.  In summary, he can look at
7  candidates nine above the number of open positions.
8  Deputy chiefs reviewed all candidates' secondary
9  criteria and determined if a candidate was eligible or
10 not eligible for promotion.  The chief then looks at
11 the needs of the department.  He determines the
12 diversity of experience, diversity of race, diversity
13 of sex, and diversity of culture in determining who he
14 selects."
15        Now, do you remember the chief making these
16 comments?
17    A   I don't remember him making those comments
18 verbatim.  What I do remember and what kind of caught
19 me off guard was his reference to using race and
20 gender as criteria when making selections for
21 promotions.
22    Q   And when you heard the chief say that, was
23 that an unambiguous statement that he made about that?
24    MR. COWNAN:  Vague and ambiguous.
25    MR. MULLANAX:  I'm sorry?

1     MR. COWNAN:  Just an objection.  Vague and
2  ambiguous.
3     MR. MULLANAX:  Okay.
4  BY MR. MULLANAX:
5     Q   You can answer.
6     A   Yeah, like I said, I don't remember what he
7  said verbatim.  Like I said, to put things in context,
8  you know, this is large general membership meeting.
9  You know, we try to do our best to maintain quiet in
10 the audience when we have somebody speaking, but when
11 the chief made comments, what really caught my
12 attention was when he referred to his comments about
13 race and gender as being criteria when determining who
14 to promote or who not to promote.
15    Q   What was your reaction to that statement?
16    A   I was in disbelief.  You know, I actually
17 looked over at our then general counsel, Greg Adam,
18 who was sitting next to me at the table.  And we kind
19 of looked at each other like, to make sure we heard
20 the same thing, because it just really, it caught me
21 off guard.  And I wanted to kind of confirm with
22 somebody else that I just heard what I thought the
23 chief said.  And by the expression on Greg Adam's
24 face, it appeared that we heard the same thing or
25 we -- yeah, we pretty much heard the same thing.

1     Q   Did you talk to anybody else that night who
2  was at the meeting about this statement that
3  Chief Scott made?
4     A   I don't remember.
5     Q   I don't know if I can ask you.  Did you
6  ask -- if he was the POA attorney, I don't know if
7  it's a privileged issue.  But did you ask him if he
8  heard the same thing?
9     MR. COWNAN:  Rocky, you're on mute.
10    MR. LUCIA:  Yes, thank you, Peter.  I'm going to
11 object to that.  I'd have to consult with Tony to find
12 out what communication he had, what was said, because
13 he is general counsel and was general counsel.
14    MR. MULLANAX:  I'll withdraw the question.
15    MR. LUCIA:  Okay.
16    MR. MULLANAX:  I'll just withdraw the question.
17 BY MR. MULLANAX:
18    Q   What did you do after hearing the statement.
19 I mean, did you ever contact Chief Scott about it or
20 anyone else regarding the statement he made about race
21 and gender?
22    A   You know, I don't remember.  You know, I --
23 yeah, I would have to speculate, so I don't remember.
24    Q   I've seen you on a couple of news stories in
25 which you stated that you were at the meeting and you



Page 17

1 heard the chief say that.  In your mind, that's a true
2 statement; is that right?
3    MR. COWNAN:  I'm going to object.
4    THE WITNESS:  Yes.  Oh, sorry, Peter.
5    MR. COWNAN:  The answer is "Yes."  Belatedly I'm
6 going to object to the form of the question to the
7 extent it assumes facts.
8 BY MR. MULLANAX:
9    Q  Okay.  Let me ask you this.  Do you recall
10 being interviewed by the news media about the
11 promotional process?
12    A  I believe I was interviewed by several
13 newspapers around the time.
14    Q  And do you recall telling them that you heard
15 Chief Scott say that he used race and gender in making
16 promotional decisions?
17    A  Yes.
18    Q  Okay.  You don't recall talking to anybody
19 that night at the meeting about Chief Scott's
20 comments?
21    A  I don't remember.
22    Q  Okay.  Then I believe later the POA, through
23 their counsel, wrote Chief Scott a letter asking about
24 the promotional process.  Did you all start
25 discussions about that or did anything ever flow from

Page 18

1 this, him making these statements regarding
2 promotions?
3    MR. LUCIA:  I'm going to object only if the
4 question is addressed to him and is trying to elicit
5 responses regarding privileged communications.  So if
6 you're asking him for his recollection about
7 communications that wouldn't be privileged, i.e.
8 between him and legal counsel, that's one thing, but I
9 wouldn't want him to be testifying about privileged
10 communications.
11    MR. MULLANAX:  Actually, what I'm seeking is
12 communications between the POA and Chief Scott or
13 Chief Scott's office.
14    MR. LUCIA:  Okay.
15    THE WITNESS:  Could you ask the question again?
16 I'm sorry.
17 BY MR. MULLANAX:
18    Q  Yeah.  After the general membership meeting,
19 I believe there was a letter.  I think this might have
20 been where the confusion arose.  I think POA counsel
21 had written a letter that, as far as I know, was not
22 privileged, but it was written either directly to
23 either DHR or Chief Scott asking about the promotional
24 process in terms of race and gender being used.  I was
25 just wondering if you all ever had a dialogue with the

