EXHIBIT L

MICHAEL REDMOND
SCHIFF V CITY OF SAN FRANCISCO

September 27, 2021
1—4

---

**Page 1**

```
1                    UNITED STATES DISTRICT COURT
2                   NORTHERN DISTRICT OF CALIFORNIA
3
   Frederick (Ric) Schiff; Glenn
4  Brakel; Alice Dicroce; Joseph
   Emanuel; Brian Greer; Clayton
5  Harmston; Steven Haskell; Micah
   Hope; Daniel Kelly; Alexander
6  Lentz; Brandon McKelley; Gerald
   Newbeck; David O'Keeffe;
7  Christopher Ritter; Steven
   Uang; and Thomas Walsh,
8
            Plaintiffs,
9
        vs.                    Case No.
10                             4:19-cv-03260-YGR
11 City and County of San Francisco;
   Greg Suhr, individually; William
12 (Bill) Scott, individually; and
   DOES 1-20,
13
            Defendants.
14 _____
15
16           REMOTE DEPOSITION OF
17             MICHAEL REDMOND
18    CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER
19            September 27, 2021
20                9:04 a.m.
21           San Francisco, California
22
23 REPORTED BY:
24 Michelle D. Knowles, CSR No. 8979, RPR, CRR, CRC, CCRR
25 APPEARING REMOTELY FROM SANTA CLARA COUNTY, CALIFORNIA
```

---

**Page 2**

```
1                   APPEARANCES OF COUNSEL
2  For Plaintiffs:
3       LAW OFFICE OF M. GREG MULLANAX
        M. GREG MULLANAX, ESQ. (via videoconference)
4       2140 N. Winery Avenue
        Suite 101
5       Fresno, California 93703
        559.420.1222
6       greg@lawmgm.com
7
8  For Defendants:
9       OFFICE OF THE CITY ATTORNEY
        PETER A. COWNAN, ESQ. (via videoconference)
10      CAROLINE PAGE, ESQ. (via videoconference)
        1390 Market Street
11      Fifth Floor
        San Francisco, California 94102
12      415.554.3800
        peter.cownan@sfcityatty.org
13      caroline.page@sfcityatty.org
14
15 Also Present:
16      FREDERICK (RIC) SCHIFF (via videoconference)
        ALICE DICROCE (via videoconference)
17      MICAH HOPE (via videoconference)
        GERALD NEWBECK (via videoconference)
18
19
20
21
22
23
24
25
```

---

**Page 3**

```
1              INDEX TO EXAMINATION
2
3  WITNESS:  MICHAEL REDMOND
4  EXAMINATION                              PAGE
5      BY MR. MULLANAX.....................    5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

---

**Page 4**

```
1               INDEX TO EXHIBITS
2
3  EXHIBIT           DESCRIPTION              MARKED
4  Exhibit 1  Q-50 Secondary Criteria
              Recommendations
5             (CCSF 008624 - CCSF 008636)        16
6  Exhibit 2  Q-60 Secondary Criteria
              Recommendations
7             (CCSF 008756 - CCSF 008760)        27
8  Exhibit 3  Q-80 Captains Secondary Criteria
              Recommendations
9             (CCSF 008822 - CCSF 008823)        36
10 Exhibit 4  Q-50 Sergeants Secondary Criteria
              Recommendations
11            (CCSF 020781 - CCSF 020788)        39
12 Exhibit 5  Q-60 Lieutenant Secondary Criteria
              Recommendations
13            (CCSF 020829 - CCSF 020833)        50
14 Exhibit 6  Q-80 Captain Secondary Criteria
              Recommendations
15            (CCSF 020859)                      51
16 Exhibit 7  Email thread with the subject "Re:
              completed - Lieutenant secondary
17            review"
              (CCSF 030514 - CCSF 030515)        54
18
19
20
21
22
23
24
25
```


π Exhibit L - Page 1 of 12

MICHAEL REDMOND
SCHIFF V CITY OF SAN FRANCISCO

September 27, 2021
5–8

Page 5

1           MICHAEL REDMOND,

2   having been first duly sworn, was examined and testified

3   as follows:

4           EXAMINATION

5   BY MR. MULLANAX:

6       Q.   Okay.  I guess we're ready to proceed.

7           Chief Redmond, my name is Greg Mullanax, and I

8   represent the plaintiffs in this case; and we're here to

9   take your deposition today.  And I have a couple

10  questions to ask before we really get started.

11          Have you ever been deposed before?

12      A.   Yes, I have.

13      Q.   Do you remember how many times you've been

14  deposed?

15      A.   Twice.

16      Q.   Okay.  I'm sure this deposition will be very

17  similar to the other ones you've experienced.  We're just

18  here today to find out what you know about the facts of

19  this case.  And so it's important that if -- if I ask you

20  a question and you don't understand it, please let me

21  know, and I'll be happy to reask it.

22          Do you understand that?

23      A.   Yes.

24      Q.   Okay.  And if you need to take a break for any

25  reason, just let us know; and we'll take a break.  So

Page 6

1   we're not -- hopefully, I don't think we'll be here that

2   long today.  But if you do want to take a break, just let

3   us know; and we'll be happy to take a break at any time.

4       A.   Okay.

5       Q.   And have you -- and you realize your testimony

6   today is under oath just as if you were testifying in

7   court before a judge and a jury?

8       A.   Yes.

9       Q.   Okay.  Did you review any documents in

10  preparation for your testimony today?

11      A.   I reviewed some of our department bulletins in

12  regards to promotions as well as my assignment sheet just

13  to see where I was at over the last couple of years in

14  different assignments.

15      Q.   Okay.  Now, you're listed -- I just want to

16  get into a little bit of your background for the record.

17          What is -- when were you hired by the SFPD?

18      A.   I started the academy in November of 1994.

19      Q.   Okay.  And what was your first assignment with

20  the police department?

