# EXHIBIT M

## Page 1

```
 1            UNITED STATES DISTRICT COURT
 2           NORTHERN DISTRICT OF CALIFORNIA
 3
 4   Frederick (Ric) Schiff; Glenn Brakel;
     Alice Dicroce; Joseph Emanuel; Brian
 5   Greer; Clayton Harmston; Steven Haskell;
     Micah Hope; Daniel Kelly; Alexander Lentz;
 6   Brandon McKelley; Gerald Newbeck; David
     O'Keeffe; Christopher Ritter; Steven Uang
 7   and Thomas Walsh,
 8           Plaintiffs,
 9      Vs.                CASE NO. 4:19-cv-03260-YGR
10
     City and County of San Francisco;
11   Greg Suhr, individually; William (Bill)
     Scott, individually; and DOES 1-20,
12   Defendants,
13           Defendants,
14   ~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~
15
                      DEPOSITION OF
16
                      HECTOR SAINEZ
17
              CONDUCTED REMOTELY VIA ZOOM
18
19                    April 5, 2021
20                     10:08 A.M.
21
22            SAN FRANCISCO, CALIFORNIA
23
24
25     Vanessa Harskamp, RPR, CRR, CSR No. 5679
```

## Page 2

```
 1               APPEARANCES OF COUNSEL
 2
 3   For the Plaintiffs Frederick (Ric) Schiff, et al.:
 4       LAW OFFICE OF M. GREG MULLANAX
         M. GREG MULLANAX, Esq.
 5       greg@lawmgm.com
         2140 N. Winery Avenue, Suite 101
 6       Fresno, California 93703
         559.420.1222
 7       559.354.0997 fax
 8
 9   For the Defendants:
10       PETER A. COWNAN, ESQ.
         peter.cownan@sfcityatty.org
11       CAROLINE PAGE, ESQ.
         Caroline.Page@sfcityatty.org
12       Office of the City Attorney
         1390 Market Street
13       Fifth Floor
         San Francisco, California 94102
14       415.554.3863
15   Also present:
16       Brandon McKelley,
17       Clayton Harmston
18       Frederick (Ric) Schiff
19       Alice Dicroce
20
21
22
23
24
25
```

## Page 3

```
 1                    I N D E X
 2
 3   WITNESS:  HECTOR SAINEZ
 4                                              PAGE
 5           EXAMINATION INDEX
 6     BY MR. MULLANAX                             5
 7
 8           INDEX OF EXHIBITS
 9   EXHIBITS                                    MARKED
10   Exhibit 1  Chief of Staff document            10
11   Exhibit 2  Q-50 Secondary Criteria            21
                Recommendations Overall Spreadsheet
12
                Exhibit 3  Q-50 Secondary Criteria   24
13              Recommendations Spreadsheet for Sainez
14   Exhibit 4  Q-50 Sergeants Secondary Criteria  32
                Recommendations
15
                Exhibit 5  Q-50 Sergeants Secondary Criteria   33
16              Recommendations Name: Sainez
17   Exhibit 6  Q-60 Lieutenants Secondary Criteria 37
                Recommendations
18
                Exhibit 7  Q-60 Lieutenants Secondary Criteria   38
19              Recommendations Name:  Sainez
20   Exhibit 8  Q-60 Lieutenants Secondary Criteria 40
                Recommendations
21
                Exhibit 9  Q-60 Lieutenants Secondary Criteria   42
22              Recommendations Name: Sainez
23   Exhibit 10 Q-80 Captains Secondary Criteria   45
                Recommendations
24
                Exhibit 11 Q-80 Captains Secondary Criteria   47
25              Recommendations Name:  Sainez
```

## Page 4

```
 1            INDEX OF EXHIBITS (Continued)
 2   EXHIBITS                                    MARKED
 3
 4
     Exhibit 12  Q-80 Secondary Criteria           48
 5               Recommendations Summary Spreadsheet
 6
     Exhibit 13  Q-80 Secondary Criteria           48
 7               Recommendations Summary Spreadsheet
                 Name: Sainez
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```



Page 5

1    SAN FRANCISCO, CALIFORNIA
2    MONDAY, APRIL 5, 2021; 10:08 A.M.
3
4
5            HECTOR SAINEZ,
6    having been first duly sworn, testified as follows:
7                EXAMINATION
8  BY MR. MULLANAX:
9    Q.   Good morning, Mr. Sainez. My name is Greg
10  Mullanax and I represent the plaintiffs in this lawsuit
11  and we are here to take your deposition today. Before
12  we get started, could I have you state your full name on
13  the record with the spelling, please?
