# EXHIBIT N

```
 1                UNITED STATES DISTRICT COURT

 2               NORTHERN DISTRICT OF CALIFORNIA

 3
    FREDERICK (RIC) SCHIFF; GLENN
 4  BRAKEL; ALICE DICROCE; BRIAN
    GREER; CLAYTON HARMSTON;
 5  STEVEN HASKELL; MICAH HOPE;
    DANIEL KELLY; ALEXANDER LENTZ;
 6  BRANDON MCKELLEY; GERALD
    NEWBECK; DAVID O'KEEFE; AND
 7  THOMAS WALSH,

 8              Plaintiffs,
    vs.                                  No.: 4:19-cv-03260-YGR
 9
    CITY AND COUNTY OF SAN
10  FRANCISCO; GREG SUHR,
    INDIVIDUALLY AND IN HIS
11  OFFICIAL CAPACITY AS FORMER
    CHIEF OF POLICE, SFPD; WILLIAM
12  (BILL) SCOTT, INDIVIDUALLY AND
    IN HIS OFFICIAL CAPACITY AS
13  CHIEF OF POLICE, SFPD, AND
    DOES 1-20,
14
                Defendants.
15  _____//

16
                   Remote Deposition of
17
                FREDERICK RICHARD SCHIFF
18
                 Tuesday, March 16, 2021
19

20
    REPORTED STENOGRAPHICALLY BY:
21  STACY J. TEGNER, CSR NO. 10622

22

23          WAGNER COURT REPORTING SERVICES
                1819 Polk Street, No. 446
24          San Francisco, California 94109
                     (415) 982-449
25

                                                              1
```

```
 1                    REMOTE APPEARANCES
 2
 3   FOR THE PLAINTIFF:
 4        LAW OFFICE OF M. GREG MULLANAX
 5        BY:  M. GREG MULLANAX
 6        Attorney at Law
 7        2140 N. Winery Avenue, Suite 101
 8        Fresno, California 93703
 9        (559) 420-1222
10        Email:  greg@lawmgm.com
11
12   FOR THE DEFENDANT:
13        OFFICE OF THE CITY ATTORNEY CITY AND COUNTY OF
14        SAN FRANCISCO
15        BY:  PETER A. COWNAN
16             CAROLINE M. PAGE
17        Attorneys at Law
18        Fox Plaza
19        1390 Market Street, Fifth Floor
20        San Francisco, California 94102
21        (415) 554-3800
22        Email:  peter.cownan@sfcityatty.org
23                caroline.page@sfcityatty.org
24
25                     ---oOo---
```

2

```
 1            BE IT REMEMBERED THAT, on Tuesday, March 16,
 2   2021, commencing at the hour of 10:07 a.m. by way of
 3   remote videoconferencing, before me, STACY J. TEGNER,
 4   CSR NO. 10622, a Certified Shorthand Reporter in and for
 5   the State of California, personally appeared
 6                    **FREDERICK RICHARD SCHIFF**,
 7   called as a witness herein, who, having been duly sworn,
 8   was thereupon examined and interrogated as hereinafter
 9   set forth.
10                          ---oOo---
11            (The following proceedings were held via
12             videoconference, with the court reporter in
13             a remote location, separate and apart from
14             the attorneys and the witness.  The
15             proceedings were stenographically reported
16             to the best ability of the court reporter
17             to hear and understand the proceedings.)
18                         **EXAMINATION**
19   BY MR. COWNAN:
20       Q.  Good morning, Captain Ric.  My name is Peter
21   Cownan.  I am a deputy city attorney with the City of
22   San Francisco.  Here also attending is Caroline Page,
23   who is my co-counsel on this case.  Thank you for being
24   here this morning.
25            I want to start off just with some background
```

                                                              6

```
 1   information.
 2           Can you please just for the record state and
 3   spell your name?
 4       A.   Sure.  My name is Frederick, F-R-E-D-E-R-I-C-K,
 5   Richard, common, and the last name is Schiff,
 6   S-C-H-I-F-F.
 7       Q.   Thank you, sir.
 8           And then you understand you are under oath
 9   today; correct?
10       A.   I do understand.
11       Q.   And I know this is old news for you, but just
12   to go over it again, that oath is the same oath that you
13   would take in a courtroom and it requires you to tell
14   the truth today.
15           You understand that?
16       A.   I do understand.
17       Q.   Okay.  And I understand that you've had your
18   deposition taken several times before; is that correct?
19       A.   Five times, I think, with the city attorney's
20   office, being represented by the city attorney's office,
21   and several times in court, in civil court.
22       Q.   When was the last time, if you can recall, that
23   you had your deposition taken?
24       A.   That's a good question.  I can't remember
25   whether it was a city attorney case or the city and
```