Page 19

1 chief or his staff about that issue?
2    A  Yeah, I personally didn't.  And, like I said,
3 just to put things into context, you know, it's kind
4 of been the chief's policy that most of those
5 communications would have occurred directly with the
6 president, President Halloran at the time.  So I would
7 not have been part of any of those meetings or
8 conversations they had because it's usually kept
9 between those two.  And when I succeeded President
10 Halloran, I used to meet with the chief one-on-one
11 every month, just the two of us, nobody else.  Those
12 meetings don't happen as often as they could.  And now
13 some of those meetings do occur with other executive
14 board members at them, but at that time, that wouldn't
15 have occurred.
16    Q  At the time we filed this lawsuit, I believe
17 it was in June of 2019, and my understanding is that
18 all of the promotion rounds since then have been
19 basically done in numerical order.  Is that your
20 understanding?
21    A  I would have to go back and look.  I do
22 believe that some candidates were still not promoted
23 in rank order, but I would have to go back and check
24 and see if there was anything I was aware of that
25 would disqualify somebody from getting promoted.

Page 20

1    MR. MULLANAX:  Okay.  I think that's all the
2 questions that I have.
3    MR. COWNAN:  Greg, can you just leave this up?
4    MR. MULLANAX:  Yes.
5    THE REPORTER:  Did you want this A or 1, because
6 in the last deposition you marked it A?
7    MR. MULLANAX:  I guess make it A.
8      (Deposition Exhibit A marked.)
9    MR. COWNAN:  And, Greg, just for the record,
10 Exhibit A to Mr. Montoya's deposition is the first
11 three pages of the December 2017 POA newsletter, but
12 only the first three pages.  It has highlighting that
13 I believe Counsel has added to it.
14    MR. MULLANAX:  That's correct.  And I can remove
15 it if you want me to.
16    MR. COWNAN:  No, not at all.
17      EXAMINATION
18 BY MR. COWNAN:
19    Q  Mr. Montoya, are you okay to continue for a
20 little bit longer?
21    A  Yes.
22    Q  You see Exhibit A in front of you, correct?
23    A  Yes.
24    MR. COWNAN:  Greg, actually, can you scroll down
25 just a little bit?



Page 37

1  MR. MULLANAX:  We're done.
2  MR. COWNAN:  Off the record.
3
4  (The deposition concluded at 2:44 p.m.)
5             --oOo--
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 39

1                    DEPOSITION ERRATA SHEET
2
3  Our Assignment No. J7782932
4  Case Caption:  Schiff vs. City and County of SF
5
6         DECLARATION UNDER PENALTY OF PERJURY
7
8         I declare under penalty of perjury that I
9  have read the entire transcript of my deposition taken
10  in the above-captioned matter or the same has been
11  read to me, and the same is true and accurate, save
12  and except for changes and/or corrections, if any, as
13  indicated by me on the DEPOSITION ERRATA SHEET
14  hereof, with the understanding that I offer these
15  changes as if still under oath.  Signed on the _____
16  day of  _____, 20___.
17
18  _____
19         ANTHONY MONTOYA
20
21
22
23
24
25

Page 38

1                 REPORTER'S CERTIFICATION
2
3         I, JODI L. BOSETTI, a Certified Shorthand
4  Reporter of the State of California, do hereby
5  certify:
6         That the foregoing proceedings were taken before
7  me at the time and place herein set forth; that any
8  witnesses in the foregoing proceedings, prior to
9  testifying, were duly sworn; that a record of the
10  proceedings was made by me using machine shorthand and
11  later transcribed into typewriting under my direction;
12  that the foregoing is a true record of the testimony
13  and proceedings taken at that time.
14         I further certify that I am not of counsel or
15  attorney for either or any of the parties to said
16  proceedings, nor in any way interested in the outcome
17  of the cause named in said caption.
18         IN WITNESS WHEREOF, I have this date subscribed
19  my name.
20  DATED:  January 24, 2022
21
22  _____
23
24  JODI L. BOSETTI, CSR No. 11316, RPR
25

Page 40

1                    DEPOSITION ERRATA SHEET
2
3  Page No._____Line No._____Change
4  to:_____
5  _____
6  Reason for
7  change:_____
8  Page No._____Line No._____Change
9  to:_____
10  _____
11  Reason for
12  change:_____
13  Page No._____Line No._____Change
14  to:_____
15  _____
16  Reason for
17  change:_____
18  Page No._____Line No._____Change
19  to:_____
20  _____
21  Reason for
22  change:_____
23  Page No._____Line No._____Change
24  to:_____
25  _____