21      A.   My field training assignment was Tenderloin

22  Police Station.

23      Q.   Okay.  And, at some point, did you become a

24  patrol officer?

25      A.   Yes.  Once I graduated the academy, finished

Page 7

1   field training, that's when I was a patrol officer.

2   First assignment, Tenderloin.

3       Q.   Okay.  And how long were you in that position?

4       A.   So field training, about -- I think it was

5   about 12 weeks, and then you moved on to probationary

6   period.  And then I was transferred to Potrero Station

7   for one year -- a little over one year where I did my

8   probation.

9       Q.   Okay.  How long were you at the Potrero

10  Station?

11      A.   I was at Potrero for about 12 to 14 months.

12      Q.   Where did you go after that?

13      A.   To Northern.

14      Q.   How long were you at Northern?

15      A.   Let's see.  I was at Northern for about

16  nine years.

17      Q.   And do you recall approximately what time

18  period that was?

19      A.   From 1996 to 2005.

20      Q.   Okay.  And when you were at Northern, were you

21  a patrol officer the whole time?

22      A.   Yes.

23      Q.   Okay.  What did you do after you left

24  Northern?

25      A.   I was promoted to sergeant, and I was

Page 8

1   transferred to Park Station.

2       Q.   And what year were you promoted to sergeant?

3       A.   2005.

4       Q.   Okay.  And how long were you at Park Station?

5       A.   I was at Park Station for approximately

6   13 months.  Back then, we did a probationary period

7   similar to an officer; so a little over one year.

8       Q.   And then where did you go?

9       A.   I went to Ingleside Station.

10      Q.   How long were you at Ingleside?

11      A.   I was at Ingleside for a little over three

12  years.

13      Q.   And were you a sergeant the whole time you

14  were assigned to Ingleside?

15      A.   Yes.

16      Q.   Okay.  And, at some point, were you promoted

17  to lieutenant?

18      A.   Yeah.  In 2009, I was promoted to lieutenant.

19      Q.   And were you still at Ingleside, or did you

20  transfer somewhere else?

21      A.   I transferred to Bayview Station.

22      Q.   Okay.  How long were you at Bayview Station?

23      A.   I was at Bayview until about 2012.

24      Q.   And then what happened?

25      A.   Then I was transferred as a lieutenant to the



MICHAEL REDMOND
SCHIFF V CITY OF SAN FRANCISCO

September 27, 2021
9–12

Page 9

1 academy.
2     Q.  Okay.  And what did you do at the academy?
3     A.  I was a lieutenant in charge of the day-to-day
4 operations of some of the training as well as the recruit
5 classes.
6     Q.  Let me -- I apologize for this.  I want to
7 jump back.
8     When you were hired back in 1994, do you
9 recall who the police chief was at the time?
10     A.  I believe it was Tony Ribera, Chief Ribera.
11     Q.  Okay.  And so how long were you at the
12 academy?
13     MR. COWNAN:  Which time, Greg?
14     MR. MULLANAX:  Oh, I guess when he was
15 lieutenant.
16     THE WITNESS:  I believe it was about six to
17 eight months.  It's not on the sheet here, but...
18 BY MR. MULLANAX:
19     Q.  And -- and what did you do after that?
20     A.  I was promoted to captain.  I became the
21 captain of Southern Police Station.
22     Q.  And do you recall what year that was?
23     A.  It was either the end of 2012, beginning of
24 2013.
25     Q.  And how long were you a captain?

Page 10

1     A.  For about a year and a half.
2     Q.  And did you get promoted after that?
3     A.  Yeah.  I was promoted to commander.
4     Q.  So was that -- when you were promoted to
5 commander, was that in about 2014 or '15?
6     A.  Yeah.  It was June of 2014.
7     Q.  And when you were the commander, where were
8 you assigned at that point?
9     A.  I had the Metro Division, which was a
10 patrol -- field operations bureau; and Metro Division
11 consisted of five -- I oversaw five district stations.
12     Q.  And how long were you in that position?
13     A.  For about a -- about a year.
14     Q.  And then were you promoted at that point?
15     A.  Yeah.  I was promoted to deputy chief.
16     Q.  And how long were you deputy chief?
17     A.  For about four years.
18     Q.  And you were at special operations bureau at
19 that point?
20     A.  I started -- yeah.  I started in field
21 operations bureau and then was transferred to special
22 op- -- two assignments.  Special operations bureau was my
23 last assignment as a deputy chief.
24     Q.  Okay.  And then you were promoted to your --
25 assistant chief, the title you currently hold; is that

Page 11

1 correct?
2     A.  Correct.
3     Q.  When was that promotion?
4     A.  September of 2019, I believe.
5     Q.  And so Chief Scott, he made that promotion; is
6 that correct?
7     A.  Correct.
8     Q.  And currently is he your direct supervisor,
9 Chief Scott?
10     A.  Yes.
11     Q.  And what are your current duties as assistant
12 chief?
13     A.  So I oversee four bureaus.  I have four deputy
14 chiefs that work for me:  One at the airport; one in
15 field operations, which is our ten district stations;
16 investigations bureau, which is all of our investigative
17 units; and special operations bureau, which houses our
18 operations center, tactical team, homeland security, the
19 motorcycle units, all the support units of patrol.
20     Q.  And are you involved in the promotional
21 process?
22     A.  Yes.
23     Q.  What's your -- how are you involved in the
24 promotional process?
25     Well, can I clarify that?  I didn't give you a

Page 12

1 time frame.
2     Let me just give you just some background
3 about our case.  We have -- our case alleges -- we have
4 problems with the promotional process, essentially,
5 starting in October of 2017.  I think that was the first
6 round of sergeant promotions and lieutenant promotions.
7     And in 2017, you were still deputy chief; is
8 that correct?