14    A.   Hector Manuel Sainez, H-E-C-T-O-R,
15  S-A-I-N-E-Z.
16    Q.   Okay. Mr. Sainez, have you been deposed
17  before?
18    A.   No.
19         Well, yes. Not in a court deposition, but
20  other deposition.
21    Q.   Okay. I'm just going to go over with you
22  pretty quickly the ground rules for the deposition.
23  It's essentially just the same as if you were testifying
24  in court. Your testimony today is under oath, just as
25  if you were testifying in court; do you understand that?

Page 6

1    A.   Yes, I do.
2    Q.   And also, if -- I am from Texas, so people say
3  I talk funny. So if I ask you a question and you don't
4  understand it, please let me know and I'll rephrase it.
5    A.   Yes, I will.
6    Q.   And if you answer a question and later claim
7  you didn't understand it, it will be presumed that you
8  understood it because you answered it. So do you
9  understand that?
10    A.   Yes.
11    Q.   So if you don't understand it, just please let
12  us know, it's no problem.
13         Also, if you want to take a break for any
14  reason, just let us know and we'll take a break. Is
15  that understood?
16    A.   Very well, yes.
17    Q.   Okay. And if I ask you a question and you
18  don't know the answer to it, it's perfectly acceptable
19  to say that you don't know. Do you understand that?
20    A.   I do.
21    Q.   Okay. We are just here to try to get accurate
22  testimony from you today based on what you remember
23  about things.
24         Now, let me ask you just a little bit about
25  your police career.

Page 7

1    Q.   When did your law enforcement career start?
2    A.   My law enforcement career began in 1987, when
3  I was hired with the San Francisco Sheriff's Department.
4    Q.   How long were you with the Sheriff's
5  Department?
6    A.   Two-and-a-half years, before I transferred
7  over to the San Francisco Police Department.
8    Q.   Now, when you transferred to the San Francisco
9  Police Department, what was your initial job title?
10    A.   Police officer.
11    Q.   How long were you a police officer?
12    A.   I was a police officer for about -- when did I
13  get promoted to inspector? I believe eight years. I
14  don't have the dates in front of me. Around eight, nine
15  years before I was promoted to inspector.
16    Q.   Now, the inspector position is no longer
17  there; is that right?
18    A.   That's correct.
19    Q.   What was the difference between an inspector
20  and a sergeant?
21    A.   An inspector was assigned strictly to
22  investigative units, such as robbery, burglary, fraud,
23  and a sergeant was assigned to duties out in what we
24  would call the field or the street, primarily doing
25  supervisorial duties, or same, same type of duties, but

Page 8

1  in administrative positions such as admin or at the
2  academy and other smaller admin units.
3    Q.   Now, when you were an inspector, where were
4  you assigned?
5    A.   I was assigned to various units. Night
6  Enforcement unit, Night Investigations, Special
7  Investigations, Gang Task Force.
8    Q.   How long were you an inspector?
9    A.   I was an inspector for, I think, three years
10  before I promoted. Well, they are parallel ranks, just
11  different duties, but when I promoted to sergeant.
12    Q.   And how long were you a sergeant?
13    A.   Let's see, I'm trying to remember. '91 to, I
14  believe it was '97-'98. I'm a little -- maybe eight
15  years, seven or eight years, I believe. I don't have
16  the actual dates in front of me.
17    Q.   That's okay. What about when you were
18  sergeant, did you later promote to lieutenant?
19    A.   I did.
20    Q.   And do you recall about when that was?
21    A.   Like I said I think it was '90, '98. '98 and
22  '99, I believe. I don't know, I'm just -- that's long
23  ago. I don't remember the exact dates.
24    Q.   And what was your next position after
25  lieutenant?