7

```
 1   the people making selections under secondary criteria
 2   use race and gender in the selection process based on
 3   the prima facie case.  So that's what I would say to
 4   that.
 5       Q.  And I think perhaps I have a different
 6   understanding or -- strike that.
 7           I would like to hear, when you say "prima facie
 8   case," what do you mean by that?
 9       A.  I mean that for looking at it for face value.
10   And maybe I'm using it incorrectly.  But when we look at
11   what actually occurred and the probability that those
12   things occurred without using race and gender, the
13   indications are that race and gender had to have been
14   used, that there's no statistical explanation other than
15   race and gender; or, in our case, race and gender, but
16   unlawful selection criteria was used.
17       Q.  Okay.  I lost my train of thought.  I'll come
18   back.
19       A.  Take your time.
20       Q.  I was going to ask you, we referred -- you
21   referred to statements that Chief Scott made.
22           When did he make those statements?
23       A.  It was in a -- so in explanation, during the
24   month of November, other than COVID years, the Police
25   Officers Association holds a open board meeting.
```

162

```
 1    They're all open, but this is a board meeting where
 2    dinner is served and everyone is invited to come down.
 3    And then in that process of the board meeting, generally
 4    they bring in a guest speaker.
 5             In this particular 2017, it was Chief Scott who
 6    came in to speak to not only the board, the executive
 7    board, the attorneys present, but well over 200 police
 8    officers that were in attendance at the Irish Cultural
 9    Center.  And, again, as I said, setting the stage, that
10    occurred, other than COVID years, every 20 -- every
11    November.
12         Q.  Okay.  And I understand this was around
13    Thanksgiving; correct?
14         A.  That is correct.
15         Q.  Okay.  And I think you've said this, but just
16    to be clear, we're talking about November 2017?
17         A.  Correct.
18         Q.  Okay.  And what do you recall -- well, strike
19    that.
20             Have you already told me now everything you
21    recall Chief Scott saying at that meeting?
22         A.  Oh, no.
23         Q.  What else --
24             (Simultaneous speakers.)
25    ///
```

```
 1   BY MR. COWNAN:
 2        Q.   I apologize.  Continue.
 3        A.   No, no, well, I probably paused there.  Go
 4   ahead.
 5        Q.   I was just going to ask the next question, is,
 6   what else do you recall him saying?
 7        A.   Okay.  Keep in mind I have no notes in front of
 8   me now, so it's ad hoc.  And it is some -- what?  Nearly
 9   four years later, but I'll try and recount a number of
10   things that he said.  It may not be sequential, so bear
11   with me.
12             He was introduced.  He came up.  It was one of
13   the first times that most of us had had an
14   opportunity -- I had met him just kind of socially
15   briefly, but we had heard -- had a chance to listen to
16   him speak.
17             As is likely to happen under these
18   circumstances, no one wanted to be the first person to
19   ask the chief a question in public.  So the president of
20   the POA at the time, Marty, offered to pose the first
21   question.  And promotional rounds had just occurred and
22   there were a lot of questions about how it had occurred
23   with the sergeants.  And, again, the things I listed as
24   being concerns for me were evident on that sergeant's
25   list.
```

```
 1              So Marty said -- Marty Halloran is his name, by
 2   the way -- said, "Well, Chief, let me ask the first
 3   question that I know is on the minds of all the officers
 4   here.  Can you explain the promotional process to us?"
 5              And I think the chief followed through with a
 6   fairly accurate explanation of how he viewed the
 7   promotional process.
 8              And he said that, "We give a service -- civil
 9   service exam, you apply for it.  If you meet certain
10   conditions, you're eligible to take the exam.  You take
11   the exam.  It's run by civil service.  The scores are --
12   are given out in rank order.  Then it goes before a
13   committee of commanders and deputy chiefs, who review it
14   for secondary criteria, and then those results are given
15   to me.  However, I am not obligated to follow secondary
16   criteria."  Again, I'm speaking for him.  "And in
17   this -- in these circumstances, I didn't use it.  I
18   promoted to obtain the goals of the department.  I
19   promoted using race and gender as selection criteria."
20              Now, I'm paraphrasing.  I actually wrote the
21   exact notes down when that occurred; so my summary is
22   close to that.  I might not be exact as to what I had
23   written down at the time.
24        Q.  The notes that you wrote down, when did you
25   write them?  When did you prepare those notes?
```