9     A.  Yes.
10     Q.  And were you involved in the promotional
11 process back in October of 2017?
12     A.  Yes.
13     Q.  What was your involvement in the promotional
14 process back in 2017?
15     A.  So I would have been part of -- as a deputy
16 chief, part of the secondary criteria review.
17     Q.  What do you mean by "secondary criteria
18 review"?
19     A.  So through the promotional process, we have --
20 where the candidates submit their secondary criteria,
21 which is similar to a résumé.  And there's a panel of
22 assistant chiefs and deputy chiefs that sit and review
23 the packets and would give a recommendation to the chief
24 of police whether the person was qualified to hire or not
25 qualified.



MICHAEL REDMOND
SCHIFF V CITY OF SAN FRANCISCO

September 27, 2021
13—16

**Page 13**

1      Q.   Now, did you actually get all the secondary
2   criteria packets submitted by each promotional candidate?
3           MR. COWNAN:  Object to the form.
4           Do you mean, like, did he physically get a
5   copy of them?
6           MR. MULLANAX:  Yes.
7      Q.   In other words, the things that they submitted
8   for their secondary criteria packet, did the --
9   Chief Redmond, did you actually get copies of those?
10   Does that make sense?
11           MR. COWNAN:  Chief, if you understand the
12   question, you can answer it.
13           THE WITNESS:  Yeah.  So we don't get copies,
14   but we do get the physical packet.  It is passed to each
15   person on the board to review.
16   BY MR. MULLANAX:
17      Q.   So you would review the packet, then transfer
18   it to the next person who is going to review it?
19      A.   Correct.
20      Q.   And then based on that information, then you
21   make a recommendation to the chief; is that correct?
22      A.   Yes.
23      Q.   And it's -- is it up to the chief to make the
24   decision on the promotional -- well, let me ask that
25   again.

**Page 14**

1           Is it up to the chief to make the promotional
2   decisions?
3           MR. COWNAN:  I'm going to object to the point
4   that it calls for speculation.
5           But, Chief, to the extent you understand that,
6   please answer.
7           THE WITNESS:  Yes, it is up to the chief.
8   BY MR. MULLANAX:
9      Q.   Okay.  And, Chief Redmond, if -- when I'm
10   asking questions, I don't want you to speculate at all.
11   None of us do.  If I ask you a question and you don't
12   know the answer or you have no personal knowledge, just
13   let us know.
14      A.   Okay.
15      Q.   Okay.  Now, the -- do you make comments on --
16   do you ever talk to the chief during the promotional
17   process -- like, let's talk about the 2017 time period.
18           My understanding is that Chief Scott was sworn
19   in as the police chief back in January of 2017.
20           Is that your recollection?
21      A.   Yes, I believe so.
22      Q.   So, in your involvement in the promotional
23   process in 2017, did you ever have any conversations with
24   Chief Scott about any of the candidates?
25      A.   No.

**Page 15**

1      Q.   Was there ever a general meeting between those
2   of you that were reviewing the secondary criteria and
3   Chief Scott about the promotions?
4      A.   No.
5      Q.   So you just submit your recommendations to the
6   chief, and that's the end of your involvement in the
7   promotional process?
8      A.   Yes.
9           MR. MULLANAX:  I'm going to pull up an exhibit
10   real quick.
11           You know, now I forgot.  Peter -- let's see.
12   Oh, here we go.  Let's see.
13           Can y'all see that document there?
14           MR. COWNAN:  We can.
15           MR. MULLANAX:  Okay.
16           MR. COWNAN:  Well, let me make sure because
17   it's irrelevant for me.
18           Chief Redmond, can you -- well, now we've lost
19   it, Greg.
20           MR. MULLANAX:  Oh, is it there?  I'm sorry.
21           MR. COWNAN:  We're seeing your entire screen,
22   your desktop.
23           MR. MULLANAX:  Okay.  Let me -- did that fix
24   it?
25           MR. COWNAN:  Correct, it did.

**Page 16**

1           MR. MULLANAX:  Okay.
2           MR. COWNAN:  Chief Redmond, can you see that
3   comment sheet in front of you?
4           THE WITNESS:  Yes.
5           MR. MULLANAX:  Okay.  This is a document --
6   it's -- I'll call it Exhibit 1, and it's CCSF 8624
7   through CCSF 8636.
8           (Exhibit 1 marked.)
9   BY MR. MULLANAX:
10      Q.   Do you recognize this document?
11      A.   Yes, I do.
12      Q.   And what is it?
13      A.   So this is a document that is provided to --
14   was provided to me in the secondary criteria review to
15   make my recommendations and to put any comments that I
16   would have about a candidate.
17      Q.   Now, on the ones, I think, on -- like, we can
18   look at the -- at the first page of it.
19           In rank number 2, there's some comments that
20   you wrote on the side.  I think it says, "Strong
21   candidate.  Has done some outstanding work."
22           Is that comment there based on your personal
23   knowledge?
24           MR. COWNAN:  Calls for a legal conclusion.
25           But you can answer, sir.



MICHAEL REDMOND
SCHIFF V CITY OF SAN FRANCISCO

September 27, 2021
29—32

Page 29

1  the secondary criteria and then passed them around?

2  A.  Yes.

3  Q.  Was Ben Houston involved in that meeting?

4  A.  I believe so, yes.

5  Q.  And do you recall if someone from the city

6  attorney's office was also available by phone or was

7  there in person?

8  A.  Yes.

9  Q.  Now, did you ever talk to Chief Scott about

10  the -- any of the promotions pertaining to this round of

11  lieutenants -- of the lieutenant promotions?

12  A.  No.

13  Q.  Have you ever talked to Chief Scott about

14  promotional decisions?

15  MR. COWNAN:  At what point in time, Greg?

16  MR. MULLANAX:  Let's say during 2017.

17  MR. COWNAN:  And before, during, after the

18  decisions?