Page 9

1  A.  I was promoted to captain for a day and then
2  promoted to commander.
3  Q.  And who promoted you to commander?
4  A.  Chief Suhr.
5  Q.  Do you remember approximately what year that
6  was?
7  A.  I'm trying to think.  2014, I believe it was.
8  Q.  And how long were you a commander?
9  A.  I was a commander, I believe, for 14 months, I
10 think it was.  15 months.  I'm not sure on the dates.
11 Q.  And then did you become assistant chief at
12 that point?
13 A.  No.  Chief Suhr promoted me to deputy chief.
14 Q.  Okay.  How long were you deputy chief?
15 A.  I was the deputy chief for, I'm trying to
16 think now, four years, five years.  Four years, I think
17 it was.
18 Q.  Do you remember what years those were?
19     Approximately, if you don't know exactly.
20 A.  I don't know exactly.  I think it was 2014.
21 2014.  No, 2013.  2013 to 2017.
22 Q.  While you were deputy chief, were you involved
23 in the promotional process at all?
24 A.  I was.
25 Q.  And what was your involvement in the

Page 10

1  promotional process while you were deputy chief?
2  A.  My involvement was to review the secondary
3  criteria of the candidates who were eligible for
4  selection for promotion and submit a recommendation.
5  Q.  Okay.  And before we get to that point, when
6  were you promoted to assistant chief?
7  A.  2017.
8  Q.  And was that by Chief Scott?
9  A.  Correct.
10 Q.  Okay.  Let me -- I want to pull up a -- let's
11 see here.  Okay.  Can you see that document that I
12 pulled up?
13 A.  No.
14 Q.  There it comes.  Well, now I can't see -- can
15 you see it now?
16 A.  Yes.
17 Q.  And that's your picture there?
18 A.  Yes, it is.
19     MR. MULLANAX:  Okay.  I'm going to mark this
20 as Exhibit 1.
21     (Plaintiff's Exhibit 1 marked for
22     identification)
23 BY MR. MULLANAX:
24 Q.  And I'm just going to tell you what I did is I
25 got this off the Internet from the San Francisco Police

Page 11

1  Department's website, and I just thought it might be
2  easier if I put this in here, but it says here that you
3  were assistant chief at this time?
4  A.  Yes.
5  Q.  And that you were involved in the Media
6  Relations Unit, Risk Management, Internal Affairs
7  Division, the Legal Division, the Equal Employment
8  Opportunity Unit and the Early Intervention System.
9     Is that information correct?
10 A.  I oversaw those offices, yes.
11 Q.  Okay.  And let me ask you about the Equal
12 Employment Opportunity Unit.  What was the function of
13 that unit?
14 A.  The EEO unit was primarily to receive and
15 investigate EEO type of complaints.  They would work
16 with the City's DHR to process any complaints that came
17 in and forward them and work with DHR on facilitating
18 the investigation of those complaints.
19 Q.  Were those -- are those complaints that are
20 brought up within the police department?
21 A.  Correct.
22 Q.  And then they are investigated along with the
23 Department of Human Resources; is that right?
24 A.  They were forwarded to DHR.
25 Q.  Okay.  Now, how long were you the assistant

Page 12

1  chief?
2  A.  Two years.
3  Q.  And did you retire after that?
4  A.  Roughly two years.  Don't quote me on the
5  exact dates, but about two years, yes.
6  Q.  Do you remember your retirement date?
7  A.  It was May of 2019.
8  Q.  Okay.  Now, regarding the promotional process,
9  you said something earlier that you were involved in
10 reviewing the secondary criteria for applicants for
11 promotions; correct?
12 A.  Yes.
13 Q.  Can you tell us a little bit about the
14 promotional process, like once the scores are rendered,
15 I guess, and you have a list, and y'all request
16 secondary criteria from all of the candidates; is that
17 correct?
18 A.  So when you say that the scores, you mean,
19 once an eligible list is adopted?
20 Q.  Yes.  In fact, let's talk about that.  What is
21 an eligible list?
22 A.  An eligible list is a list that is posted by
23 DHR, once an examination has been conducted, and they
24 post a list of candidates who made it through the
25 process and are eligible for selection



Page 33

1 since you compiled this document, the information on
2 here is accurate; is that correct?