165

```
 1        A.   I wrote those immediately after the meeting.
 2        Q.   Was Chief Scott there -- well, strike that.
 3             What was the response to Chief Scott's
 4   statements?
 5        A.   By the public?
 6        Q.   Whoever was in the hall.
 7        A.   Well, I was standing next to -- I was a
 8   lieutenant at the time standing next to a captain, and
 9   we were shocked.
10        Q.   Who was the captain that you were standing next
11   to?
12        A.   Retired Captain Jerry DeFilippo.
13        Q.   Can you do your best to spell the last name?
14        A.   I could do better, but I'm going to have to
15   pick up my phone.  It's a capital D-E . . .
16             D-E-F-I-L-I-P-P-O.
17        Q.   Okay.
18        A.   And I have that because his wife worked for the
19   police credit union.  So . . .
20        Q.   I was asking you about reactions.
21             Do you recall any other reactions in the moment
22   to Chief Scott's statement?
23        A.   Just widespread shock and amazement.
24        Q.   Do you recall having any specific conversations
25   with anyone following -- that night following that
```

166

1  conversation?
2       A.  Oh, a bunch of people.
3       Q.  Do you recall any specific conversations you
4  had?
5       A.  Sure.
6           I had conversation with a POA attorney in
7  attendance, Greg Adams.  And I believe standing with us
8  was Matt -- you want me to try and look up his name?
9       Q.  Just tell me what you remember.
10      A.  Did you hear what I hear -- I heard?  Is that
11 lawful criteria?  Can you use race and gender in your
12 selection process to meet the needs of the department?
13 I was adamant that you could not.  I think there were a
14 lot of people who were unsure -- that the chief said it
15 so brazenly that they -- they felt that there must --
16 and, again, this -- I'm paraphrasing conversations --
17 that there must be something that we don't know about
18 that gives this chief special authority to do that.
19          My response to anybody who said that to me is I
20 don't know any such rule or permission or opportunity to
21 violate state or federal law or department policy or
22 civil service policy or city policy.
23          So that was the gist of the conversation, and
24 that was pretty much widespread throughout.
25          Some people were in the back and hadn't heard

167

1  it and were talking to other people who had or some
2  people heard parts of it and some people were confused.
3  That was pretty much the lay of the land.
4      Q.  You mentioned an individual Matt.
5          Who is that person?
6      A.  There were two POA attorneys that I was aware
7  of present.  One was Greg Adams and one was his
8  associate Matt.  And it starts with a T.  I want to say
9  like Matt Taylor.
10     Q.  Okay.
11     A.  But I don't remember his -- his last name.  I
12 believe he was the attorney there.  There were two -- it
13 was the two of them talking to myself in conversation.
14 I spoke to Marty Halloran at the time.  Several people
15 on the board.
16         Again, as you can imagine, it was kind of a
17 shocker.
18     Q.  Any of the other board members' names that you
19 can recall that you spoke to that night?
20     A.  No, because part of the problem, it's difficult
21 to remember whether I spoke to them that night or later
22 on.
23         So, again, I spoke to a large number of people,
24 and I would have to really think back as to who was
25 present.  I may have kept notes as to some of the people

168

247

STENOGRAPHER'S CERTIFICATE

I certify that the foregoing proceedings in the within-entitled cause were reported at the time and place therein named;

That said proceedings were stenographically reported by me, a duly Certified Shorthand Reporter of the State of California, to the best of my ability via remote teleconferencing, and were thereafter transcribed into typewriting;

That before completion of the deposition, review of the transcript [ X ] was [  ] was not requested. If requested, any changes made by the deponent (and provided to the reporter) during the period allowed are appended hereto.

I further certify that I am not of counsel or attorney for either or any of the parties to said cause of action, nor in any way interested in the outcome of the cause named in said cause of action.

In WITNESS WHEREOF, I have hereunto set my hand this 30th day of March, 2021.

_____
STACY J. TEGNER, CSR
Certified Shorthand Reporter
Certificate No. 10622