19  MR. MULLANAX:  Yeah, before, during, or after.

20  THE WITNESS:  No.

21  BY MR. MULLANAX:

22  Q.  Now, were you involved in the promotional

23  process before Chief Scott became chief?

24  A.  Yes.

25  Q.  So you were involved in promotional decisions

Page 30

1  with Chief Greg Suhr; is that correct?

2  A.  Yes.

3  MR. MULLANAX:  And for the court reporter,

4  Suhr is S-u-h-r, I believe.

5  THE WITNESS:  Yes.

6  BY MR. MULLANAX:

7  Q.  Did you ever have -- during the promotional

8  process under Greg Suhr, did you ever have any

9  discussions with him about the promotional decisions?

10  A.  No.

11  Q.  So in your involvement with the promotional

12  process under two different chiefs, has the procedure

13  remained the same under both of them?

14  MR. COWNAN:  Object to it as to time.

15  But go ahead.

16  MR. MULLANAX:  Well, I can rephrase that.

17  Q.  Under -- you had promotional -- you were

18  involved in the promotional process under Chief Suhr; is

19  that correct?

20  A.  Yes.

21  Q.  And Chief Scott; that's correct?

22  A.  Yes.

23  Q.  Were you involved in the promotional process

24  with any other chief?

25  A.  No.

Page 31

1  Q.  So did the promotional process remain the same

2  under Chief Scott as it had been under Chief Suhr?

3  MR. COWNAN:  Object to form.

4  But you can answer the question.

5  THE WITNESS:  Can you repeat it, please?  I'm

6  sorry.

7  BY MR. MULLANAX:

8  Q.  Yes, sir.

9  Did -- the promotional process that you were

10  involved in under Chief Suhr, did it stay the same under

11  Chief Scott?

12  A.  Yes.

13  MR. MULLANAX:  Okay.  And just FYI, Ric Schiff

14  just showed up here.  So just to let you know, Peter and

15  Caroline, that he just walked into the room.

16  MR. COWNAN:  Okay.  No problem.  Thank you.

17  BY MR. MULLANAX:

18  Q.  Okay.  Did you -- after the promotional

19  process -- after the results were announced from the

20  lieutenants -- let's say the lieutenants promotional

21  round back in 2017, did you have any issues with the

22  promotional process at that point?

23  MR. COWNAN:  Overbroad.

24  But you can answer.

25  THE WITNESS:  Yes.

Page 32

1  BY MR. MULLANAX:

2  Q.  And what issues did you have with that

3  promotional process with the lieutenants?

4  MR. COWNAN:  Same objection.

5  But you can answer.

6  THE WITNESS:  I just -- I think it was very

7  frustrating, especially to a lot of the members that were

8  not picked up.  I think it was something, as a

9  department, we looked at.  The way choices were made

10  frustrated a lot of people.

11  But I think, ultimately, when you go into

12  promotions, it's very tough because the -- the Rule of

13  Ten and how many people are really -- it's almost like

14  the number situation went away from the department, and

15  things were looked at as a group.  So I -- I feel that

16  people were very frustrated with what happened.

17  BY MR. MULLANAX:

18  Q.  When you say "things were looked at as a

19  group," what do you mean by that?

20  A.  Well, I think just myself, being in this

21  department for a long time, sort of knew how the

22  promotional process went and how -- obviously, I went

23  through it.  But I think the -- the movement or the

24  amount of people that may have been skipped, especially

25  in the first or second page on a list, with the number of



MICHAEL REDMOND
SCHIFF V CITY OF SAN FRANCISCO

September 27, 2021
33–36

Page 33

1  jobs, it wasn't something that we were -- as a
2  department, something we had never seen before.
3      Q.  And how do you mean that, that you hadn't seen
4  before?
5      A.  Well, I think it's -- usually, in past
6  experience, it would be something of a discipline case
7  where somebody was skipped.  And I think members -- for
8  whatever reason, which I don't know, members were skipped
9  or not promoted due to other factors.
10     Q.  Do you think race had any part in that, in the
11  promotional decisions?
12     A.  I don't think so.
13     Q.  Do you think gender had any role in the
14  promotional decisions?
15     A.  No.
16     Q.  Did you hear complaints from officers about
17  the promotional process after the results were announced
18  in the lieutenants first round of promotions?
19     A.  Yes.
20     Q.  Did you hear complaints from some of the
21  candidates that they thought race and/or gender played a
22  part in the promotional decisions?
23     A.  I didn't have any direct conversations about
24  that, but I think that was one of the, sort of, thoughts
25  out there.

Page 34

1      Q.  Now, did Chief -- has Chief Scott ever told
2  you that race or gender played a role in him making
3  promotional decisions?
4      A.  No.
5      Q.  You mentioned the Rule of Ten earlier.
6      What is the Rule of Ten?
7      MR. COWNAN:  To the extent you know, sir.
8      THE WITNESS:  So the Rule of Ten is if
9  there's -- to what I know, if there's one job available,
10  there's ten scores that are -- ten scores that are in
11  play for that one job.  If there are two jobs, it moves
12  another score; and would move down the line depending on
13  how many requisitions or jobs are available.
14  BY MR. MULLANAX:
15     Q.  So if there are two jobs available, how far
16  down the list can you go?
17     MR. COWNAN:  Well, object to the extent it
18  calls for spec- -- Chief to speculate.
19     But, sir, you can answer if you know without
20  guessing.
21     THE WITNESS:  So it would go to Rank 11 or 12
22  is what I believe.
23  BY MR. MULLANAX:
24     Q.  Okay.  So, in your understanding, if you have
25  one job available, it would go from 1 to 10; is that

Page 35

1  correct?  I mean --
2      A.  Yeah.
3      Q.  Let me rephrase that.
4      If you have one job available, the chief,
5  under the Rule of Ten, could pick a candidate from 1 to
6  10 in rank; is that correct?