3   A.   I believe it is, yes.
4        MR. MULLANAX:  Okay.  Exhibit 4.
5        Okay.  What we'll mark as Exhibit 5 is --
6 starts off with CCSF 8681, and it's a 7-paged document.
7        (Plaintiff's Exhibit 5 marked for
8        identification)
9 BY MR. MULLANAX:
10   Q.   Do you recognize this document?
11   A.   I do.
12   Q.   And what is it?
13   A.   It is my individual recommendation on the
14 candidates that were available for selection.
15   Q.   And if we compare it with Exhibit 4, it
16 appeared to be the second round of sergeants promotions,
17 and it started off rank number 17, and Exhibit 5 starts
18 off with the same rank, 17.  Do you think that this is
19 relating to the second round of promotions?
20   A.   Yes.
21        MR. COWNAN:  No problem.  I was just going to
22 object on, to the extent it calls for speculation, but I
23 believe Mr. Sainez has responded "yes."
24 BY MR. MULLANAX:
25   Q.   Okay.  And I don't want to hold anybody to

Page 34

1 that because it's not on there.
2        I'm just trying to figure out exactly where it
3 is.
4 BY MR. MULLANAX:
5   Q.   The first plaintiff we have in here is Micah
6 Hope, on the first page down to 32; do you see that?
7   A.   Yes.
8   Q.   And then under "yes," you have a question
9 mark.  What does that mean?
10        MR. COWNAN:  If you recall.
11        THE WITNESS:  I don't remember why I put the
12 question mark.
13 BY MR. MULLANAX:
14   Q.   So you don't know why you didn't check "no" or
15 were you maybe unsure, if you remember?
16   A.   I don't remember.
17   Q.   Okay.
18   A.   Yeah, I don't remember.
19   Q.   No, I believe you.  I don't know, it would be
20 tough to remember.  I just didn't know if that might
21 refresh your recollection.
22        Then we go down to the next page, the next
23 plaintiff is McKelley at 35 and Lentz at 37, and you
24 checked "yes" for both of them; is that correct?
25   A.   That's correct.

Page 35

1   Q.   And then the next page is Emanuel at 48, and
2 you checked "yes" for him; do you see that?
3   A.   I'm sorry.  What line did you say he was on?
4   Q.   He is on number 48.
5   A.   Yes.
6   Q.   Joseph Emanuel.
7   A.   Yes.
8   Q.   The next page we have, if you look at 56, is
9 Daniel Kelly, and you said "yes"; is that correct?
10   A.   Correct.
11   Q.   And Steven Uang, number 56, also, you checked
12 "no" on him; is that right?
13   A.   That's correct.
14   Q.   Did you know Steven Uang?
15   A.   I know of him, but I don't know him.  I
16 worked, I worked with him at some of the -- at one unit
17 shortly and that was it.
18        I mean, like I said, I know him, I worked for
19 him briefly, but I didn't know him very well.
20   Q.   Okay.  Did you know Micah Hope?
21   A.   I know who he is, but I don't know him.
22   Q.   Okay.  If we do down next line 57 is David
23 O'Keeffe, and you checked "yes" for him; is that right?
24   A.   That's correct.
25   Q.   Then a couple more down at number 60, Glenn

Page 36

1 Brakel, you checked "yes" for him?
2   A.   Correct.
3   Q.   And then Christopher Ritter at number 63, you
4 checked "yes" for him; is that right?
5   A.   Correct.
6   Q.   Now, after you prepared these forms, and then
7 you prepared the master form, you know, where you put
8 everybody else's recommendations on there, you submit
9 all that to the chief; is that correct?
10   A.   Yes.
11   Q.   Did you -- did the chief ever meet with y'all
12 when he was -- during the promotional process, about
13 these candidates?
14   A.   No.
15   Q.   So he never sat down with the folks that were
16 on that -- who made these decisions here, or made these
17 recommendations, he never sat down and talked to y'all
18 about why you made certain decisions or anything like
19 that?
20   A.   To my knowledge, no.
21   Q.   Did you ever have a meeting with Chief Scott
22 related to these promotional processes where he
23 discussed with you your recommendations?