7      MR. COWNAN:  Same objection.
8      But you can answer.
9      THE WITNESS:  Yes, but there could be ties
10  within there; so it would even have more people because
11  of ties.
12  BY MR. MULLANAX:
13     Q.  Okay.  Did you ever hear any discussion about
14  the SFPD or Chief Scott wanting to enlarge the applicant
15  pool for some of these promotions?
16     MR. COWNAN:  At what point in time, sir --
17  Greg?
18     MR. MULLANAX:  Oh, let's say 2017 or 2018.
19     THE WITNESS:  No.
20  BY MR. MULLANAX:
21     Q.  Did you ever talk to Ben Houston about the
22  promotional process -- or let me rephrase that.
23     Did you ever talk to Ben Houston about the
24  lieutenants promotions in 2017?
25     A.  No.

Page 36

1      Q.  Have you ever talked to Ben Houston about any
2  results of a promotion around -- either regarding
3  sergeants or lieutenants?
4      A.  No.
5      MR. MULLANAX:  Now, I just pulled up a Q-80
6  Captains Secondary Criteria Recommendations.
7      Can y'all see that on the screen?
8      MR. COWNAN:  I can.
9      What about you, Chief Redmond?
10     THE WITNESS:  Yes.
11     MR. MULLANAX:  Okay.  And I'm going to mark
12  that as Exhibit 3.
13     (Exhibit 3 marked.)
14  BY MR. MULLANAX:
15     Q.  And that consists of pages CCSF 8822 through
16  CCSF 8823.
17     And do you recognize this document, Chief?
18     A.  Yes.
19     Q.  And what is it?
20     A.  So this is the secondary criteria for Q-80
21  captains for the 2017 round.
22     Q.  Okay.  My understanding is on the -- if I can
23  find my list here.  The first captains promotional round,
24  I believe, was in February of 2016.
25     Does that sound about right?



MICHAEL REDMOND
SCHIFF V CITY OF SAN FRANCISCO

September 27, 2021
41—44

Page 41

1   A.   Well, I think one of the -- well, I know
2   because after we saw the first round of promotions, I
3   felt that Chief Scott, being from -- not from this
4   department and coming in from the outside, didn't know a
5   lot of the candidates.  So I felt, just as one of --
6   being one of the people in secondary criteria, that there
7   needed to be more comments in regards to the candidates
8   for him to take a look at.
9       Q.   Because Chief Scott came from the LAPD; is
10  that correct?
11      A.   Yes.
12      Q.   And so when he started as chief of police in
13  the San Francisco in January of 2017, he had never had
14  any employment with the San Francisco Police Department
15  at that time; is that correct?
16      A.   Yes.
17      Q.   So in the -- so your decision to put more
18  detail in was to inform him because he was new to the
19  department; is that correct?
20      A.   Yes.
21      Q.   And your comments on here appear to relate
22  exactly to what you said.  The secondary criteria, you're
23  commenting on their ex- -- you know, their number of
24  years of experience and individual experience they have
25  with different things.

Page 42

1       Like, for example, if you look at page 2 --
2   let's go down to -- see, if we look on page 2 of
3   Exhibit 4, which is CCSF 20782, we can go down to
4   number 18, David O'Keeffe.  You note in there, "2016
5   incident/2018 received written reprimand for 2016 case."
6       And then if you go down to look at number 20,
7   Glenn Brakel, you wrote on here, "15 years of experience.
8   Former" -- is that "PBTF member"?
9       A.   Yeah.  That was a task force -- patrol bureau
10  task force that we had at the time.
11      Q.   Okay.  So, to your knowledge, does -- did the
12  chief -- in the 2017 and 2018 promotional process, did he
13  look at the secondary criteria packets, or do you know if
14  he just relied on your recommendations that the committee
15  gave him?
16      MR. COWNAN:  Object to the form.
17      You can answer, though, if you know.
18      THE WITNESS:  Yeah, I don't -- I do not know.
19  BY MR. MULLANAX:
20      Q.   Did you ever hear anything -- did anybody ever
21  tell you that Chief Scott did not look at the secondary
22  criteria packets or did look at the secondary criteria
23  packets?
24      A.   No.
25      Q.   Were there any issues -- well, let me ask

Page 43

1   this:  I think you said that there was a lot of
2   consternation amongst some of the officers after the 2017
3   promotions; is that correct?
4       A.   Yes.
5       Q.   Were there the same issues after the second
6   round of promotions in 2018?
7       A.   I believe so.
8       Q.   What kind of complaints did you hear about in
9   the 2018 promotions?
10      A.   The majority of the complaints were just in
11  regards to how -- how much skipping around was done in
12  the promotional process and the reasoning behind why
13  certain people did not get jobs and other people did.
14      Q.   Do you believe that any of those comments had
15  any credence?
16      MR. COWNAN:  Object to overbroad.
17      But you can answer if you understand.
18      THE WITNESS:  Yeah, could you repeat that?
19  I'm sorry.
20  BY MR. MULLANAX:
21      Q.   Yeah.
22      Those comments that you heard complaints about
23  the promotional process where it looked like there was
24  some jumping around going on, did you think that any of
25  those complaints had merit?

Page 44

1       MR. COWNAN:  Same objections.
2       But you can answer.
3       THE WITNESS:  Yeah.  I think in the history of
4   at least my involvement in promotions, there were people
5   in the department that were skipped that I have no reason
6   why they were skipped.
7   BY MR. MULLANAX:
8       Q.   Did you ever ask the chief about it?
9       A.   No.
10      Q.   Back in 2017, in November, Chief Scott made an
11  appearance at the POA meeting.
12      Did you go to that meeting?
13      A.   What -- there's a lot of POA meetings.  I
14  don't -- I don't recall if I was there or not.