24        MR. COWNAN:  Greg, if I can interject, do you
25 mean just this round of promotions or at any point?



Page 37

1  BY MR. MULLANAX:
2      Q.   Well, we can specify this round, but at any
3  round.  Let me ask you this one.
4           On the second sergeants promotion in 2018,
5  November of 2018, do you recall meeting with Chief Scott
6  and discussing your recommendations for this list?
7      A.   I remember meeting with Chief Scott, providing
8  him with the sheets and all of the material.  I don't
9  have any recollection of specifically talking about any
10 individual candidates.
11     Q.   Okay.  Did you ever in any other promotional
12 list that you were assisting in, do you recall ever
13 having a conversation with Chief Scott where he asked
14 you about any particular individuals or about your
15 recommendations?
16     A.   I do not recall that.
17         MR. MULLANAX:  Okay.  Let's go to, I think I
18 might be right here, Exhibit 6?
19         MR. COWNAN:  Correct.
20     (Plaintiff's Exhibit No. 6 was marked for
21     identification)
22 BY MR. MULLANAX:
23     Q.   Okay.  Exhibit 6 is CCSF 8726, and it is a
24 five-paged document.
25         Mr. Sainez, do you recognize this document?

Page 38

1      A.   Yes, I do.
2      Q.   And what is it?
3      A.   This is the Q-60 Lieutenants Secondary
4  Criteria Recommendations.
5      Q.   And this is the, basically the same document
6  as was used in the sergeants promotion list; is that
7  correct?
8      A.   Correct.
9      Q.   Okay.  And did you put this form together?  Is
10 this your handwriting?
11     A.   Yes.
12     Q.   And as far as you know, as you put it
13 together, it is accurate; is that correct?
14     A.   I believe it to be accurate, yes.
15         MR. MULLANAX:  Okay.  Now I'm going to pull up
16 Exhibit 7, which is CCSF 8736, and it's a five-paged
17 document.
18     (Plaintiff's Exhibit 7 marked for
19     identification)
20 BY MR. MULLANAX:
21     Q.   Do you recognize this document?
22     A.   I do.
23     Q.   And what is it?
24     A.   It is the -- my individual Q-60 Secondary
25 Criteria Recommendation List.

Page 39

1      Q.   And the Q-60 means lieutenants; is that
2  correct?
3      A.   Correct.
4      Q.   And since it is ranked number 1, let's see,
5  the first round for lieutenants, I believe, was October
6  of 2017; do you think that is about right?
7      A.   Yes.
8      Q.   Okay.  And since this document is not dated,
9  I'm presuming that this was from that October, 2017
10 round because it starts at rank 1.  Would you say that's
11 accurate, or does that sound good to you?
12     A.   I believe you are correct.
13     Q.   Okay.  We go back to lieutenants, the first
14 plaintiff we see on page 2 is number 17, Brian Greer,
15 and you checked "yes" for him; is that right?
16     A.   That's correct.
17     Q.   And a little bit further down on number 18 is
18 Thomas Walsh.  You checked "yes" for him, didn't you?
19     A.   Yes.
20     Q.   And the same thing with Clayton Harmston at
21 number 19?
22     A.   Yes.
23     Q.   And then the next page we have the plaintiff
24 on there, Alice Dicroce, ranked number 21, and you
25 checked "yes" for Alice; is that correct?

Page 40

1      A.   Correct.
2      Q.   Okay, now the second round, I believe the
3  second round of lieutenants promotions was in November
4  of 2018; does that sound about right to you?
5      A.   It sounds about right.
6          MR. MULLANAX:  Okay.  I'll find the one I want
7  to see.  I'm pulling up Exhibit No. 8.
8      (Plaintiff's Exhibit 8 marked for
9      identification)
10 BY MR. MULLANAX:
11     Q.   And that's a document starting off with CCSF
12 8773; do you see that?
13     A.   Yes.
14     Q.   Do you recognize this document?
15     A.   Yes.
16     Q.   And what is it?
17     A.   The Q-60 Lieutenant Secondary Criteria
18 Recommendations.
19     Q.   And did you put together this document?
20     A.   I did.
21     Q.   And as far as you know, and the best you can
22 remember, this is accurate, your information here?