15      Is there any other particular?
16      Q.   It was around Thanksgiving in 2017, and there
17  was a lot of complaints about the promotional process
18  that had just been -- where the promotions had been
19  announced in October of 2017.  And Chief Scott made an
20  appearance at the SFPOA meeting, and Chief Scott denied
21  saying this, but there were people at the meeting who
22  claim that Chief Scott said he used race and gender in
23  making promotional decisions.
24      Do you recall if you were at that meeting or
25  not?



MICHAEL REDMOND
SCHIFF V CITY OF SAN FRANCISCO

September 27, 2021
45–48

Page 45

1        MR. COWNAN:  Object to the form.  It assumes
2  facts.
3        But you can answer.  So the only question
4  right now is, do you remember if you were at that
5  meeting?
6        THE WITNESS:  No, I don't remember.
7  BY MR. MULLANAX:
8     Q.   Did you ever hear anybody say that they heard
9  Chief Scott say that he used race and gender in making
10  promotional decisions at a POA meeting?
11     A.   No.
12     Q.   Based on the results of the promotions in the
13  first two promotional rounds that we discussed, do you
14  believe, looking at the results of the promotions, that
15  race or gender played a part in those promotional
16  decisions?
17        MR. COWNAN:  I'm going to object to the form
18  and to the extent it asks for opinion testimony.
19        But you can answer.
20        THE WITNESS:  My opinion is there's probably a
21  lot of things that came into play during those
22  promotions.
23  BY MR. MULLANAX:
24     Q.   When you say "a lot of things," what do you
25  mean?

Page 46

1        MR. COWNAN:  Same -- same objections:
2  Foundation, speculation, opinion testimony.
3        But you can answer.
4        THE WITNESS:  I think the amount of people
5  that were skipped and the movement on the list, the rhyme
6  or reason behind it, I could not form an opinion that it
7  was just because of race and gender.
8  BY MR. MULLANAX:
9     Q.   Now, the promotional exams -- were you
10  involved in developing the promotional exams for the 2017
11  or 2018 promotions?
12     A.   No.
13     Q.   I guess they were given before -- let me --
14  I'm sorry.  Let me -- that was a bad question.
15        Were you involved in the development of the
16  testing materials for the -- for the promotional rounds
17  in 2017, 2018, 2019?
18     A.   No.
19     Q.   What is the purpose of the promotional exam?
20     A.   The purpose of the exam is to test the
21  candidate on what the subject matter experts feel is
22  relevant for that person to perform on the first day in
23  that particular job, whether it's a sergeant, lieutenant,
24  or captain.
25     Q.   So do you think it's -- and so the promotional

Page 47

1  exam consists of a written portion; is that correct?
2     A.   I believe, on these tests, there was a written
3  and an oral.  We have transitioned to some other tests
4  where there are full oral components, but they do have
5  somewhat of a written, I believe.
6     Q.   And so back in this time period that we're
7  talking about here, 2017, 2018, 2019, what -- how much
8  weight would you give the promotional exam scores, like
9  the rankings of the candidates, in making a promotional
10  decision?
11        MR. COWNAN:  You're asking when he makes a
12  recommendation?
13        MR. MULLANAX:  Well, I -- what I'm asking is
14  their rank -- after they take the exams, they get ranked
15  in order, and I'm wanting to know how much importance
16  should be placed on the ranking when the chief makes
17  promotional decisions.
18        MR. COWNAN:  In that case, I object on -- to
19  the form.  I object on speculation, foundation, and
20  impermissible hearsay testimony -- or opinion testimony.
21  Excuse me.
22        But, Chief, if you understand the question,
23  you can answer it.
24        THE WITNESS:  Okay.  I'm going to ask if you
25  could restate it for me real quick.  Sorry.

Page 48

1  BY MR. MULLANAX:
2     Q.   That's okay.
3        On the -- how much weight do you think the
4  rankings based on the promotional exam should be given
5  when making promotional decisions?
6        MR. COWNAN:  Same objections.
7        THE WITNESS:  I think the rankings on our
8  promotional tests are important and are -- should be
9  considered, obviously.  I think that has been one of the
10  challenges with this promotional process as it is now
11  because, usually, the ranking really gave somebody a
12  judge of when they're going to get promoted and not.  And
13  when we looked at it in prior instances, really the only
14  time a chief would not promote somebody was if there was
15  some kind of discipline or current discipline that the
16  candidate wouldn't get promoted.
17        So the Rule of Ten and the things that
18  happened in -- in this era really was something new to
19  the police department.
20  BY MR. MULLANAX:
21     Q.   Have -- have things changed in that regard
22  since these rounds of promotions that we've been talking
23  about?
24        MR. COWNAN:  Objection to the form.
25        You can answer if you understand.



Page 49

1       Actually, I'm sorry.  Greg, you've got to be
2   more specific.  I don't know what you're referring to
3   when you say, "Have things changed?"
4   BY MR. MULLANAX:
5       Q.  Well, has the promotional process changed
6   since these rounds that we're talking about in terms of
7   does it look like the promotions are being made more in
8   rank order than they were in 2017 to 2018?
9       MR. COWNAN:  Objection.  Compound.
10      But you can answer.
11      THE WITNESS:  The last -- the rules haven't
12  changed, but the last group of lieutenants and captains
13  were in rank order.
14  BY MR. MULLANAX:
15      Q.  Based on your experience in the police
16  department since 1994, do you think that's a better
17  result than what happened in 2017 and 2018 promotional
18  rounds?
19      MR. COWNAN:  Object to the form.  Object to
20  hearsay, speculation, and foundation.
21      You can answer.
22      Oh, excuse me.  Not hearsay.  I keep saying
23  hearsay; I mean opinion testimony.
24      You can answer.
25      THE WITNESS:  Yes, I believe it is better to

Page 50

1   do rank order.  But I also think that within the rank
2   order, we have to look at the totality of the candidate
3   and if they're there; and if there is a reason or -- for
4   somebody not to get into rank order, there should be a
5   legitimate reason.
6       MR. MULLANAX:  Okay.  I'm going to pull up one
7   more exhibit.