23     A.   Well, looking at it now, it looks like I made
24 a mistake.
25     Q.   Really?  Where is that?



Page 49

1    MR. MULLANAX: Okay. Okay. Now I'm going to
2  pull up Exhibit 13.
3       (Plaintiff's Exhibit 13 marked for
4       identification)
5  BY MR. MULLANAX:
6    Q.   And Exhibit 13 is a two-paged document
7  starting with CCSF 8841. Do you recognize this
8  document?
9    A.   Yes, I do.
10   Q.   And what is this?
11   A.   My individual Q-80 Captains Secondary Criteria
12  Recommendations.
13   Q.   And that's your handwriting on the document;
14  is that correct?
15   A.   That's correct.
16   Q.   The first one we see there ranked number 12 is
17  Frederick Schiff, and you checked "yes"; is that
18  correct?
19   A.   Correct.
20   Q.   Okay. Okay. Now, regarding the process
21  during -- we talked a little bit earlier about did you
22  have any communications with Chief Scott during the
23  promotional process about any of the, your
24  recommendations or anything like that. We just went
25  over, I think that was during the sergeants portion I

Page 50

1  was asking you that.
2       But during the lieutenants and during the
3  captains portion, did you ever have any discussions with
4  Chief Scott about your recommendations?
5    A.   I don't remember having any specific
6  conversations with the chief over any individual
7  recommendations.
8    Q.   Okay. Now, when you talked about earlier I
9  think you said that y'all had meetings where you sit
10  around with all the other persons that are involved in
11  this process and have meetings regarding it. What did
12  you call those meetings?
13   A.   Secondary criteria meetings.
14   Q.   Yes. Thank you. The secondary criteria
15  meetings. What did y'all discuss in there, generally?
16   A.   So we convened, we sit down. We discuss the
17  policies, the rules that apply, the secondary criteria,
18  the vacancy announcement and the MOU, all of the
19  different documents that are relevant to review, observe
20  and consider when we review each candidate's resume
21  application secondary criteria, et cetera.
22   Q.   Now, you referred to the MOU. Is that the
23  Memorandum of Understanding between the Police Officers
24  Association and the City?
25   A.   That's correct.

Page 51

1    Q.   Okay. And did y'all, in these secondary
2  criteria meetings, did y'all ever discuss individual
3  candidates?
4    A.   No.
5    Q.   Do you know if there was ever a time in the
6  promotional process where there was discussions about
7  individual candidates and their qualifications or
8  anything like that?
9    A.   No, actually, I made a point that we didn't
10  have these discussions, because I wanted to make sure
11  each chief, deputy chief or assistant chief can have
12  their own, write down their own views, their own
13  perspectives based on what they have before them so that
14  they would not unconsciously influence somebody by
15  making a statement or a discussion.
16       What I wanted is each individual to write down
17  exactly what they think and feel based on the
18  information that they have in front of them provided by
19  the candidates, the department, secondary criteria
20  spreadsheets and all the other documents.
21   Q.   Okay. So there was never any discussion as
22  far as, you know, about like someone saying, Hey, I used
23  to work with Jane Doe over at the Bay View station and
24  she did this one time?
25       You can't, you know, there was other

Page 52

1  discussions like that?
2    A.   No.
3    Q.   Okay. Who has -- who made the final decisions
4  on promotions during these rounds that we discussed here
5  today?
6    A.   The chief of police.
7    Q.   And that's Chief Scott?
8    A.   Well, if I remember correctly, in this suit
9  you also named Suhr; right?
10   Q.   Yes, but I don't have any documents from when
11  Suhr was the chief.
12   A.   So you are talking about these sheets
13  specifically, not just the process?
14   Q.   Exactly, these sheets specifically.
15   A.   Yes, that would be Chief Scott.
16   Q.   And Chief Scott, he was appointed chief in
17  approximately January of 2017; is that correct?
18   A.   That's correct.
19   Q.   Okay. Now, did you ever hear Chief Scott ever
20  say anything like he made promotional decisions based,
21  at least in part, on the applicants gender or race?