8       I'm sorry.  This one document, I don't know
9   where it went.  I think I've got it -- it will be a brief
10  one once I pull it up.
11      Okay.  I'm sorry about that.  I think we're on
12  Exhibit 5 now, and I'll mark as Exhibit 5 a document
13  that's five pages starting off with page CCSF 20829, and
14  it goes to CCSF 20833.
15      (Exhibit 5 marked.)
16  BY MR. MULLANAX:
17      Q.  Can you see this, Chief Redmond?
18      A.  Yes.
19      Q.  And what is this?
20      A.  So this is the Q-60 Lieutenant Secondary
21  Criteria Recommendations sheet that is filled out during
22  the secondary criteria process.
23      Q.  And is this the sheet that you filled out?
24      A.  Yes.
25      Q.  And is that your handwriting on it?

Page 51

1       A.  Yes, it is.
2       Q.  Okay.  And this -- I'm going back to page 1 of
3   Exhibit 5.
4       Does this appear to be the second round?  It
5   starts with Rank 17.
6       A.  I believe so.
7       MR. MULLANAX:  Okay.  And that's the
8   lieutenant.  Okay.
9       And I've got one more.  Let's see.  And I'm
10  going to show you here what I'm going to mark as
11  Exhibit 6.
12      (Exhibit 6 marked.)
13  BY MR. MULLANAX:
14      Q.  And I hope I haven't messed up the exhibits,
15  but it's a one-page document consisting of page
16  CCSF 20859.
17      Do you see this document?
18      A.  Yes.
19      Q.  And what is it?
20      A.  This is the Q-80 Captain Secondary Criteria
21  Recommendation form that we use in secondary criteria for
22  that round.
23      Q.  Okay.  And this -- does it appear to you to be
24  the 2018 -- from November 2018 captains promotion round?
25      MR. COWNAN:  Object to the extent it calls for

Page 52

1   the chief to speculate.
2       MR. MULLANAX:  Yeah, it's not dated.
3       Q.  Yeah, I don't want you to speculate, but it
4   just starts at Rank Number 17, and I didn't know if you
5   recognized that from the 2018 round.
6       A.  Yeah, I'm not sure.  I believe it was the last
7   round off that list of promotions just based on the rank
8   numbers that are there, sir.
9       Q.  Okay.  And is that your handwriting on there?
10      A.  Yes.
11      Q.  And you recall filling this form out?
12      A.  Yes.
13      Q.  Okay.  All right.  Now, do you know who Hector
14  Sainez?
15      A.  Yes.
16      Q.  And who is Hector Sainez?
17      A.  Hector was the assistant chief.  His position
18  was chief of staff, and he worked for -- directly for
19  Chief Scott.
20      Q.  So did you ever report to him?  I mean, was he
21  higher above you in the chain of command?
22      A.  Yes.
23      Q.  Okay.  And how long did you work under Hector
24  Sainez?
25      A.  So I never reported to him as the assistant



MICHAEL REDMOND
SCHIFF V CITY OF SAN FRANCISCO

September 27, 2021
57–60

Page 57

1 he met on Friday morning and his results were delivered
2 to AC Moser.
3        Who is AC Moser?
4     A.  So that is Assistant Chief Robert Moser who is
5 the chief of staff currently.
6     Q.  Okay.  And was he chief of staff in October of
7 2019?
8     A.  I believe so.  Yes, he was.  Yes.
9     Q.  Okay.  And it says, "and his results were
10 delivered to AC Moser for Chief Scott's review and
11 consideration while identifying his Q-80 and Q-60
12 promotion selections."
13        Do you know what Mr. Houston was talking about
14 in this email?
15     A.  Yes.
16     Q.  And what was he talking about?
17     A.  So Deputy Chief McEachern could not
18 participate in the secondary criteria for the Q-80s
19 because his brother was a candidate.  So when we did the
20 secondary criteria that day, I think we -- my
21 recollection is we -- based on the numbers then, we
22 probably did it all in one day with captains and
23 lieutenants; but he could not be part of it, so he had to
24 do a separate secondary criteria review with Mr. Houston
25 on the Q-60 lieutenant promotions because his brother was

Page 58

1 not part of that candidate pool.  So he had to be
2 separated from us.  It was for that.
3        MR. MULLANAX:  Okay.  All right.  That's
4 Exhibit 7.
5        Peter and Caroline and Chief, can we take a
6 five-minute break?
7        MR. COWNAN:  That's fine.
8        MR. MULLANAX:  I think I'm almost done.
9        MR. COWNAN:  That's fine, but I wouldn't -- I
10 would suggest let's take another ten minutes just to be
11 safe.
12        MR. MULLANAX:  Ten minutes.  Okay.  10:40?
13        MR. COWNAN:  Yes.
14        MR. MULLANAX:  Okay.  Thank you.
15        MR. COWNAN:  Thank you.
16        (Recess taken.)
17        MR. MULLANAX:  All right.  So we're back on
18 the record.
19     Q.  Chief Redmond, can you hear me?
20     A.  Yes, I can.
21     Q.  Okay.  So I just want to go back over some of
22 the promotional history with the police department.
23        So you were hired in November of 1994, and
24 your first promotion came -- well, it was in 2005 or 2006
25 when you were promoted to sergeant?

Page 59

1     A.  Correct.
2     Q.  Okay.  Now -- and then later you were promoted
3 to lieutenant in 2009?
4     A.  Correct.
5     Q.  During the time before you were promoted to
6 lieutenant, were there complaints made about the
7 promotional process of the San Francisco Police
8 Department?
9        MR. COWNAN:  Overbroad.
10        You can answer.
11        THE WITNESS:  Yes.  There's always been
12 complaints about every promotional process in the
13 San Francisco Police Department.
14 BY MR. MULLANAX:
15     Q.  Do you recall what the complaints were back
16 then around the time you were promoted to sergeant?  I
17 mean, did -- was there a belief that maybe race or gender
18 played a role in the promotional decisions?