22   A.   I do not recall him -- I do not recall ever
23  hearing him say that.
24   Q.   Were you a member of the POA?
25   A.   I was.



Page 61

1 rules allow is that the, with the Rule of Ten scores,
2 all of those candidates in that window under the Rule of
3 Ten scores are eligible for promotion.
4    Q.   But do you know what the purpose of the Rule
5 of Ten scores is?
6    A.   I do not.
7        MR. COWNAN:  Object that it calls for -- the
8 response was "I do not."  My objection is that to the
9 extent it calls for speculation.
10       MR. MULLANAX:  Yeah, that's why I asked him if
11 he knew what it was for.
12 BY MR. MULLANAX:
13   Q.   Is it the same thing, people sometimes in
14 these situations talk about banding.  Is the Rule of Ten
15 a form of banding?
16       MR. COWNAN:  Same objection.  You can answer,
17 sir.
18       THE WITNESS:  I do not know.
19   Q.   Did you ever have any discussions with Chief
20 Scott about using the Rule of Ten?
21   A.   Nothing specific that I can remember, only
22 just I just remember explaining what it meant.  But the
23 information that we have, the listing of candidates,
24 that all came from staff services.  The listing of
25 eligible candidates came from staff services which, as I

Page 62

1 understand it, is confirmed by DHR.  So whenever there
2 is a number of requisitions, they would say these are
3 the candidates that are eligible for selection.
4    Q.   Okay.
5    A.   So --
6    Q.   I'm sorry, I didn't mean to interrupt.
7    A.   And that's what would indicate which
8 candidate's secondary criteria we would review.
9    Q.   Now, once you submitted all the information to
10 Chief Scott to consider, he just -- you never had any
11 discussion with Chief Scott during the time period he
12 was making his decision on who to promote; is that
13 correct?
14    A.   That's correct.  I would give him all the
15 information and then he would decide who he was going to
16 promote.
17   Q.   Do you remember how long he would -- it would
18 take him to decide who to promote?
19    A.   I don't have an exact date, but it's not
20 something that he decided overnight.
21   Q.   Okay.  Fair enough.  When would you find out
22 about the promotional decisions of Chief Scott?
23    A.   When he told me he made his selection.
24   Q.   Was that about the time it was announced
25 publicly, or was it --

Page 63

1    A.   Um, it's pretty close, yeah.  It would be the
2 day of or the following day that he would notify me.
3 That's when he was ready to release the name of who he
4 selected.
5    Q.   So when you are -- and I'm almost finished
6 here, but in the secondary criteria meetings when you
7 were reviewing the secondary criteria, do you also have
8 the applicants' disciplinary files handy?
9    A.   We have a summary sheet handy and available,
10 it's not the exact, the actual file, just a summary
11 sheet.
12   Q.   Okay.  And that's the one that shows the
13 summary of their disciplinary history?
14    A.   That's correct.
15   Q.   Okay.  I forgot the name of that document.
16       And what was that -- what are you looking for?
17 When you are looking to make a decision on whether to
18 recommend as the candidate moves along in the process,
19 what exactly are you looking for when you are reviewing
20 the secondary criteria, and the discipline and all that
21 stuff?
22    A.   What do you mean, like what are we looking
23 for?
24   Q.   When you are looking -- when you are reviewing
25 the criteria for you to make your recommendations on

Page 64

1 these sheets, is there something that you look for to
2 help you determine whether to say "yes" or "no?"
3    A.   When you look at the candidates, for the most
4 part, and I'm only speaking for myself, I can't speak
5 for the other deputy chiefs or assistant chiefs, but you
6 look at the sheets for all -- they are all eligible for
7 selection.  If there is something that would exclude
8 them, then that's something that I would note.
9    Q.   So are you then -- are you then looking more
10 for is there anything that should exclude them from
11 being recommended?
12    A.   Yeah, I mean, obviously you are looking for
13 stronger candidates.  You are looking for some who have
14 experience, some who have the training.  But looking at
15 the sheet, looking at the eligible list, they are all
16 eligible for selection unless, based on MOU and the
17 other issues that come up that they are not eligible or
18 that they refused, because there are some candidates who
19 withdraw from the process.