19     A.  No.
20        MR. COWNAN:  Same objections.
21        THE WITNESS:  Sorry.
22        MR. COWNAN:  No problem.
23        The answer was, "No."  My objection was, "Same
24 objections," as well as relevance.
25        Go ahead.  Go ahead, Greg.

Page 60

1 BY MR. MULLANAX:
2     Q.  Okay.  Were the promotions made back in those
3 days -- were they mostly in rank order?
4     A.  My recollection --
5        MR. COWNAN:  Same objections.
6        THE WITNESS:  Go ahead.
7        MR. COWNAN:  Go ahead, Chief.
8        THE WITNESS:  My recollection is yes, although
9 there were people that were skipped or passed over.
10 BY MR. MULLANAX:
11     Q.  Okay.  And when Greg Suhr took over and became
12 chief -- I'm not sure exactly what year that was, but
13 when he became chief, was there any big change in the
14 promotional decisions involving promotions based on rank
15 order?
16        MR. COWNAN:  Same objections.  Relevance.
17 Overbroad.
18        Go ahead, sir.
19        THE WITNESS:  What I at least seem to know
20 from my experience in the positions I've been in is
21 usually someone wasn't passed or -- passed over unless
22 there was some type of discipline and even more current
23 discipline because even if there was, someone could still
24 be considered.
25 /////



Page 61

1   BY MR. MULLANAX:

2       Q.   Okay.  So -- and are you talking under

3   Greg Suhr, Chief Suhr?

4       A.   Yes.

5       Q.   Okay.  Now, the first couple rounds of

6   promotions, then, or at least the first round of

7   promotions under Chief Scott, did you see a radical

8   change in that promotional process?

9           MR. COWNAN:  Object to the form.

10          Go ahead, sir.

11          THE WITNESS:  Yes.

12  BY MR. MULLANAX:

13      Q.   And that change was based on the fact that

14  it -- the promotions got away from the rank order

15  criteria; is that correct?

16          MR. COWNAN:  Well, I'm going to object on

17  calls for legal conclusion and opinion testimony.

18          But you can answer, sir.

19          THE WITNESS:  Yes.

20  BY MR. MULLANAX:

21      Q.   Did Chief Scott ever give an explanation for

22  why he jumped around the list in making those promotional

23  decisions and didn't go by rank order?

24      A.   No.

25      Q.   Did you ever bring up to Chief Scott's

Page 62

1   attention -- well, let me strike that.

2           Did you have any concerns at the time -- I

3   think you testified earlier that you did, but did you

4   have concerns at the time of the promotions in 2017 and

5   2018 that there was too much jumping around on the

6   list -- on the promotional list?

7           MR. COWNAN:  Asked and answered.

8           But you can answer again.

9           THE WITNESS:  No.

10  BY MR. MULLANAX:

11      Q.   You -- so you didn't have concerns about that

12  or you did?

13          MR. COWNAN:  I think it would be helpful if we

14  had the question read back.

15          THE WITNESS:  Yeah.

16          Can you rephrase it?

17          MR. MULLANAX:  Yes.

18          Madam Court Reporter, can you read that

19  question back, please?

20          (Record read.)

21          THE WITNESS:  Yes, I did have concerns.

22  BY MR. MULLANAX:

23      Q.   Did you express those concerns to Chief Scott?

24      A.   No.

25

Page 63

Page 64



Page 65



13          MR. MULLANAX:  Okay.  All right.  I think
14  that's all the questions I have.
15          MR. COWNAN:  Okay.  I don't think we have any,
16  but let's go off the record and give us ten minutes.
17          MR. MULLANAX:  Okay.
18          MR. COWNAN:  All right.
19          MR. MULLANAX:  All right.  So we'll come back
20  at 11:00.
21          MR. COWNAN:  Okay.  Thank you.
22          MR. MULLANAX:  All right.
23          (Recess taken.)
24          MR. COWNAN:  Okay.  So I think we are all
25  done.  We have no redirect or follow-up.

Page 66

1          MR. MULLANAX:  And I have no more questions.
2          MR. COWNAN:  All right.
3          MR. MULLANAX:  Thank you, Chief, for appearing
4  this morning.  Thank you.
5          THE WITNESS:  Thank you, Greg.  Appreciate it.
6          MR. MULLANAX:  Alrighty.
7          MR. COWNAN:  Thank you, Chief.
8          THE WITNESS:  Thank you, everybody.
9          THE REPORTER:  Counsel, before we go, as to
10  confidentiality, do you want the entire transcript
11  designated "confidential"?
12          MR. COWNAN:  Yes, please.
13          MR. MULLANAX:  Okay.  And, Mr. Cownan, do you
14  want a copy of the transcript?
15          MR. COWNAN:  Yes, please.
16          THE REPORTER:  Okay.  Great.  Thank you.
17          (The deposition concluded at 11:02 a.m.)
18
19
20
21
22
23
24
25

Page 67

1                    REPORTER'S CERTIFICATION
2
3          I, Michelle D. Knowles, a Certified Shorthand
4  Reporter, do hereby certify:
5
6          That the foregoing witness was by me duly
7  sworn; that the deposition was then taken remotely before
8  me at the time and place therein set forth; that the
9  testimony and proceedings were reported stenographically
10  by me and later transcribed into typewriting under my
11  direction; that the foregoing is a true record of the
12  testimony and proceedings taken at that time; that
13  reading and signing of this transcript was not requested.
14          I further certify that I am neither counsel
15  for, nor related to, any party to said proceedings, nor
16  in any way interested in the outcome thereof.
17
18          IN WITNESS WHEREOF, I have subscribed my name,
19  this 7th day of October, 2021.
20
21
22
23          Michelle D. Knowles, CSR No. 8979,
                RPR, CRR, CRC, CCRR
24
25

ESQUIRE
DEPOSITION SOLUTIONS