20   Q.   And how far back can you go in the person's
21 disciplinary history?
22       MR. COWNAN:  Same objection, calls for
23 speculation.  Go ahead, sir.
24       THE WITNESS:  I don't remember.  I don't have,
25 I haven't looked at the MOU in several years.



Page 65

1  BY MR. MULLANAX:
2  Q.   Well, there's a department bulletin issued on
3  January 3rd of 2018, and it is talking about the sworn
4  promotional process, and it says that formal reprimands
5  without further penalty will not be considered for the
6  purpose of promotion after the formal reprimand has been
7  in the employee's personnel file for two years.  Does
8  that sound about right to you?
9       MR. COWNAN:  Same objection, but you can
10 answer.
11      THE WITNESS:  Again, without reviewing the
12 document and the MOU, I can't answer that definitively,
13 but it sounds about right.
14 BY MR. MULLANAX:
15 Q.   Now, what is a formal reprimand?  What types
16 of discipline did the San Francisco Police Department
17 administer?  Like what is a formal reprimand?
18 A.   A formal reprimand is a written reprimand that
19 they received and it is in their file.  There's
20 admonishments, there is suspension.
21 Q.   So can one be suspended without having a
22 formal reprimand, or is that just part of the same
23 process?
24 A.   It depends on the severity of the misconduct.
25 Q.   Okay.  All right.  Okay.  Let me, especially

Page 66

1  the first round of deposition -- I mean, not
2  depositions, but the promotional rounds that occurred in
3  2017, that was the -- just a few months after Chief
4  Scott became chief of the police department; is that
5  right?
6  A.   He came in in January, and the promotional
7  process was in --
8  Q.   October?
9  A.   -- October.  So it's more than a few months,
10 that's like nine months, ten months in.
11 Q.   Well, how much familiarity did Chief Scott
12 have with the personnel?  I know the chief can't know
13 everybody, all the sworn officers.  But I'm just saying,
14 I'm trying to get a sense from you, did he rely -- did
15 the chief seek out advice from anybody about some of
16 these candidates?
17      Because it would seem to me that looking at
18 just a bunch of documents, it may be hard to tell one
19 from another.  Do you know if he reached out to anybody
20 to ask about certain candidates?
21 A.   That's a question you'll have to ask him.
22 Q.   Okay.  So you don't know.  But he never asked
23 you; is that correct?
24 A.   Nothing that I can recall.  Nothing that I
25 remember.  And that just, we gave him the, all the

Page 67

1  materials, all the applications, the secondary criteria,
2  the relevant IA and our recommendations, and I don't
3  recall having any specific discussions about any
4  specific candidates.
5       MR. MULLANAX:  Okay.  I think that's all I
6  have.
7       MR. COWNAN:  So, okay.
8       MR. MULLANAX:  Thank you for coming in today,
9  Mr. Sainez.
10      THE WITNESS:  Thank you for having me.
11      MR. MULLANAX:  All right.
12      MR. COWNAN:  We can go off the record.
13      MR. MULLANAX:  Let's go off the record.
14      THE COURT REPORTER:  Mr. Cownan, would you
15 like a copy of the transcript?
16      MR. COWNAN:  Yes.
17          -oOo-
18      (The deposition was concluded at 12:00 P.M.)

Page 68

1       REPORTER'S CERTIFICATION
2
3       I, Vanessa Harskamp, Certified Shorthand
4  Reporter in and for the State of California, do hereby
5  certify:
6       That the foregoing witness was by me duly
7  sworn; that the deposition was then taken before me at
8  the time and place herein set forth; that the testimony
9  and proceedings were reported stenographically by me and
10 later transcribed into typewritten form under my
11 direction; that the foregoing is a true record of the
12 testimony and proceedings taken at that time.
13      I further certify that I am not related to any
14 of the parties to this action by blood or marriage, and
15 that I am in no way interested in the outcome of this
16 matter.
17      IN WITNESS WHEREOF, I have subscribed my name
18 this 12th day of April, 2021.
19
20
21
22      
23      _____
24      VANESSA HARSKAMP, RPR, CRR, CCP, CSR NO. 5679
25