EXHIBIT O

POLICE CHIEF WILLIAM SCOTT VOLUME I
Frederick (Ric) Schiff vs Greg Suhr

April 06, 2021
1–4

**Page 1**

```
1              UNITED STATES DISTRICT COURT
2             NORTHERN DISTRICT OF CALIFORNIA
3
4  Frederick (Ric) Schiff; Glenn Brakel;
   Alice Dicroce; Joseph Emanuel; Brian
5  Greer; Clayton Harmston; Steven Haskell;
   Micah Hope; Daniel Kelly; Alexander Lentz;
6  Brandon McKelley; Gerald Newbeck; David
   O'Keeffe; Christopher Ritter; Steven Uang
7  and Thomas Walsh,
8          Plaintiffs,
9    Vs.               CASE NO. 4:19-cv-03260-YGR
10
   City and County of San Francisco;
11 Greg Suhr, individually; William (Bill)
   Scott, individually; and DOES 1-20,
12 Defendants,
13        Defendants,
14 -----------------------------------------
15
                  DEPOSITION OF
16
          POLICE CHIEF WILLIAM SCOTT
17
          CONDUCTED REMOTELY VIA ZOOM
18
                   VOLUME I
19
20
                April 6, 2021
21
                 10:03 A.M.
22
23          SAN FRANCISCO, CALIFORNIA
24
25   Vanessa Harskamp, RPR, CRR, CSR No. 5679
```

**Page 2**

```
1           APPEARANCES OF COUNSEL
2
3  For the Plaintiffs Frederick (Ric) Schiff, et al.:
4    LAW OFFICE OF M. GREG MULLANAX
     M. GREG MULLANAX, Esq.
5    greg@lawmgm.com
     2140 N. Winery Avenue, Suite 101
6    Fresno, California 93703
     559.420.1222
7    559.354.0997 fax
8
9  For the Defendants:
10   PETER A. COWNAN, ESQ.
     peter.cownan@sfcityatty.org
11   CAROLINE PAGE, ESQ.
     Caroline.Page@sfcityatty.org
12   Office of the City Attorney
     1390 Market Street
13   Fifth Floor
     San Francisco, California 94102
14   415.554.3863
15 Also present:
16   Brandon McKelley
17   Clayton Harmston
18   Frederick (Ric) Schiff
19   Alice Dicroce
20   Gerald Newbeck
21   Micah Hope
22   Christopher Ritter
23   David O'Keeffe
24
25
```

**Page 3**

```
1                   I N D E X
2
3  WITNESS:  POLICE CHIEF WILLIAM SCOTT
4                                             PAGE
5          EXAMINATION INDEX
6    BY MR. MULLANAX                            4
7
8          INDEX OF EXHIBITS
9  EXHIBITS                                   MARKED
10 Exhibit 1 San Francisco POA Journal from     14
            December of 2017
11
   Exhibit 2 A letter from the San Francisco Police  30
12           Officers Association, dated November
             19th of 2018
13
   Exhibit 3 Department Bulletin                42
14
   Exhibit 4 Collaborative Reform Initiative, An   48
15           Assessment of the San Francisco Police
             Department, dated October, 2016
16
   Exhibit 5 A letter dated March 7th, 2019     68
17
   Exhibit 6 A letter from April 19th, 2019, from  73
18           the POA's law firm to Chief Scott
19
20
21
22
23
24
25
```

**Page 4**

```
1        SAN FRANCISCO, CALIFORNIA
2     TUESDAY, APRIL 6, 2021; 10:03 A.M.
3
4
5        POLICE CHIEF WILLIAM SCOTT,
6  having been first duly sworn, testified as follows:
7              EXAMINATION
8  BY MR. MULLANAX:
9    Q.  Okay.  Good morning, Chief Scott.  My name is
10 Greg Mullanax and I represent the plaintiff in this
11 case, and we are here today to take your deposition.
12 But before we get started really, could you please state
13 your full name for the record?
14   A.  Yes, thank you.  William Scott.
15   Q.  And that's the common spelling; right?
16   A.  Yes.
17   Q.  And where are you located today during the
18 deposition?
19   A.  I'm at my office at 1245 Third Street, San
20 Francisco.
21   Q.  Have you been deposed before?
22   A.  Yes.
23   Q.  And how many times have you been deposed, if
24 you recall?
25   A.  Let's see, I believe four.  Somewhere around
```



ESQUIRE
DEPOSITION SOLUTIONS

800.211.DEPO (3376)
EsquireSolutions.com

POLICE CHIEF WILLIAM SCOTT VOLUME I
Frederick (Ric) Schiff vs Greg Suhr

April 06, 2021
5–8

Page 5

1 four, but I believe four.
2     Q.  Okay.  So I'm sure you are familiar with the
3 deposition process, but I'll just go over a couple of
4 ground rules before we get started.
5         One of them is remember that your testimony
6 today is under oath, just as if you were testifying in
7 court in front of a judge and jury; do you understand
8 that?
9     A.  Yes.
10     Q.  If I ask you a question and you don't
11 understand it, please let me know and I'll be happy to
12 rephrase it; do you agree to do that?
13     A.  Yes.
14     Q.  Okay.  Have you reviewed any documents in
15 preparation for your testimony today?
16     A.  Yes.
17     Q.  And what did you review?
18     A.  The secondary criteria for the promotional
19 list of sergeant, lieutenant and captain.
20     Q.  For all of the candidates?
21     A.  The secondary criteria, as well as the
22 promotional list.
23     Q.  Okay.  I think since we are at the beginning
24 of the deposition that we agreed to go over the issues
25 having to do with the secondary criteria on April 28th;

Page 6

1 is that correct, Counsel?
2         MR. COWNAN:  We have, but it might be, right
3 now, Greg, it's filling in with Chief Scott about what
4 he references, but what he means when he is talking
5 about secondary criteria, because I can represent to you
6 what I think it is.  I don't think it is the entire
7 packet, I think it is the summaries, but Chief Scott will
8 have to correct me if I'm wrong.
9         MR. MULLANAX:  Is that the summaries like we
10 discussed yesterday in Mr. Sainez's deposition?
11         MR. COWNAN:  I believe so, Greg.
12         MR. MULLANAX:  Okay.  But that's okay.  But
13 regarding the deposition on April 28th, I just want to
14 make sure that our agreement is on the record that we
15 have agreed to reconvene on April 28th to go over the
16 issues regarding the secondary criteria and the
17 promotional process and all of that.
18         MR. COWNAN:  Yes, we have agreed to that.  I
19 do want to talk to you about that, though, because if
20 Chief Scott hasn't yet or hasn't ever reviewed those
21 packets, you may not need to depose him on that regard.
22 With that being said, we did agree to an additional day,
23 yes.
24         MR. MULLANAX:  Okay.  All right.  So are you
25 all ready to proceed now?

Page 7

1         MR. COWNAN:  Yes.
2 BY MR. MULLANAX:
3     Q.  Chief Scott, I want to start off with some
4 just basic background information.
5         Where did you grow up?
6     A.  Most of my childhood was in Birmingham,
7 Alabama.
8     Q.  When did you come out to California?
9     A.  1989.
10     Q.  Why did you come out to California in 1989?
11     A.  I came out to California when I took a job to
12 join the Los Angeles Police Department.
13     Q.  Was that the first job in your law enforcement
14 career?
15     A.  Yes.
16     Q.  And when you were hired by the L.A.P.D., what
17 was your position?
18     A.  I was hired as a police officer.
19     Q.  Okay.  And how many years did you serve as a
20 police officer for the L.A.P.D.?
21     A.  27.
22     Q.  Were you -- what was your first promotion
23 after being a patrol officer?
24     A.  My first promotion, my first civil service
25 promotion was to detective, to the rank of detective in

Page 8

1 1995.
2     Q.  And were you assigned to a unit like homicide
3 or burglary or anything like that?
4     A.  Yes.
5     Q.  What unit were you assigned to?
6     A.  I was assigned to auto theft.  I was assigned
7 to gang investigations.  I was assigned to homicide.  I
8 was assigned to gangs and sexual assault for a short
9 while as well.
10     Q.  So you saw a little bit of everything, then?
11     A.  Yes.
12     Q.  How many years were you a detective?
13     A.  Let's see.  In total?  In total, I believe
14 about six-and-a-half.
15     Q.  And what was your next position after that?
16     A.  Sergeant.
17     Q.  How long were you a sergeant?
18     A.  About two years total.
19     Q.  Now, in L.A.P.D. at the time you became
20 sergeant, do you remember what year that was?
21     A.  About two-and-a-half years total, I'm sorry.
22     Q.  That's okay.  Do you remember what year you
23 were promoted to sergeant?
24     A.  Yes.  1997.
25     Q.  Now, when you applied to become a sergeant,



Page 9

1  did the L.A.P.D. have a similar promotional process as
2  the San Francisco Police Department does?
3      A.  It was a civil service process, but there were
4  some differences.
5      Q.  So you had to take a test?
6      A.  Yes.
7      Q.  And did you have any oral interviews or
8  anything like that?
9      A.  Yes.
10     Q.  And how did they -- at the time you were
11 promoted to sergeant, did they develop a list according
12 to a rank?  Ranking?
13     A.  Yes.
14     Q.  And how did the L.A.P.D. choose those to
15 promote off the list?
16         Was it -- did they do banding, kind of like
17 Rule of Ten or something like that, or did they just
18 pick them in a rank order?
19         MR. COWNAN:  I'm going to object to the form,
20 but you can answer, sir.
21         THE WITNESS:  I'm sorry, Peter.  You were
22 muffled a little bit.
23         MR. COWNAN:  I'm objecting on form and
24 relevance, but you can answer if you understand the
25 question, Chief Scott.

Page 10

1          THE WITNESS:  Sure.  Mr. Mullanax, can you
2  repeat that question?
3  BY MR. MULLANAX:
4      Q.  Yes, I can make it a little simpler.  I think
5  I messed it up a little bit.
6          But when you were being promoted to sergeant
7  and they put you on a list, did they put the list in
8  rank order?
9      A.  There was order of the score and banding
10 within the score.
11     Q.  Okay.  So then the -- whoever made the
12 decision, they didn't have to go in rank order; is that
13 correct?
14     A.  They didn't have to, no.
15     Q.  Okay.  Now, after you were sergeant, you were
16 sergeant, you said, for about two-and-a-half years.
17 What was your next position?
18     A.  I was a sergeant and then I reverted back to
19 detective, at the rank of a detective supervisor.
20     Q.  And how long were you a detective supervisor?
21     A.  About just short of four years, I believe.
22     Q.  What was your next --
23     A.  I'm sorry, Mr. Mullanax.  In total probably
24 five years, because I was a detective supervisor before
25 I made sergeant, then I made sergeant and I went back to

Page 11

1  detective supervisor.
2      Q.  And after you were detective supervisor, what
3  was your next rank?
4      A.  Lieutenant.
5      Q.  Do you remember what year you were made
6  lieutenant?
7      A.  2003.
8      Q.  Okay.  And how long were you a lieutenant?
9      A.  About four-and-a-half years.
10     Q.  And then what was your next rank after that?
11     A.  Captain.
12     Q.  And how long were you a captain?
13     A.  For almost five years.
14     Q.  Do you remember what year you were sworn in as
15 captain?
16     A.  2007.
17     Q.  And then what was your next rank after
18 captain?
19     A.  Commander.
20     Q.  And so how long were you a commander?
21     A.  Three-and-a-half years, I believe.
22     Q.  And what year were you sworn in as commander?
23     A.  2012.
24     Q.  And did you have a position after commander
25 with L.A.P.D.?

Page 12

1      A.  Yes.
2      Q.  And what was that?
3      A.  Deputy chief.
4      Q.  And when did you become deputy chief?
5      A.  I was sworn in, in 2015, I believe.  I was
6  acting deputy chief for a couple of months before I was
7  actually sworn in, but I was sworn in at the beginning
8  of '15.
9      Q.  And were you deputy chief when you came to the
10 San Francisco Police Department?
11     A.  Yes.
12     Q.  And when were you sworn in as the chief of the
13 San Francisco Police Department?
14     A.  January of 2017.
15     Q.  And were you -- tell me what the selection
16 process involved.  Was it -- I'll start over.
17         What was the selection process when you
18 became -- when you applied for the San Francisco police
19 chief job?
20     A.  It was an application process, submit a
21 resume, an application.  From there they conducted
22 interviews for the candidates, I guess the gap that
23 passed the application process, interviewed.  So a round
24 of interviews, actually, several rounds of interviews.
25     Q.  Who made the final decision to appoint you as



POLICE CHIEF WILLIAM SCOTT VOLUME I
Frederick (Ric) Schiff vs Greg Suhr

April 06, 2021
13–16

Page 13

1 police chief?
2     A.  My understanding was the mayor.
3     Q.  And was that Ed Lee?
4     A.  Yes.
5     Q.  Okay.  So in your current position as police
6 chief, who do you answer to, directly?
7     A.  I answer to the Police Commission and the
8 mayor.
9     Q.  Are so do you answer -- this -- I don't
10 remember really how to answer this, but do you answer to
11 them equally or do you have to answer more to the mayor?
12 Or I don't know how that works, so could you explain
13 that, if you understand my question?
14     A.  I believe I understand your question.  The
15 Police Commission oversees the police department, and
16 they are actually a -- I report to the Police
17 Commission.
18     Q.  Okay.
19     A.  But I also report to the mayor, because the
20 police department is a part of the Executive Branch.
21 It's an appointed position.  So the city charter gives
22 both the Police Commission and the mayor the authority
23 to hire and fire, actually, the police chief.
24     Q.  So are you considered an at-will employee?
25     A.  Yes.

Page 14

1     Q.  And so what you are saying is that the mayor
2 could fire you or the Police Commission; is that
3 correct?
4     A.  That is correct.  That's my understanding,
5 anyway.
6     Q.  Okay.  So you started in January of 2017.  Do
7 you recall attending a meeting at the San Francisco
8 Police Officers' Association in November of 2017?
9     A.  I attended many meetings at the POA when I
10 first got here, but I don't remember a date.  But I'm
11 quite sure that I did attend a meeting in November of
12 2017.
13     Q.  Do you remember -- I'm going to pull up an
14 exhibit and I will make it Exhibit No. 1.
15         (Plaintiff's Exhibit 1 marked for
16          identification)
17         MR. MULLANAX:  Hopefully I can do this.  Let's
18 see here.
19 BY MR. MULLANAX:
20     Q.  Can you see this document, Chief?
21     A.  Yes.
22     Q.  Okay.  And we are going to mark this as
23 Exhibit 1.  And I'll just represent that it's the San
24 Francisco POA Journal from December of 2017.  And this,
25 I just put -- it's not the whole document, but I just

Page 15

1 put the first page to identify it, and then I'm going to
2 scroll down to the second page.  And it says this is the
3 minutes of the meeting that was held on November 16th of
4 2017.  Do you recall that after looking at this?
5         MR. COWNAN:  Well, he may take a second to
6 read through it.
7         MR. MULLANAX:  Okay.  Can you read it?  I can
8 make it larger if it's too small on your screen, because
9 it is kind of small print.
10         THE WITNESS:  No, I can read it, thank you.
11         MR. MULLANAX:  Okay.
12         THE WITNESS:  Okay.
13 BY MR. MULLANAX:
14     Q.  Do you recall that meeting?
15     A.  Yes, I believe that meeting was at the -- at
16 the actual POA office.  I believe.
17     Q.  Okay.  And you may be correct.  I'm just
18 looking on the minutes it says it was at the United
19 Irish Cultural Center on 45th Avenue, but I have
20 highlighted some portions on here and it said that you
21 made a presentation that night.  Do you recall making a
22 presentation to the membership?
23     A.  Yes, I do.  And, actually, where are you
24 reading?
25     Q.  Just if you look on the third column, just

Page 16

1 down the -- after the first paragraph it says,
2 "Presentation by Chief Scott."
3     A.  Yes.
4         MR. COWNAN:  Chief Scott, I think Counsel is
5 referring to the second to -- the second line at the
6 very top, which says "United Irish Cultural Center."
7 That's where he is looking at.
8         THE WITNESS:  Oh, okay.  Yes, correct.
9 BY MR. MULLANAX:
10     Q.  Thank you.  But it says here that you gave a
11 presentation that evening.  And I think you said -- do
12 you remember that now?
13     A.  I do.  Yes.
14     Q.  Okay.  And down at the first highlighted
15 portion I have it says "Promotions."  And it said that
16 you have an open door policy for anyone who did not get
17 promoted.
18         You stated that "The Rule of Ten will continue
19 and that not everyone on the promotional list will get
20 promoted and that more promotions will come in the
21 future."
22         Do you recall saying that?
23         Is that an accurate rendition of what you
24 said?
25     A.  I believe that's fairly accurate.



POLICE CHIEF WILLIAM SCOTT VOLUME I                    April 06, 2021
Frederick (Ric) Schiff vs Greg Suhr                              17–20

Page 17

1     I don't believe it is verbatim, but I believe
2 it is fairly accurate.
3     Q.   Okay.  And then if we go to the last column,
4 the last highlighted portion I have, it says,
5        "President Halloran asked the Chief to explain
6 the Rule of Ten and how he picked one promotional
7 candidate over another."
8        And then you can read the rest of the
9 paragraph, or I can read it into the record, whatever
10 you want to do.
11     A.   I have read it.
12     Q.   Okay.  Is that -- is that an accurate
13 rendition of what you told the membership that night?
14        MR. COWNAN:  Which part of it, Greg, are you
15 talking about?
16        MR. MULLANAX:  The part, the last column, the
17 first highlighted portion where it starts off,
18 "President Halloran asked the Chief to explain the Rule
19 of Ten."
20        MR. COWNAN:  Can you -- you are referring to
21 the entire highlighted section?
22        MR. MULLANAX:  I'm sorry?
23        MR. COWNAN:  You are referring to the entire
24 highlighted section that is referring to President
25 Halloran?

Page 18

1        MR. MULLANAX:  Yes.
2        MR. COWNAN:  Chief Scott, do you understand
3 that?
4        THE WITNESS:  I do, yes.
5 BY MR. MULLANAX:
6     Q.   Chef Scott, do you think that is an accurate
7 statement of what you said that night?
8     A.   I think it captures what was talked about.
9 But I also think that the way it is written, there's
10 some inference in there because of the way it is
11 written.  But I think in terms of the subject that were
12 talked about that I discussed, yes, that's correct.
13     Q.   Okay.  On the last line of that first
14 highlighted paragraph on the last column, it says,
15        "He determines the diversity of experience,
16 diversity for race, diversity of sex and diversity of
17 culture in determining who he selects."
18        Is that statement true?
19     A.   It, that statement is written, put in the
20 context that I used diversity for race, sex, culture in
21 determining who was selected, that is not true.
22     Q.   So you dispute what is stated here in the
23 minutes; is that right?
24     A.   I did talk about diversity.  But if that
25 article is inferring or that summary of what I said is

Page 19

1 determining -- is inferring or saying that I use race,
2 sex or culture as a selection criteria, I don't -- that
3 is not accurate.  And that's what, to me, that is
4 inferring the way it is written.
5     Q.   Okay.  In what context did you talk about
6 diversity?
7     A.   I talked about that the diversity of this
8 department is important.
9     Q.   Did you talk about --
10     A.   I also talked about what diversity is.  That's
11 where the diversity of experience, diversity of race,
12 diversity of sex.  Diversity means many different
13 things.
14     Q.   Yeah.  What is your definition of diversity?
15     A.   The differences in people.
16        MR. COWNAN:  Hold on for one second.
17        I'm just going to object to the form of the
18 question.
19        Go ahead, sir.
20        THE WITNESS:  I'm sorry, could you --
21        MR. COWNAN:  You can go ahead and answer what
22 he is asking.
23        THE WITNESS:  Yeah, diversity is, in the
24 context of what he is talking about, is the differences
25 in people, and that encompasses many things.

Page 20

1 BY MR. MULLANAX:
2     Q.   Okay.  The next paragraph that is highlighted
3 says,
4        "A Board of Director member asked the Chief if
5 a candidate gets skipped a second time, will they get
6 more information as to why they got skipped?"
7        Do you see that portion there?
8     A.   Yes.
9     Q.   And then, is that -- has the department
10 provided those candidates that did get skipped, have
11 they provided those candidates any information as to why
12 they got skipped?
13        MR. COWNAN:  Go ahead.  But I'm just going to
14 ask that you clarify what period of time you are talking
15 about.
16        MR. MULLANAX:  Let's say after the the, 2017,
17 after Chief Scott arrived, I think the first time
18 promotions at that point was in October of 2017.
19        MR. COWNAN:  So about the time that this
20 newsletter was created?
21        MR. MULLANAX:  Yes.
22        MR. COWNAN:  Chief Scott, if you understand
23 the question in that context?
24        THE WITNESS:  Yeah, I want to -- can you
25 repeat the question, Mr. Mullanax?


π Exhibit O - Page 5 of 25

POLICE CHIEF WILLIAM SCOTT VOLUME I
Frederick (Ric) Schiff vs Greg Suhr

April 06, 2021
21–24

Page 21

1        I want to make sure I understand your
2 question.
3 BY MR. MULLANAX:
4    Q.  Yes, sir.  I'm just asking if -- if those that
5 got skipped, you know, they, people who get skipped, I
6 guess, definitely want to know why, you know, why they
7 got skipped.  And you stated in here that the -- those
8 people would get more information as to why they got
9 skipped.
10        Since that time, has the department provided
11 information to those people that were skipped in the
12 promotional process as to why they were skipped?
13    A.  Well, again, I think that's a summary that is
14 taken out of context.  I was asked at the time by Martin
15 Halloran, who was the president, if I would meet with
16 the members who had not been selected and I agreed to do
17 that and I did do that.  And there were a host of
18 candidates that came to my office to ask what they could
19 do better and why they got skipped, and I answered that
20 as best that I could.
21        But if you are asking if there was a specific
22 reason that I gave an individual why they got skipped,
23 no, that answer is "no."
24    Q.  Okay.  When, and you, I know you met with some
25 of the plaintiffs in this case.

Page 22

1        When you met with those who got skipped and
2 who requested a meeting with you, did you do any
3 preparation into looking at that candidate's background
4 before you met with them?
5    A.  No.  Those, there was -- no.  I did not.
6    Q.  Okay.  And why not?
7    A.  Because that open door was meant to be an
8 opportunity for the candidate to come in and talk to me
9 about whatever they wanted to talk to me about; in fact,
10 I was doing the open door before this came up.  Most of
11 the people that came to my office happened to come
12 around the time that promotions were either about to
13 happen or after they happened, but I was already doing
14 open door.
15        So other than knowing who was coming in my
16 office to meet with me, I didn't do any prep work on the
17 people that came in.  It was there for them to talk and
18 ask questions.
19    Q.  Did you make any notes or generate any memos
20 from these meetings with the candidates?
21    A.  No.
22    Q.  Okay.  Now, I'll turn off the Share screen if
23 I can find it.  Oh, Stop Share.
24        Okay, is that better?
25        Do you recall, Chief Scott, about how many of

Page 23

1 the candidates that did not get promoted that you met
2 with?
3    A.  No, I don't recall exactly.  I can just tell
4 you it was many.
5    Q.  Okay.  I want to ask you about the promotional
6 process and what your involvement in the promotional
7 process is.
8        When the announcement is made that there's
9 going to be -- that they -- for the testing and things
10 like that, are you involved in that portion of it?
11    A.  I'm sorry, what, which portion?  I'm sorry.
12    Q.  When they announced that the testing is going
13 to be coming out?
14    A.  No, I'm not.
15    Q.  When do you become involved in the promotional
16 process?
17    A.  Well, let me clarify.  I am not involved in
18 posting the announcements.  There is a discussion
19 between DHR and me in terms of the time of when that
20 announcement will be posted, but ultimately it's, that
21 part of the examination is -- is conducted by DHR.
22    Q.  Okay.  And then, so the candidates, they have
23 to take a test; is that correct?
24    A.  Yes.
25    Q.  And is the test composed of an oral portion,

Page 24

1 as well as a written portion?
2    A.  Yes.
3    Q.  And then the candidates, I guess that make a
4 list can -- are invited to submit secondary criteria; is
5 that correct?
6    A.  That is correct.
7    Q.  Okay.  And then once -- and does the list, the
8 eligible list, does it come from DHR?
9    A.  Yes, it does.  I'm sorry, Peter.
10        MR. COWNAN:  If you know.
11        THE WITNESS:  Yes, as far as -- yes, it comes
12 from DHR.
13 BY MR. MULLANAX:
14    Q.  Yes.  And that is -- Peter reminded me to tell
15 you something I didn't tell you at the beginning.
16        Chief Scott, if I ask you a question, I don't
17 ever want you to speculate on it.  So if you don't know
18 the answer, it is perfectly acceptable to say you don't
19 know.  So we are just here to find out what you know and
20 not what you -- I'm not asking for any speculation.
21        So when the -- and the DHR, just for the
22 record, is the San Francisco Department of Human
23 Resources; is that right?
24    A.  Yes.
25    Q.  And then once the candidates submit their



POLICE CHIEF WILLIAM SCOTT VOLUME I
Frederick (Ric) Schiff vs Greg Suhr

April 06, 2021
25–28

Page 25

1 secondary criteria, what happens in the process next?
2    A.  Once the secondary criteria is submitted, it
3 is then reviewed by a panel consisting of deputy chiefs,
4 the city attorney also sits in those meetings just for
5 questions and, and to provide any answers to questions
6 that might arise about the process.  But the deputy
7 chiefs and the assistant chiefs actually are the
8 committee who review, individually review the secondary
9 criteria.
10    Q.  Now, so they review all the secondary criteria
11 submitted; is that right?
12    A.  That's correct.
13    Q.  And then they submit their recommendations to
14 you?
15    A.  Correct.
16    Q.  And yesterday, I won't make it an exhibit
17 here, but there was some forms that looked like kind of
18 a spreadsheet that showed each member's, whether they
19 recommended that person or not, that candidate or not;
20 is that correct?
21        Is that how you received it?
22    A.  In the form of a spreadsheet?
23    Q.  Yes, or a document that looks like a
24 spreadsheet.
25    A.  It is more of a matrix, secondary criterias,

Page 26

1 all the different secondary criterias basically had
2 the -- I'd say a check box with X's if that particular
3 candidate had that particular criteria in their -- in
4 their history or in their personnel file.
5    Q.  Okay.
6    A.  And then with the recommendation by the person
7 who reviewed that candidate's package.
8    Q.  So what exactly do you receive from the
9 committee when they are finished doing their work?
10    A.  That document that you just referred.
11    Q.  Okay.  But you don't actually get all the
12 secondary criteria, all the things that were submitted,
13 along with the -- to support their secondary criteria
14 claims?
15    A.  No.
16    Q.  Okay.  So, and when you -- do you recall you
17 started in January of 2017, and in October of 2017, I
18 think was the -- a round of promotions.  You made those
19 promotions, did you not?
20        You were involved in that process?
21    A.  October, 2017, yes.
22    Q.  And do you have the final word on who gets
23 promoted?
24    A.  Yes.
25    Q.  Does anyone else have any say in it or any --

Page 27

1 can someone like on the Police Commission or the mayor
2 veto one of your selections?
3    A.  No, it has never happened since I have been
4 here.
5        MR. COWNAN:  Yeah, I'm going to object to the
6 point it asked for a legal conclusion.  All right.
7 BY MR. MULLANAX:
8    Q.  Okay.  So when you are making the decisions to
9 promote, you are essentially looking at the
10 recommendations from the committee members, and then
11 that spreadsheet you were talking about, the matrix; is
12 that correct?
13    A.  Can you repeat your question?  I want to make
14 sure I heard you correctly.
15    Q.  Yes, sir.  When you make your promotional
16 decisions, the information you are relying on, are the
17 recommendations from the committee and that matrix
18 spreadsheet we were talking about?
19    A.  Correct.
20    Q.  Anything else?
21    A.  The recommendations are individual, so they
22 don't discuss the candidates as a group, they
23 individually evaluate each candidate and they make a
24 recommendation.  So that's on their recommendations is
25 actually separate from the matrix.

Page 28

1    Q.  Right.  And they, some of them I have seen
2 some of the spreadsheets are, or the recommendation
3 sheets, and there's a place where they make comments,
4 and a lot of times there are comments made and sometimes
5 there are no comments made; is that true?
6    A.  That's generally true, yes.
7    Q.  So when you guys are, I mean, when you were
8 doing the first or the round in October of 2017, was it
9 difficult because you hadn't been in the department very
10 long at that point?
11    A.  Was what difficult?
12    Q.  Deciding who to promote, because you were, you
13 were still fairly new at the time, or maybe been there
14 ten months, is that difficult to make promotional
15 decisions when you haven't been with the department for
16 a long time?
17    A.  Well, I --
18    Q.  That's not meant to be a criticism, I'm just
19 asking.
20    A.  No, no.  Yeah, but it appeared to be two
21 questions there.
22        First question:  Is it difficult?  Yes, it is
23 difficult.
24    Q.  Okay.
25    A.  The second question:  Is it difficult when you



ESQUIRE
DEPOSITION SOLUTIONS

POLICE CHIEF WILLIAM SCOTT VOLUME I                    April 06, 2021
Frederick (Ric) Schiff vs Greg Suhr                              29–32

Page 29

1  are new to an organization?  Yes, that is difficult as
2  well.
3        Q.   When you were considering who to promote, did
4  you ever make any phone calls or talk to anybody about
5  any of the candidates?
6        MR. COWNAN:  Which time are you talking about,
7  Greg?
8        MR. MULLANAX:  In October of 2017, or for that
9  promotional round, whenever that could be.
10       THE WITNESS:  Yeah, I didn't make phone calls
11  who to select, no, but I did talk to the assistant chief
12  about the candidates and what they knew about the
13  candidates on occasion during that process, or actually
14  after the secondary criteria was submitted.
15       Q.   Right.  That's the time period, I should have
16  been more clear, after that secondary time period was
17  submitted you got the recommendations from the committee
18  member and all that, did you ever discuss with anybody
19  else in the department about any of the candidates?
20       A.   Other than the assistant chief and mainly the
21  Chief of Staff, who was the one that basically
22  coordinated the -- that process, and he was the one that
23  actually gave me the matrix and the recommendations.
24       Q.   And who was your Chief of Staff in October of
25  2017?

Page 30

1        A.   That was Assistant Chief Hector Sainez.
2        Q.   Do you know what like work like pay is?
3        A.   Yes.
4        Q.   What is like work like pay?
5        MR. COWNAN:  Object on relevance grounds, but
6  you can answer, sir.
7        THE WITNESS:  Like work like pay is a process
8  when an employee is doing a job higher than the rank in
9  their current rank, they get paid for doing that job if
10  they do it for a certain amount of days, which I believe
11  is 28.  I'm not for sure about the days.  But they get
12  paid at the rank of the work that they are doing.
13  BY MR. MULLANAX:
14       Q.   Well, do you know if like work like pay, at
15  least since you have been Chief, has been used as a way
16  to avoid promoting somebody?
17       MR. COWNAN:  Same objections.  Go ahead, sir.
18       THE WITNESS:  To avoid promoting?  No.
19       MR. MULLANAX:  Okay.  So I think we are on
20  Exhibit 2.  I'm just going to pull up the document real
21  quick.
22       (Plaintiff's Exhibit 2 marked for
23        identification)
24  BY MR. MULLANAX:
25       Q.   Okay.  I have pulled up Exhibit 2 here, which

Page 31

1  is a letter from the San Francisco Police Officers
2  Association, dated November 19th of 2018.
3        Can you see this on your screen, Chief Scott?
4        A.   Yes.  I can see part of the document, yes.
5        Q.   Okay, I'm going to scroll down.
6        Do you recall receiving this letter?
7        MR. COWNAN:  Chief Scott, take a look, take a
8  second to read through it.
9        MR. MULLANAX:  Yeah, if you want me to scroll,
10  let me know and I'll scroll.
11       THE WITNESS:  Okay, I read down to the bottom
12  of that page.
13       MR. MULLANAX:  Okay.
14       THE WITNESS:  Okay.  I have read it.
15  BY MR. MULLANAX:
16       Q.   Do you recall seeing this letter before?
17       A.   I'm familiar with it, yes.  I don't remember
18  specifically receiving the letter or when, but I do
19  remember -- I can remember the issue.
20       Q.   Okay.  And it is signed by Rick, and I'm not
21  sure if I'm pronouncing his name correctly, but
22  Andreotti.  And for the record that is
23  A-N-D-R-E-O-T-T-I, who is the POA vice-president.  He
24  asked in this letter, at the last line, asked to meet
25  with you to discuss the concerns raised in this letter.

Page 32

1        Did you ever have a meeting with Mr. Andreotti
2  or anyone else from the POA regarding the concerns
3  raised in this letter?
4        A.   I don't remember whether I met with Rick
5  Andreotti or not, but I did meet with the POA regarding
6  Marty Halloran many times regarding this issue.
7        MR. COWNAN:  I apologize for doing this.  The
8  answer to not the last question, but the question
9  before, Chief Scott saying that he remembers the issue,
10  you guys were speaking over each other, so I wanted to
11  make sure that the record was clear.
12       MR. MULLANAX:  Okay.
13       MR. COWNAN:  You can go ahead.
14  BY MR. MULLANAX:
15       Q.   Okay.  One of the things they complained about
16  in this letter was the lack of transparency in the
17  promotional process.  Did you ever discuss that issue
18  with the POA or members of the POA?
19       A.   If you -- if you are referring to the Rule of
20  Ten, yes.
21       Q.   And what kind of discussions did you have
22  regarding the Rule of Ten?
23       A.   Just an explanation of the Rule of Ten and
24  what it meant.
25       Q.   What is the Rule of Ten?



POLICE CHIEF WILLIAM SCOTT VOLUME I

April 06, 2021

Frederick (Ric) Schiff vs Greg Suhr

33–36

Page 33

1    A.  The Rule of Ten is a rule of our civil service
2 promotional list. And basically in essence what it is,
3 is the candidate pool is nine above the number of
4 vacancies. So, in other words, if there is one vacancy,
5 you can go nine above that first score up to a score of
6 ten. So the Rule of Ten is you can -- you can select
7 from qualified candidates from ten scores.
8    Q.  Okay. So if you select -- so it's nine above
9 of number of vacancies. So if you have ten vacancies,
10 you would have 19; is that correct?
11    A.  I'm sorry? Would you read that again? If you
12 have ten vacancies?
13    Q.  Yes. You said the Rule of Ten gives you nine,
14 nine ranks or nine -- you have nine. If you have ten,
15 you have nine more. Well, start over.
16     Explain to me again what you mean by the Rule
17 of Ten. You said it is nine above the number of
18 vacancies that are open?
19    A.  Yeah. So the simplest way to understand it,
20 that's why I use one. If there is one vacancy and there
21 is one person in rank one, the first, the highest score.
22    Q.  Right.
23    A.  You can go nine ranks above that or nine
24 scores above that, so that's ten scores. Rule of Ten.
25 That's why I used one. I think it is easier to

Page 34

1 comprehend when you break it down to one plus the nine
2 scores above, so...
3    Q.  But nine scores above, when you are talking
4 about if there is one vacancy, and are you talking
5 about, I think what confuses me is the nine scores
6 above. Are you talking about nine scores below, you can
7 go down the list nine scores?
8    A.  Or below, yes. Nine scores below the number
9 of vacancies. So one, one vacancy, one score, you can
10 go nine scores below that. I said above, but actually
11 it is below. Nine lower scores if that's -- I think
12 that's a simpler way to put it.
13    Q.  Okay. So if you had ten, you could go down to
14 19; is that right?
15    A.  Correct.
16    Q.  So if you pick, if you have ten vacancies and
17 you could go down to rank 19, I guess, if you pick the
18 first one at rank 19, does that give you another drop
19 down on the rank listing to pick another candidate?
20    MR. COWNAN: I'll object to the form, but you
21 can answer if you understand the question and you know
22 the answer, sir.
23    THE WITNESS: Yeah, but my understanding is it
24 depends on the number of vacancies. And so it -- it
25 depends on the number of vacancies. So it could, but

Page 35

1 not necessarily. It really depends on the number of
2 vacancies as compared to the scores.
3 BY MR. MULLANAX:
4    Q.  So if you have -- and I apologize for, you may
5 think these are dumb questions, and they probably are,
6 but I'm just trying to get the handle on it.
7    If you have ten vacancies and you can go down
8 to rank 19, do you have to pick all -- and you are going
9 to fill those vacancies, do you have to pick them all
10 from the rank one to 19?
11    MR. COWNAN: I'm going to object to the form
12 and to the extent it asked him to speculate. But, sir,
13 if you understand the question and you know the answer,
14 you can answer.
15    THE WITNESS: Let me hear the question again,
16 and I think I understand it, but let me hear the
17 question again.
18 BY MR. MULLANAX:
19    Q.  Yes, sir. If you have ten vacancies, that
20 would let you appoint them, fill the vacancies going
21 down to rank number 19 under the Rule of Ten; is that
22 correct?
23    A.  That is correct.
24    Q.  And so if you were going to fill those ten
25 vacancies, would they all have to come from the one to

Page 36

1 19 rankings?
2    A.  They would come from within that group of
3 candidates.
4    Q.  Okay.
5    A.  Yes.
6    Q.  So if you picked someone low, like let's say
7 you picked number 19, that doesn't drop the list down
8 further?
9    MR. COWNAN: Same objections. You can answer
10 if you understand.
11    THE WITNESS: It could. No, it doesn't drop
12 the list down further for that particular portion of the
13 process. So, in other words, whatever -- when the
14 candidates are notified to submit their secondary
15 criteria, that form is already taken into consideration.
16    So when the promotions are made from -- and
17 the way we've done it since I have been here, we try to
18 promote as many vacancies as we can from that group of
19 candidates and usually we are able to get, fill all the
20 vacancies at the time that the secondary criteria went
21 out.
22    Now, if somebody resigns, retires or leaves
23 the department after the secondary criteria went out, we
24 don't go back and add more names to the list until the
25 next round of promotions and the next secondary criteria



POLICE CHIEF WILLIAM SCOTT VOLUME I
Frederick (Ric) Schiff vs Greg Suhr

April 06, 2021
37–40

Page 37

1 goes out. I believe that answers your question.
2     Q.   Okay.  And what is the -- what is the
3 justification for the Rule of Ten?  I mean, why is it
4 employed?
5        MR. COWNAN:  Object to the form.  May call for
6 speculation.  But if you understand the question and
7 know the answer, you can answer it, sir.
8        THE WITNESS:  Well, I wasn't here when that
9 rule of the list was implemented, but my understanding
10 is it just creates a bigger candidate pool to pull from.
11 BY MR. MULLANAX:
12     Q.   Do you think that's a better system than
13 filling of vacancies in rank order?
14        MR. COWNAN:  Object to the form, and go ahead,
15 sir.
16        THE WITNESS:  Yeah, when you say, "better
17 system," I think it has some benefits to have a larger
18 candidate pool, yes.  Better?  That's a matter of
19 perspective.  It's the rule of the list.  It does give
20 us a bigger candidate pool and that can have benefits.
21 BY MR. MULLANAX:
22     Q.   Now, the testing process, the testing process
23 is designed to replicate actual issues that would arise
24 in employment; is that correct?
25     A.   I'm sorry?  I didn't understand your question,

Page 38

1 I'm sorry.
2     Q.   Well, what I'm trying to figure out is, you
3 have the actual testing process, the written portion and
4 the oral portion; is that correct?
5     A.   That is correct.
6     Q.   And so when the candidates are later ranked,
7 it is based on the score that they obtained on those
8 testing; is that right?
9     A.   As far as the score that they are assigned,
10 yes, that's correct.
11     Q.   And is the testing portion of the promotional
12 process, is that an important part of the process?
13        MR. COWNAN:  Objection.  Go ahead.
14        THE WITNESS:  Yeah, it is important.  That's
15 the primary criteria to be eligible for promotion.
16        I mean, you have to pass the test, is what I'm
17 saying, in order to be considered for promotion.
18 BY MR. MULLANAX:
19     Q.   Right.  And then, but there's a concern out
20 there that sometimes if you don't follow closely with
21 the rank listing that there may be people who don't have
22 as much experience or things like that to be able to do
23 their jobs correctly.  And if it is merit based, it
24 seems like the test would be an objective way to
25 evaluate merit.

Page 39

1        Aside from -- I understand the secondary
2 criteria, and we can get more into that in the next
3 deposition, but isn't it true that the testing process
4 is designed to find out who could probably handle the
5 job better because it simulates what they are going to
6 be experiencing?
7     A.   I wouldn't say that is an absolute true
8 statement.  The testing process is but one part of the
9 process.  It -- you know, somebody that makes 100 on or
10 aces the test doesn't necessarily mean that they are
11 going to do a great job at that job that they are
12 applying for.  It's a part of the process to qualify for
13 promotion, but other things are considered, and
14 appropriate reason, other things should be considered.
15     Q.   And how much do you think, if you can answer
16 this question, how much do you think the testing
17 results -- what percentage of the decision should be
18 based on testing results versus the secondary criteria
19 and the other criteria?
20        MR. COWNAN:  Object to the form of the
21 question, it may call for speculation, but you can
22 answer to the extent that you know.
23        THE WITNESS:  Yeah, there is not a percentage,
24 the way our process is set up, there is not a percentage
25 of, you know, your written test counts for this percent,

Page 40

1 your interviews count for this percent, if you do an
2 assessment, it, every -- all the factors are considered,
3 and there is not, it works like, I believe, if I
4 understand your question --
5        MR. MULLANAX:  Yes, sir.
6        THE WITNESS:  -- you asked is there a
7 percentage or should there be a percentage, there is
8 not.  I don't know that there should be.  I think you --
9 the organization should consider all the criteria that
10 are there.
11 BY MR. MULLANAX:
12     Q.   When you are looking at the matrix and the
13 information that you have in making promotional
14 decisions, how much do you rely on the ranking of the
15 candidates?
16     A.   I don't understand your question.  If you can
17 repeat it.
18     Q.   Yes, sir.  How much, when you are making your
19 promotional decisions and you are looking at the
20 information in front of you, how much do you rely on the
21 testing aspect versus the secondary criteria?
22     A.   Well, the testing process, I mean, the actual
23 score of the candidate's score is actually what puts
24 them in the position to be considered.  So, yes, that's
25 a consideration.  If -- if you are comparing the person

π Exhibit O - Page 10 of 25

POLICE CHIEF WILLIAM SCOTT VOLUME I
Frederick (Ric) Schiff vs Greg Suhr

April 06, 2021
41–44

**Page 41**

1 who scored number 1 versus the person who scored number
2 2 or the person who scored number 3, and then there are
3 scores that have multiple candidates in the same score.
4     So it is not a process that that is the only
5 criteria, and I don't think that that is the best way to
6 do business if the score is the only criteria, because
7 other things have to be factored in and should be
8 factored in, in my opinion.
9     Q.   Okay.  Did you ever use race or gender in
10 making any of these decisions?  Promotional decisions?
11     A.   No, not as a criteria for selection, no.
12         MR. MULLANAX:  Okay.  Could we take -- we
13 haven't been going for quite an hour.  Can we take a
14 five-minute break?
15         MR. COWNAN:  Yeah, if we can, let's take a
16 ten-minute break.
17         MR. MULLANAX:  Okay.
18         MR. COWNAN:  And then we can come back at 11.
19         MR. MULLANAX:  All right.  I'm losing my
20 screen here.  So we'll take a ten-minute break, I guess
21 come back at 11:05?
22         MR. MULLANAX:  Sure.
23         MR. MULLANAX:  That will make it easier.
24         MR. COWNAN:  Sure.
25         MR. MULLANAX:  Okay.  Thank you.

**Page 42**

1     (Recess)
2 BY MR. MULLANAX:
3     Q.   All right we are back on the record.
4         And Chief Scott, do you realize that you are
5 still under oath even though we had a break?
6     A.   Yes.
7         MR. MULLANAX:  Okay.  Thank you.  Before we
8 took a break, I asked you a little bit about the testing
9 process and so I want to ask you a little bit more.
10         I'm going to show you a document, Exhibit 3.
11         (Plaintiff's Exhibit 3 marked for
12         identification)
13 BY MR. MULLANAX:
14     Q.   Can you see that, Chief Scott?
15     A.   Yes.
16     Q.   And do you recognize this document?
17     A.   I recognize it, yes, it's the bulletin.  If I
18 could see the rest of it, but, yeah, I do recognize it.
19     Q.   Sure.  And I'll -- we'll go through it here in
20 a second, or parts of it.  But I'll show you at the
21 bottom on page 4, is that your signature there?
22     A.   Yes.
23     Q.   For the record, Exhibit 3 consists of pages
24 RS1283 through RS1286.  And I'm going to go back up to
25 the first page.  Chief, do you remember why you issued

**Page 43**

1 this Department Bulletin?
2         MR. COWNAN:  Chief Scott, if you need to, we
3 are talking about a 2018 document, so if you need to
4 take a few minutes to read through it, please do so.
5         THE WITNESS:  Thank you.  I would like to read
6 through it.
7         MR. COWNAN:  Okay.
8         THE WITNESS:  If you can --
9 BY MR. MULLANAX:
10     Q.   Sure.  Tell me when to scroll and I'll be
11 happy to.
12         Do you want me to make it bigger?
13     A.   No, I can see it.  Thank you.
14     Q.   Okay.
15     A.   Okay.  I'm done with -- finished with that
16 page.
17     Q.   Okay.
18     A.   I'm finished with that page.
19     Q.   Okay.
20     A.   I'm finished with that page.
21     Q.   Okay.  And the last page, page 4.  Okay.
22     A.   Okay.  I'm finished with that page.
23     Q.   Okay.  I'd like to go back to page 3, and see
24 the question towards the top where it says, "Why are
25 there three different exam components?"  Do you see

**Page 44**

1 that?
2     A.   Yes.
3     Q.   Well, first of all, regarding the whole
4 document, did you write this memo?
5     A.   No, I didn't write it, I approved it.
6     Q.   You approved it?  Okay.  And the first part of
7 the answer says, "The exam is meant to simulate the job
8 as much as possible."  Is that true?
9     A.   Yes.
10     Q.   Ask then you go on to say, "The more of the
11 job you test, the more you can accurately predict the
12 future success."  Do you believe that to be true?
13     A.   I believe that's a good indicator, yes.
14     Q.   And then, "Exam components may include job
15 simulations, work samples, and other measures of
16 technical knowledge."  Do you -- is that true?
17     A.   Yes.  And let me clarify your last question.
18         When I said I believe it's a good indicator, I
19 mean being in this business for 30 years, some people
20 get promoted and they perform superbly and others don't,
21 so it's not a perfect science.  So I just want to
22 clarify that answer.
23     Q.   Okay.  It's probably kind of like the bar exam
24 a little bit?
25     A.   Hmm.



POLICE CHIEF WILLIAM SCOTT VOLUME I
Frederick (Ric) Schiff vs Greg Suhr

April 06, 2021
45–48

Page 45

1    Q.  And then it says, towards the bottom of page
2  3, it has a paragraph there, "How are tests developed?"
3  Do you see that?
4    A.  Toward the bottom?  Yes.
5    Q.  It says, the answer is, "DHR's public safety
6  team first conducts a detailed job analysis."
7        What is the DHR's public safety team?
8    A.  They have specific individuals that worked
9  with the public safety department on examination.
10   Q.  Are members of your department on that team?
11   A.  They are not on DHR's public safety team, no.
12   Q.  Okay.  Do they consult with the police
13  department?
14   A.  They do, yes.
15   Q.  Okay.  Does the police department confer with
16  them when they conduct a detailed job analysis?
17   A.  I'm sorry.  Repeat your question, please.
18   Q.  It says, "The public safety team first
19  conducts a detailed job analysis."  Do they conduct that
20  job analysis with the police department?
21   A.  They consult with members of the police
22  department, yes.
23   Q.  Okay.  And then based on -- if we go on to
24  page 4, that paragraph goes on to say that, "Using the
25  job analysis result, the public safety team works with

Page 46

1  the Test Development Committee to create test
2  components"?  You saw that note?
3        MR. COWNAN:  Can you scroll down to page 4?
4        MR. MULLANAX:  Oh, I'm sorry, you are right.
5        Sorry, Peter.
6        Sorry, Chief.  There you go.
7        THE WITNESS:  Yes, I can see that.
8  BY MR. MULLANAX:
9    Q.  Okay.  Who was the -- what is the Test
10  Development Committee?
11   A.  This is in reference to the members of the
12  department who worked for -- who are selected to work
13  with DHR on developing the test, it's not a -- it's a
14  variety of ranks, at least it has been since I have been
15  here.  But these are folks that are selected to work
16  with DHR, and that is headed by the Deputy Chief of the
17  Administration Bureau, or has been since I have been
18  here.
19   Q.  Is that, the SME, you used that acronym.  Is
20  that Subject Matter Expert?
21   A.  Yes, the acronym does mean Subject Matter
22  Expert.
23   Q.  And so it says, "The DHR public safety team
24  works with the SMEs within SFPD and contractors to
25  develop test components."  Do you see that?

Page 47

1    A.  Uh-huh, yes.
2    Q.  What contractors does the SFPD use in
3  developing the test components?
4    A.  You know, I don't -- actually, it is DHR who
5  uses the contractor.  And I don't remember the name of
6  the contractor, but I do know they do consult or hire a
7  contractor to work with developing -- developing tests,
8  I don't remember the name off the top of my head, but I
9  am familiar with that process.
10   Q.  Okay.  And then just, and so the DHR, they are
11  the ones that actually develop the test; is that
12  correct?
13   A.  That is correct.  Well, they do it in
14  conjunction with the contractors and the public safety
15  team and the SMEs, but the DHR public safety team is
16  actually responsible for that process.
17   Q.  Now, are these contractors like that test
18  specialist, or like specialists giving tests; is that
19  what those contractors are?
20   A.  Well, they are consultants.  I don't know what
21  all they do, but that is part of what they do.  I can't
22  say if that's the only thing that they consult on.
23   Q.  Okay.  And then the next, if we go down a
24  little bit, it says, "Why do SMEs have to participate in
25  job analysis?"

Page 48

1        And you state here, "The job analysis is the
2  basis for the test.  If the job analysis does not
3  reflect the job, the test will not either."  Do you
4  still believe that to be correct?
5    A.  I believe it is accurate, yes.
6    Q.  And then at the -- you later go on to say,
7        To develop a high quality test, it is
8  important to involve a wide variety of experts.  At
9  least 60 percent of the rank participates in the job
10  analysis."  What do you mean by that last sentence, the
11  60 percent of the rank?
12   A.  The rank being tested for.  For instance, if
13  the test is for sergeant examination, then 60 percent of
14  the sergeants rank participates in that analysis.
15   Q.  Okay.  Do they have meetings about this or how
16  does that conduct -- how do they participate?
17   A.  Yeah, they -- my understanding is that they do
18  have meetings.
19        MR. MULLANAX:  Okay.  That was Exhibit No. 3.
20  Let me pull up -- okay.  I want to show you Exhibit 4.
21        (Plaintiff's Exhibit 4 marked for
22        identification.)
23  BY MR. MULLANAX:
24   Q.  And I'll ask you, this is a Collaborative
25  Reform Initiative, An Assessment of the San Francisco

POLICE CHIEF WILLIAM SCOTT VOLUME I
Frederick (Ric) Schiff vs Greg Suhr

April 06, 2021
53–56

Page 53

1  candidates?
2      A.  No.  Actually, no, I don't.
3          Well, let me clarify.  I can request a
4  performance evaluation if I need to look at one, but it
5  is not a part of one of the secondary criteria, if you
6  look at the criteria performance evaluations, it is not
7  part of it.
8      Q.  The discipline isn't?  Oh, I'm sorry, the
9  performance evaluations aren't?
10     A.  That's correct.
11         MR. MULLANAX:  And, Peter, were you going to
12  make an objection to the last question?
13         MR. COWNAN:  I'm just going to object to the
14  extent it misstates his testimony as to, or vague and
15  ambiguous as to secondary criteria that Chief Scott,
16  that specific thing.  But go ahead, Greg, it's fine.
17  BY MR. MULLANAX:
18     Q.  Okay.  The next sentence says, "Although the
19  overall data show a level of diversity among the ranks,
20  various sources raised concerns about the transparency
21  of the promotion process."
22         So, again, I understand this is before your
23  time with the San Francisco Police Department.  But have
24  you heard similar complaints now about the lack of
25  transparency in the promotional process, other than from

Page 54

1  the POA?
2      A.  I'm going to answer that question with the
3  best I can.  I have heard people reference lack of
4  transparency to people, individuals wanting an
5  understanding of why they were not selected.
6          I don't believe there is a lack of
7  transparency, or even people saying that there is a lack
8  of transparency about what the process is.  I think what
9  I have been told and heard from people is the
10  frustration about lack of transparency in people not
11  understanding why they weren't selected, if somebody,
12  particularly if somebody in a lower score than them was
13  selected in front of them.
14  BY MR. MULLANAX:
15     Q.  Do you understand the concern that sometimes
16  people with a lower score are promoted and they may
17  later be supervising their former Field Training
18  Officer, for example?
19         MR. COWNAN:  I object to the form.
20         You can answer if you understand the question,
21  sir.
22         THE WITNESS:  No, I need clarification, if you
23  don't mind, before I answer the question.
24  BY MR. MULLANAX:
25     Q.  Sometimes some complaints have been raised by

Page 55

1  those who were not promoted and people below them were
2  promoted.  For example, there has been complaints that a
3  former Field Training Officer is now being supervised by
4  a former student, so to speak.  Based on the promotion,
5  do you think that's a concern, a valid concern of the
6  police officers in the promotional process?
7          MR. COWNAN:  Same objection.  I also would
8  like to interpose the objection of relevance.  But you
9  can answer, sir.
10         THE WITNESS:  Yeah, just to clarify your
11  question, your question is do I think that's a valid
12  concern?
13         MR. MULLANAX:  Yes.
14         THE WITNESS:  No, I don't.
15  BY MR. MULLANAX:
16     Q.  Why is that?
17     A.  The same --
18         MR. COWNAN:  Go ahead, sir.
19         THE WITNESS:  That's not a criteria.  There is
20  no right -- there is no entitlement based on your
21  standing or position to guarantee a promotion.  In other
22  words, if you are an FTO and you trained an officer,
23  there is no entitlement that you get promoted before the
24  officer that you trained.  I mean, I don't think that's
25  a valid concern.

Page 56

1  BY MR. MULLANAX:
2      Q.  But does it factor into the decision,
3  especially if the former Field Training Officer was
4  ranked higher than the person promoted?
5      A.  No, not in that way.  Not in the way you are
6  asking, no.
7          MR. COWNAN:  I'd like to interpose the same
8  objection as the last time.
9  BY MR. MULLANAX:
10     Q.  Okay.  I have heard you say that sometimes in
11  the promotional process they use intangibles in making a
12  decision.  What do you mean by the intangibles?
13         MR. COWNAN:  I'm going to object to the extent
14  it assumes facts, but go ahead, Chief.
15  BY MR. MULLANAX:
16     Q.  Let me start over just to lay a foundation.
17  Have you ever said that you use intangibles in making
18  promotional decisions?
19     A.  Yes, I have said something to that effect,
20  yes.
21     Q.  Okay.  And what do you mean by that?
22     A.  Well, intangibles are things like leadership,
23  you know, a person's leadership ability or their
24  reputation of leadership, of things like responding
25  appropriately in tense and crisis situations and things

POLICE CHIEF WILLIAM SCOTT VOLUME I
Frederick (Ric) Schiff vs Greg Suhr

April 06, 2021
57–60

Page 57

1 like that. Sometimes that comes through by way of
2 documentation accommodations and the like. But there
3 are intangibles, you know. Not every -- no two people
4 are the same.
5     Q.  So when you are making your promotional
6 decisions, how do you know if a certain candidate has
7 good leadership potential or is a good leader?
8     A.  Well, like sometimes it comes by way of
9 commendations, or a person has commendations. And
10 sometimes in some of the comments that are written by
11 the evaluating deputy chief and assistant chief, they
12 will make those type of comments on occasion.
13        Everybody has a reputation, good or bad, and
14 those reputations in an organization like this are often
15 not secret, I mean, it's people have reputations of
16 being a good worker, a good employee or a bad worker, a
17 bad employee, and so those things tend to make their way
18 sometimes on a documentation by way of accommodations or
19 other documentations. Discipline, for instance.
20     Q.  So when, during the October, 2017, promotional
21 round, were you privy to any information documenting
22 leadership or reputation around the department of
23 individual candidates?
24     A.  Well, privy to, far as what is on the
25 secondary criteria, commendations, those type of things,

Page 58

1 if somebody is actually taken training, for instance, a
2 sergeant taking SLI to show they have an interest in
3 developing themselves as leaders I mean, those things
4 are relevant as well.
5        So, yeah, I mean, it is also in terms of
6 intangibles, you asked the question about coming into a
7 department and not -- and being new, and it is difficult
8 because you don't know the players, but you do hear
9 things. I read captain's comps, I read, medal of valor
10 process, you know, where I get to hear about acts of
11 valor and acts of courageous leadership and things like
12 that, and those things are mentioned in the secondary
13 criteria.
14        But those are documented, but those aren't
15 tangibles that lead to that type of performance.
16     Q.  And have you used the term cultural
17 competencies in making, when referring to the
18 promotional process?
19     A.  Clarify your question, please.
20     Q.  I think you've used, but I want to ask you,
21 have you used the term cultural competency or cultural
22 competencies when discussing the promotional process?
23     A.  Cultural competency as a selection criteria?
24 No. Have I used competency and cultural diversity and
25 terms like that when talking about the needs of the

Page 59

1 department and the goals of the department? Yes. And
2 oftentimes those two are brought up in the same
3 conversation.
4     Q.  What is -- what do you mean by cultural
5 competency?
6     A.  Being competent about cultures, different
7 cultures, either your own or somebody else's.
8     Q.  Are you talking about being familiar with
9 other cultures? Or I don't understand exactly what you
10 mean.
11     A.  Cultural competency, I'll just summarize what
12 it means to me, anyway. For instance, we have a large
13 Chinese population, the city is 33 percent Asian
14 American or Chinese, and the culture of Chinese people
15 with Chinese heritage, there are certain things
16 culturally that if you have taken the time to learn or
17 you are familiar with the culture that you may be
18 familiar with, as opposed to somebody who had not taken
19 the time to learn and may not be familiar with, like
20 taking your shoes off when you enter a person's house
21 and things like that.
22        There is a level of knowledge and competency
23 that is good for our city and good for our department in
24 terms of just how we deliver services and how we relate
25 to the people that we are sworn to protect and serve.

Page 60

1     Q.  Okay. And during the promotional process, do
2 you know if for lack, let's say there is a lieutenant
3 who wants a sergeant to be promoted or wants to give him
4 a good word. Do things like that happen in the
5 promotional process?
6     A.  Are you asking if I use those type of things
7 to make selections? You've got to clarify your question
8 for me.
9     Q.  Well, first of all, I guess the question is
10 does it happen, let's say you have a sergeant and there
11 is someone that the sergeant is supervising wants to
12 become a sergeant and is in the middle of the process
13 and he want to call somebody to give, say, you know, she
14 is a good candidate, put a good word in for her or
15 something like that. Does that ever happen in the
16 department?
17     A.  I can't say that it doesn't happen. I'm
18 not -- I'm not privy to those calls.
19     Q.  Have you received any phone calls like that
20 during the process?
21     A.  Of individuals saying this person is a good
22 candidate?
23     Q.  Yes.
24     A.  I have received that type of information, yes.
25     Q.  Does that play a role in your decision-making



Page 61

1 process?

2    A.   No, it actually doesn't, because I really have

3 talked publicly about the promotion process not being a

4 political process.  You know, people from the community,

5 elected officials or anything like that trying to

6 influence that process I don't think is a good thing for

7 this department.

8       So, no, I don't use that, and I discourage

9 people from trying to insert themselves in the process

10 that way.

11       MR. MULLANAX:  Okay.  I think we are almost

12 finished with this portion, but can we have maybe a

13 ten-minute break and come back and we may be close to

14 being finished, or finished?

15       MR. COWNAN:  Yeah, if we can, I think Caroline

16 and I want to have a discussion with you as well, so

17 let's do 15 minutes for this break.

18       MR. MULLANAX:  Okay.  I'm sorry, do you all

19 want to talk during the break?

20       MS. PAGE:  Can we call you, Greg, on the

21 number that we used yesterday?

22       MR. MULLANAX:  Yeah, call me.  I'm sitting

23 right here.

24       MR. COWNAN:  Let's plan to come back, if it's

25 okay with you guys, let's plan to come back at 11:50.

Page 62

1       MR. MULLANAX:  Okay.  11:50.

2       (Recess)

3 BY MR. MULLANAX:

4    Q.   All right.  I guess we are ready to go back on

5 the record.

6       So, Chief Scott, we are reconvening after a

7 break, and you realize you are still under oath?

8    A.   Yes.

9    Q.   Okay.  I'm going to refer back to Exhibit 4,

10 let me share that, that we were discussing before the

11 break.  And that's that Collaborative Reform Initiative

12 from October of 2016.  Do you see that on your screen?

13    A.   Yes.

14    Q.   Okay.  I'm going to go -- I made it into a

15 three-paged document.  The last page has some

16 recommendations on there.  Do you -- it has findings and

17 recommendations.  Do you recall reading the findings and

18 recommendations?

19    A.   Yes.

20    Q.   There's a lot of them, there's probably 100 or

21 so.  But if we go back down to, if you look on that

22 page, can you read the text okay?

23    A.   Yes, thank you.

24    Q.   Okay.  If we go to finding 91, which is about

25 halfway down the page it says they find that the

Page 63

1 promotion process is not transparent.  "The lack of

2 transparency has created a level of distrust of the

3 process in segments of the department."

4       Do you see that there?

5    A.   Yes.

6    Q.   And we discussed that, I think previously.

7 But then they recommend in 91.1, "The SFPD should

8 increase the level of transparency of the promotion

9 process and should clearly outline the qualifications

10 required to advance the promotion."  Do you believe the

11 SFPD has complied with this recommendation?

12    A.   Yes, I do.

13    Q.   And how have you complied with it?

14    A.   Well, we -- the part of the bulletin that you

15 showed me earlier was documentation that we put out to

16 the entire membership of the police department.

17 Document what the process is.  Meaning from start to

18 finish, actually.  And that is part of the process,

19 again, having the open hours as open office hours for

20 anybody that wanted to discuss with me whatever they

21 wanted to discuss.

22       That was a part of the process in terms of me

23 and other members of the command staff actually talking

24 to line up, you know, even the meeting that you

25 referenced with the POA, which was one of, you know,

Page 64

1 more than, talked with POA on more than one occasion,

2 but that was a part of making attempts to convey to our

3 membership what the process is, and that recommendation

4 speaks specifically to transparency of the promotion

5 process.

6       The process.  I mean, that's the operative

7 word, process.  And that's what it speaks to.  What is

8 the process?  And we've done a lot to at least convey to

9 members what the process is.

10    Q.   And you are referring to that Exhibit 3 we

11 talked about earlier; right?  (Indicating)

12    A.   Yes.

13    Q.   Okay.  Thank you for that.  Recommendation

14 91.2, it says, "The SFPD should consider providing

15 feedback to unsuccessful candidates for promotion as a

16 means of advancing institutional knowledge and

17 performance improvement."

18       Has the SFPD provided feedback to unsuccessful

19 candidates?

20       MR. COWNAN:  Objection on relevance grounds,

21 but you can answer it.

22       THE WITNESS:  Oh, thank you.  So the feedback

23 of one of the -- one of the ways that we've attempted to

24 do that was the open office hours, and that was, of

25 course, as I mentioned earlier, and it is part of at the

POLICE CHIEF WILLIAM SCOTT VOLUME I
Frederick (Ric) Schiff vs Greg Suhr

April 06, 2021
85–88

Page 85

1 number is determined, the number of notifications to
2 submit secondary criteria is based on that number.
3      Q.  Okay.
4      A.  So let's say that number goes out today and
5 tomorrow and I'll, for the sake of it, your question,
6 speak to the sergeant's rank.  And the notice goes out
7 today, based on the number of vacancies that we have
8 today.  If tomorrow two additional sergeants retire,
9 there is two additional vacancies, but we won't send
10 another secondary criteria request.  Those two
11 additional vacancies, if we didn't request for those to
12 be included in this round of promotions, we have to wait
13 until we make that request for those additional two.
14      So it doesn't automatically mean that while we
15 are evaluating secondary criteria more vacancies come up
16 those positions can be considered for a promotion at
17 that time.
18      Q.  Oh, so what you are saying is they can't,
19 then, they have to wait until another request for a
20 secondary criteria?
21      A.  Yeah, because we have to get approval for
22 that.  We have to get approval for the amount of people
23 that we are going to promote, the amount of members that
24 we are going to promote.  And how many, in terms of the
25 Rule of Ten, it is determined by the number of

Page 86

1 vacancies.
2      So once that goes out, the way it has been
3 done since I have been here, if we get additional
4 vacancies after that secondary criteria request, we will
5 wait until the next round of promotions to fill those
6 vacancies.
7      Q.  Okay.  Thank you for explaining that to me.
8      That makes sense.
9      Do you recall back in May of 2017 a Woman's
10 Network meeting held at the San Francisco police
11 headquarters?
12      A.  I met with, if you are talking about the POA
13 Women's Committee?
14      Q.  Yes, sir.
15      A.  That they were called at that time?  If you
16 are asking if I recall meeting with them, yes.
17      Q.  Did you make any comment about using the Rule
18 of Ten scores to address the issue of increasing the
19 number of minorities and women in the police force?
20      A.  I don't remember making that specific comment,
21 no.
22      Q.  Is that comment, can you use the Rule of Ten
23 to address issues of diversity in gender and race?
24      A.  Well, what the Rule of Ten does, is it expands
25 the candidate pool, however that lies.  It, the

Page 87

1 candidate pool is the candidate pool.
2      So however that is made up in terms of
3 diversity, demographics, what have you, it just expands
4 the pool.  So there is no guarantee that you are going
5 to get one group more of one group or one group more of
6 another group.  It just doesn't work that way.  A pool
7 is a pool.  I mean, it is made up of the membership of
8 the department.  But the Rule of Ten expands the pool,
9 and whatever that captures, it captures.
10      MR. MULLANAX:  I think that's all I have
11 today.  So it's like 12:39.  So I guess we may reconvene
12 on April 28th.  Is that the best way to say it?
13      MR. COWNAN:  To discuss the topic of secondary
14 criteria and what packets are or what the Chief thought
15 that would be; correct.
16      MR. MULLANAX:  That we talked about, okay.
17      MR. COWNAN:  Okay.
18      MR. MULLANAX:  Well, I appreciate you
19 appearing today, Chief.  Thank you very much.
20      THE WITNESS:  Thank you.  Okay.
21      MR. COWNAN:  Off the record.
22      (A discussion was held off the record)
23      THE COURT REPORTER:  Are you ordering a copy?
24      MR. COWNAN:  Yes, we are.
25      (The deposition was adjourned at 12:42 P.M.)

Page 88

1           REPORTER'S CERTIFICATION

3      I, Vanessa Harskamp, Certified Shorthand
4 Reporter in and for the State of California, do hereby
5 certify:
6      That the foregoing witness was by me duly
7 sworn; that the deposition was then taken before me at
8 the time and place herein set forth; that the testimony
9 and proceedings were reported stenographically by me and
10 later transcribed into typewritten form under my
11 direction; that the foregoing is a true record of the
12 testimony and proceedings taken at that time.
13      I further certify that I am not related to any
14 of the parties to this action by blood or marriage, and
15 that I am in no way interested in the outcome of this
16 matter.
17      IN WITNESS WHEREOF, I have subscribed my name
18 this 16th day of April, 2021.
19
20
21
22

23 _____
24      VANESSA HARSKAMP, RPR, CRR, CCP, CSR NO. 5679
25

ESQUIRE
DEPOSITION SOLUTIONS

800.211.DEPO (3376)
EsquireSolutions.com

WILLIAM SCOTT III VOLUME II
Schiff vs San Francisco

October 18, 2021
92–95

**Page 92**

```
1              UNITED STATES DISTRICT COURT
2              NORTHERN DISTRICT OF CALIFORNIA
3
4   Frederick (Ric) Schiff;   ) Case No. 4:19-cv-03260-YGR
    Glenn Brakel; Alice       )
5   Dicroce; Joseph Emanuel;  )
    Brian Greer; Clayton      )
6   Harmston; Steven Haskell; )
    Micah Hope; Daniel Kelly; )
7   Alexander Lentz; Brandon  )
    McKelley; Gerald Newbeck; )
8   David O'Keeffe;           )
    Christopher Ritter;       )
9   Steven Uang; and Thomas   )
    Walsh,                    )
10                            )
               Plaintiffs,    )
11                            )
       vs.                    )
12                            )
    City and County of        )
13  San Francisco; Greg Suhr; )
    William (Bill) Scott,     )
14  individually; and         )
    DOES 1-20,                )
15                            )
               Defendants.    )
16  _____  )
17    CONFIDENTIAL - PURSUANT TO THE PROTECTIVE ORDER
18                     VOLUME II
19         ZOOM VIDEOCONFERENCE DEPOSITION OF
20                WILLIAM SCOTT, III
21              PAGES 92 THROUGH 144
22             SAN FRANCISCO, CALIFORNIA
23                OCTOBER 18, 2021
24
25  REPORTED BY:  MICHAEL CUNDY, CSR 12271
```

**Page 93**

```
1            DEPOSITION OF WILLIAM SCOTT, III, taken
2   at 1245 Third Street, Sixth Floor, San Francisco,
3   California, on Monday, October 18, 2021, at 10:15 A.M.,
4   before Michael Cundy, Certified Shorthand Reporter, in
5   and for the State of California.
6
7   APPEARANCES:
8   FOR THE PLAINTIFFS:
9              LAW OFFICE OF M. GREG MULLANAX
               BY:  M. GREG MULLANAX, ESQ.
10             (Via videoconference)
               2140 N. Winery Avenue
11             Suite 101
               Fresno, California 93703
12             (559) 420-1222
               greg@lawmgm.com
13
    FOR THE DEFENDANTS:
14
               OFFICE OF THE CITY ATTORNEY
15             BY:  PETER A. COWNAN, ESQ.
                    CAROLINE PAGE
16             (Via videoconference)
               1390 Market Street
17             Fifth Floor
               San Francisco, California 94102
18             (415) 554-3863
               peter.cownan@sfcityatty.org
19             caroline.page@sfcityatty.org
20  ALSO PRESENT:
21             DANIEL KELLY
22             STEVEN UANG
23             ALICE DICROCE
24             FREDERICK SCHIFF
25             CLAYTON HARMSTON
```

**Page 94**

```
1   APPEARANCES:
2
3                  JOSEPH EMANUEL
4                  BRIAN GREER
5
6
7
8
9
10
11
12
13        October 18, 2021
14
15
16
17
18
19
20
21
22
23
24
25
```

**Page 95**

```
1                  I N D E X
2
3   WITNESS:  William Scott, III
4
5   EXAMINATION:                                  PAGE
6   By Mr. Mullanax                          96, 137
7   By Mr. Cownan                                135
8
9
10              INDEX OF EXHIBITS
11  EXHIBITS                                   MARKED
12  Exhibit 7   Q50 through Round 3              106
13  Exhibit 8   Q050 Sergeant Promtional Grid    107
                CCSF 008513 through
14              CCSF 008520
15  Exhibit 9   Q050 Sergeant Promtional Grid    113
                CCSF 020772 through
16              CCSF 020775
17  Exhibit 10  Q060 Sergeant Promtional Grid    127
                CCSF 008768 through
18              CCSF 008771
19
20
21
22
23
24
25
```



WILLIAM SCOTT III VOLUME II
Schiff vs San Francisco

October 18, 2021
96–99

Page 96

1    SAN FRANCISCO, CALIFORNIA; MONDAY, OCTOBER 18, 2021
2         10:15 O'CLOCK A.M.
3         -oOo-
4
5    Whereupon,
6         WILLIAM SCOTT, III,
7    having first been called as a witness, was duly sworn
8    and testified as follows:
9
10        EXAMINATION
11   BY MR. MULLANAX:
12   Q    Good morning, Chief Scott.  You may recall, I'm
13   Greg Mullanax.  I represent the plaintiffs in this case.
14        Do you remember our deposition from -- I think
15   it was back in April?
16   A    I do.
17   Q    Okay.  And this is just continuing from that
18   deposition, and I think we will -- I don't think we will
19   be here very long today, but I appreciate your
20   appearance here this morning.
21   A    Sure.  Thank you.
22   Q    Last time, we talked about the promotional
23   process and the rule of 10 and things like that, and I
24   just want to verify that I understood your testimony
25   correctly on a couple of issues.

Page 97

1         One of the issues is that you had your command
2    staff, which is what I was calling promotional
3    committee, but basically, your command staff, assistant
4    chiefs, that prepared spreadsheets with their
5    recommendations on them, and they provided that
6    information to you; is that correct?
7    A    That is partially correct.
8    Q    What all did you review in making your
9    promotional decisions?
10   A    The matrix that you referred to is what I
11   reviewed along with the recommendations from the members
12   of the secondary criteria committee.
13   Q    And the secondary criteria committee, is that
14   your command staff?
15   A    That is not the entire command staff, no.
16   Q    Okay.  Who composed the secondary criteria
17   committee?
18   A    It's the assistant chiefs and the deputy
19   chiefs.
20   Q    Okay.  So my understanding is that, after they
21   went through and reviewed the secondary criteria of all
22   of the applicants, then they filled out their documents
23   and then forwarded that to you with the matrix, I guess,
24   that was prepared by DHR; is that correct?
25   A    No, that's not correct.

Page 98

1    Q    Okay.  What did you have then when making the
2    promotional decisions?
3    A    So I had the matrix, and then each member that
4    reviewed the secondary criteria packages completed a
5    recommendation sheet, for lack of a better way to put
6    that.
7    Q    Okay.
8    A    And so that's what I had as well, each
9    individual member's recommendation sheet.
10   Q    Okay.  So the matrix and the recommendation
11   sheets; is that correct?
12   A    That is correct.
13   Q    And my recollection on those documents is that
14   those documents didn't refer to anybody by their race or
15   sex or any characteristics like that; is that correct?
16   A    That's correct.
17   Q    After you made your decisions on the promotions
18   but before they were announced, did you ever ask the
19   secondary -- did you ever tell the secondary criteria
20   committee this is what the promotions you wanted to
21   make, and did they have any comments on it or anything
22   like that?
23   A    Let me make sure I understand.  Can you ask the
24   question one more time?  I want to make sure I
25   understand your question.

Page 99

1    Q    Yes, sir.
2         MR. COWNAN:  Just to be helpful, I think you
3    had two questions there.  I think it will be helpful if
4    you break it down into one or two separate ones.
5         MR. MULLANAX:  Thank you, Peter.  It was a bad
6    question.
7    BY MR. MULLANAX:
8    Q    So, Chief Scott, after you reviewed the
9    information and you made your promotional decisions, did
10   you convey your decisions to the command staff or those
11   that were composed of the secondary criteria committee?
12   A    No, not -- no.  Not as a group, no.
13   Q    Okay.  Did you convey it to any individuals and ask
14   for any feedback on your decisions on the promotions?
15   A    I didn't ask for feedback, but I did provide it
16   to at the time -- whoever is sitting as the chief of
17   staff with the particular promotion.
18   Q    And that was not for purposes of receiving
19   feedback, that was just for informing them of your
20   decision; is that correct?
21   A    Correct, yes.
22   Q    Now, in the promotional process, the city is
23   engaged in contracts with outside contractors in helping
24   to prepare the promotional exams.
25        Are you aware of that?



**Page 100**

1    A    Are you talking about for the civil service
2  promotional exams -- promotional exams?
3    Q    Yes, sir.
4    A    Yes.
5    Q    And what is the purpose of retaining an outside
6  contractor for the promotional process?
7       MR. COWNAN:  If you know.
8       THE WITNESS:  My understanding is the outside
9  company actually prepares the exam -- examination, so
10  the -- the written examination part as well as the --
11  there's a second part of the examination where members
12  from departments outside of the San Francisco Police
13  Department are brought in to participate in interviews.
14  That outside company also assists with that process.
15  BY MR. MULLANAX:
16    Q    Do you have any involvement with the
17  contractors that are engaged to work on the promotional
18  process exam?
19    A    My involvement is limited to an introduction,
20  basically, in a briefing, basically, at the beginning,
21  and that's pretty much it.
22       And then I see them -- those folks that do come
23  to town when the outside members of other departments
24  are brought in for the interview process, there is,
25  basically, a hello, and I usually greet that group

**Page 101**

1  before they start that process, but other than that, no.
2    Q    Are those the subject matter experts you are
3  talking about?
4    A    No.
5    Q    What role does the subject matter experts have
6  in this process?
7       MR. COWNAN:  Again, if you know, Chief.
8       THE WITNESS:  So my understanding of the
9  subject matter experts, you are referring to the
10  internal department members who are selected as subject
11  matter experts for the purpose of coming up with the
12  material for the -- for the tests itself, the
13  examination itself.
14  BY MR. MULLANAX:
15    Q    So this is -- if you know -- again, I don't
16  want to -- I don't want to ask you to speculate about
17  anything, so if you don't know the answer to anything I
18  ask, just tell us.  That's perfectly acceptable.
19       So my understanding is the SMEs work with the
20  contractor in helping to develop the exams.
21       Would that be fair to say?
22    A    That is my understanding, yes.
23    Q    Now, in one of the contracts discusses the
24  duties of the contractor, and it says -- first of all,
25  there's an abbreviation that you use, KSAO.  And KSAO, I

**Page 102**

1  don't know if you know what that means, but it's
2  knowledge, skills, abilities, and other dimensions and
3  competencies related to a police officer's performance.
4       Have you heard that term before?
5    A    I'm not familiar with that acronym, but that
6  sounds about right.
7    Q    Okay.  In the contract -- one of the contracts,
8  it says, the contractor shall recommend the combination
9  at different selection procedures that have been shown
10  to result in minimal adverse impact -- for example,
11  race, gender, age, and ethnicity -- that are effective
12  measurements of the critical KSAOs required for the
13  specific position.
14       Is that your understanding of one of the
15  contractor's duties?
16       MR. COWNAN:  Objection to the extent it lacks
17  foundation and assumes facts.
18       Sir, you can answer, if you know.
19       THE WITNESS:  No.  That's not -- I -- I am not
20  involved in that level of detail in terms of selecting
21  those contractors.
22  BY MR. MULLANAX:
23    Q    But had you all ever had any discussions about
24  the selection procedure or the testing procedures that
25  may have a disparate impact on maybe different racial

**Page 103**

1  groups or anything like that?
2    A    What's your question again?  I'm sorry.
3    Q    Have you ever had any discussions with the
4  contractor or internally about the testing procedures
5  and do they have like an adverse impact on certain
6  minorities or anything like that?
7    A    No, I have not had that discussion.
8    Q    But as far as you know, the test drafting
9  procedures and stuff, are they designed to minimize the
10  desperate impact or adverse impact on different genders
11  or race or ethnicities?
12       MR. COWNAN:  I'm going to object to the extent
13  it asks you to speculate.
14       Sir, you can answer, if you know.
15       THE WITNESS:  I -- what I know is that I expect
16  the test to be fair, and I -- like I said, I'm not
17  involved in that level of detail.  But I don't know if
18  that answers your question or not, but no, I am not
19  familiar with that as you read it, but I do expect the
20  test to be as fair as it can be.
21  BY MR. MULLANAX:
22    Q    Do you believe -- the tests that were given in
23  the rounds, let's say, for sergeant and lieutenant back
24  in 2017, do you think that testing process was fair?
25    A    Yes.

WILLIAM SCOTT III VOLUME II                                    October 18, 2021
Schiff vs San Francisco                                              104—107

Page 104

1    Q   Do you think the scoring -- do you think there
2  was any scoring that had adverse impact on certain
3  racial groups or genders?
4    A   No.
5        MR. COWNAN:  Belatedly, I object to the extent
6  that calls for expert opinion.
7  BY MR. MULLANAX:
8    Q   But you have been involved in the police -- I
9  think you were hired by LAPD back in 1989; is that
10 correct?
11   A   Yes.
12   Q   And since then, you have worked your way up.  I
13 think you were assistant chief before you left the LAPD; is
14 that correct?
15   A   Deputy chief.
16   Q   Deputy chief, I'm sorry.
17       And then you came here and became chief of the
18 San Francisco Police Department in 2017; is that
19 correct?
20   A   Yes.
21   Q   So based on all of those years of experience
22 from the -- starting from entry level to the top
23 position, this testing round that occurred for the
24 promotion that occurred in 2017 and 2018 and 2019, do
25 you think the testing procedure was fair?

Page 105

1        MR. COWNAN:  I'm going to object to the extent
2  it calls for the chief to speculate, and also, it calls
3  for a lay opinion.
4        Sir, you can answer the question.
5        THE WITNESS:  I believe it was fair, yes.
6  BY MR. MULLANAX:
7    Q   This part is going to be -- Peter, I'll try
8  to figure out how to do this -- to do the best.
9        Let's see here.
10       I'm going to try to pull up Exhibit -- okay.
11       I'm sharing the screen.  I hope you all can see
12 it.  It's an eight-page document, and the first page
13 says, Q50 through round three.
14       Can you see that, Chief Scott?
15   A   Yes.
16   Q   Do I need to enlarge it or anything?
17   A   Not for me.  I can see it.
18   Q   This is a document that shows the promotional
19 rounds, and I'm going through some of the pages.  It's
20 not Bates stamped, but it shows who was promoted in the
21 first round as you can see by the yellow.  Those in
22 yellow were promoted the first round.  Those that were
23 promoted in the second round are orange-colored.
24       Do you see that?
25   A   Yes.

Page 106

1    Q   And then we have the second -- well, second
2  round is orange, and then the third round is green.
3        So that's just -- I just did that kind of as a
4  reference for us, and I guess I can mark it as
5  Exhibit 7.
6        (Exhibit 7 was marked for identification.)
7  BY MR. MULLANAX:
8    Q   Now, what I want to pull it up -- this may be a
9  little difficult.  It will be -- okay.
10       Can -- let me switch that to -- okay.
11       Can you see this, Chief Scott?  It's an Excel
12 spreadsheet.
13   A   Yes.
14   Q   Okay.  And it's, basically, the same thing
15 except we can scroll through it as the previous one, but
16 I wanted to ask you and then I wanted to pull up -- let
17 me -- in fact, let me just hold off on this right now.
18 Let me pull up the matrix, okay.
19       This is the one I meant to pull up, and I
20 apologize for that.  This is difficult to see.
21       But do you see this, Chief Scott?  I'm sorry.
22 Now, do you see it?
23   A   Yes.
24   Q   It's a Q050 Sergeants Promotional Grid, and
25 just for the record, it's an eight-page document

Page 107

1  starting with CCSF 8513, and that's -- I'll mark that as
2  Exhibit 8.
3        (Exhibit 8 was marked for identification.)
4  BY MR. MULLANAX:
5    Q   And on here -- I'll enlarge it for you, just so
6  you can see.  If I widen it like that, does that fill
7  your screen up?  Can you still see that okay?
8    A   I can still see it, yes.
9    Q   Okay.  Now, do you recognize this document?
10   A   Yes.
11   Q   And what is this document?
12   A   That's the promotional matrix that you had
13 asked regarding -- you --
14   Q   Okay.  So --
15   A   -- a copy of one of them, I would assume.
16   Q   Yes.  This was produced to us in discovery, and
17 it's marked confidential under the protective order that
18 we have with the court.
19       Is this the document -- so when you were making
20 promotional decisions for the sergeants' round, you had
21 this document and then plus the secondary criteria
22 recommendations from your command staff?
23   A   Yes.
24   Q   Okay.  Now, here on the sergeants -- we can go
25 down to -- let's see -- like, to 140, you see Domingo



WILLIAM SCOTT III VOLUME II                              October 18, 2021
Schiff vs San Francisco                                        108–111

**Page 108**

1  Williams there.  He -- well, let me ask you this:  On
2  the left side, what does it mean where it says number on
3  that first column?
4       MR. COWNAN:  If you know.
5       THE WITNESS:  The number is just a numerical
6  number from one to -- the first person on the list to
7  whatever the last person on the list.
8  BY MR. MULLANAX:
9    Q    To give everyone a number?
10   A    The numbers -- basically, it's a count of the
11  number of people on the list, basically.
12   Q    Okay.  Then if you see the next column, it says
13  rank.
14       Do you see that column?
15   A    Yes.
16   Q    What does rank mean?
17   A    Rank is their rank, what score, if you will --
18  what score did they meet.
19   Q    And so we can have multiple people in the same
20  rank; is that correct?
21   A    Yes.
22   Q    For example, rank number four, we have two
23  applicants, and they both have 989 scores; is that
24  correct?
25   A    Yes.

**Page 109**

1    Q    And so the score column, is that the score that
2  the applicant achieved on the test?
3    A    Yes.  That is my understanding, yes.
4    Q    Okay.  So if we go down to Domingo Williams, he
5  was number, let's say, 140.
6       Do you see him there?
7    A    Yes.
8    Q    And his rank is number 80.  Now, he was
9  promoted in the first round, but he's pretty far down
10  the list.
11       Do you recall why you promoted Domingo
12  Williams?
13   A    Well, I can only promote who is eligible.
14   Q    Okay.
15   A    And he was eligible.
16   Q    But did you promote Domingo Williams over
17  someone that was higher on the list?
18   A    That's the rule of the list.
19   Q    Was your decision based on the information
20  that's on this promotional grid?
21   A    The information on the promotional grid, yes,
22  that is -- partially the decision is based on that and
23  the recommendations, and then ultimately, it's my
24  decision in terms of who I'm going to promote.
25   Q    But can you give us an indication why you chose

**Page 110**

1  to promote Mr. Williams over people that were much
2  higher on the list?
3    A    He's eligible.  Just like everybody else who
4  was promoted, they are all eligible.
5       There's no rule of promoting the exact order of
6  the scores on the list.
7       The chief executive -- in this case, the chief
8  of police -- has the ability to promote from the list of
9  eligible candidates for the amount of positions that are
10  open.
11   Q    So --
12   A    So in other words, I can pick from anywhere in
13  that list of eligible candidates.  That's within the
14  rules.
15   Q    And it's at your discretion?
16   A    Yes.
17   Q    And do you recall what factors you use to make
18  a decision to promote Domingo Williams over someone who
19  was higher on the list?
20       MR. COWNAN:  Greg, you are asking -- I think
21  we're getting tripped up with the comparative.  You are
22  asking specifically if Chief Scott remembers any of the
23  reasons why Mr. Williams was actually promoted; is that
24  right?
25       MR. MULLANAX:  Yes.

**Page 111**

1       MR. COWNAN:  Chief, do you understand that?
2       THE WITNESS:  Yes.
3       MR. COWNAN:  As you sit here today, do you
4  recall any of the reasons why you promoted Domingo
5  Williams?
6       THE WITNESS:  Well, I can tell you what the
7  process is.
8       When I look at the secondary criteria, as you
9  can see, no two candidates are exactly alike.  They all
10  bring something different to the table.  They all bring
11  something different to the equation.
12       And I'm able to take from the list of eligible
13  candidates.  There is no magic formula, if that's what
14  you are asking, Mr. Mullanax.
15       I have a group of eligible candidates.  I can
16  pick from any of them within that group, and that's fair
17  and within the rules.
18  BY MR. MULLANAX:
19   Q    Well, and I'm -- I'm not trying to fuss with
20  you.  I'm just trying to find out if you can tell from
21  looking at this matrix why you chose Domingo Williams
22  over someone that was ranked much higher.
23       Is there anything in the qualifications that
24  you can see on there that would show that he might be
25  promoted over, let's say, number 17 or, let's say, Greg



WILLIAM SCOTT III VOLUME II
Schiff vs San Francisco

**Page 112**

1  Scott, number 19?  I mean, I don't want to go -- we're
2  not going to go through all of these.  I'm just trying
3  to get an idea of what you looked at when you made your
4  decisions.
5      A   I look at the list of eligible candidates, and
6  from there, everybody brings something a little bit
7  different to the table.
8          As you can see, those Xs represent the
9  secondary criteria experience and training and all of
10  these different things.  Nobody is the same.
11         And part of this process is -- from my vantage
12  point, is trying to get a good mix of people that are
13  going to move this department forward and able to
14  do that from the list of candidates.  They all are
15  eligible, or they wouldn't be on the list.
16     Q   Well, and I'm not going to -- again, I'm not
17  fussing with you about their eligibility.  I'm just
18  trying to find out the decision-making process.
19     Q   Based on this grid, can you say what Domingo
20  Williams brought to the table as opposed to someone who
21  was ranked much higher?
22     A   As long as he's eligible.  You look at his
23  secondary criteria, and he has some boxes checked, some
24  not, just like every other candidate, but he's eligible.
25         He, like all of the other candidates that were

**Page 113**

1  selected, were in the group that I was able to choose
2  from.  They all bring unique experiences based on who
3  they are, what they have done, and they are eligible.
4          I don't know how else to answer that.
5      Q   Okay.  This is -- I'm going to show you
6  Exhibit 9.
7          (Exhibit 9 was marked for identification.)
8  BY MR. MULLANAX:
9      Q   And it starts with page CCSF 20772, and it's a
10  four-page document that ends on page 20775.
11         Can you see that, Chief?
12     A   Yes.
13     Q   And do you recognize this document?
14     A   It looks like -- well, it looks like the same
15  document or same type of document.
16     Q   It's entitled, the Q050 Sergeant Promotional
17  Grid, and it looks like it starts at rank 17 whereas the
18  previous one started at rank number one.
19         But is this the document that you had with
20  you -- it appears to be -- and I don't want you to
21  speculate, but it appears to be the second round
22  of promotional decisions on the sergeants.
23     A   I'm not sure which round it is, but it's the
24  same type of matrix.  I mean, the matrix is familiar to
25  me.  I'm not sure when that was presented to me.

**Page 114**

1      Q   If you go -- say, go back to Exhibit 8, if we
2  look at what -- Raymond Padmore, number 134, he was
3  ranked -- he was promoted in the first round.
4          What do you recall about Raymond Padmore's
5  factors that made you decide to promote him?
6      A   He's eligible.  He's eligible.  You look at his
7  secondary criteria.  He has got a lot of boxes checked,
8  not all, but he's eligible just like all of the other
9  candidates that were selected.
10     Q   Did you --
11     A   One thing I can say about Raymond Padmore is
12  that I actually got a chance to see his work because he
13  worked -- at the time I got here, he worked actually in
14  the chief's office, but I did get to see his work.  I
15  got to see how you dealt with people in many different
16  occasions, so there was some familiarity with him.
17         But aside from that, I mean, you look at the
18  secondary criteria.  He's eligible, and he's got a lot
19  of -- a lot of those boxes checked, just like a lot of
20  the other candidates.
21     Q   So at least you had some personal knowledge of
22  Officer Padmore; is that correct?
23     A   Yes.
24     Q   Did you have any personal knowledge of Domingo
25  Williams?

**Page 115**

1      A   Not to the degree that I had with Raymond
2  Padmore, but I saw him on occasion do his work in the
3  field.
4      Q   Darius Jones, he is number -- ranked number --
5  rank order number 138.
6          Do you recall his promotion, or do you know
7  him?
8      A   I know who he is, yes.
9      Q   Do you know why you promoted him in the first
10  round?
11     A   The same answer, he's eligible, and he was
12  promoted.
13         It's the same answer for everybody that was
14  promoted in that first round, they are eligible.  They
15  are within the group that I had to choose from, and they
16  were promoted based on what I thought was the best thing
17  for this department at that time.
18     Q   Okay.  On the different columns where we see
19  the different Xs, are there any of those columns that
20  you give priority to as opposed to other columns?
21     A   There's no -- if you are asking priority --
22  make-or-break type of priority, no, but I will say this:
23  One of the things that I was very interested in seeing
24  was the CIT training, which is on the far right-hand,
25  and it's -- again, it's not a make-or-break thing.



WILLIAM SCOTT III VOLUME II                    October 18, 2021
Schiff vs San Francisco                        116–119

Page 116

1    But at the time that I came into this
2    department, one of the things that we were trying to get
3    better at was de-escalation, CIT, crisis intervention,
4    to reduce the -- or to have better outcomes for these
5    critical incidents, so not a make-or-break but
6    definitely is something that I paid attention to.
7        Q   And now CIT is crisis intervention training; is
8    that correct?
9        A   That is correct.
10       Q   And then PCIT is police crisis intervention
11   training.
12           Do you see that?
13       A   Yes.
14       Q   What is the difference between crisis
15   intervention training and the police crisis intervention
16   training?
17       A   I don't know if it's police crisis
18   intervention, but my understanding is there's two
19   modules of training.  There's a 40-hour module of CIT
20   training, basically, a week-long -- a week of training,
21   and then there's a shorter block of training.
22           Basically, this was more the practical hands-on
23   training that -- for officers in the field.  That was
24   a -- it's actually 10 hours of crisis intervention and
25   10 hours of use-of-force training, so that's the

Page 117

1    difference between the two.
2        Q   How much -- those courses, are they taught
3    in-house?  Would they go to POST, or how is that done?
4        A   They are taught in-house.
5        Q   Chief, did you -- I'm sure you did, but did you
6    factor in, like, awards like medals of valor and things
7    like that?
8        A   Yes.  So everything in the secondary criteria
9    is factored in.  This is part of what secondary criteria
10   is about, so the candidates can say what it is that they
11   bring to the position that they are applying for, so
12   everything is factored in.
13       Q   So there is no -- just to summarize, you had no
14   formula, it's just based on what you saw from your --
15   the promotional committee to review of the secondary
16   criteria, their recommendations, and then this matrix,
17   and then you made decisions based on that; is that
18   correct?
19       A   Yes, that's correct.  And specifically, there
20   is no formula.  There is no one of the criteria has more
21   points than the other.  It's just -- there is no formula
22   like that.
23           I did and I still do care greatly about crisis
24   intervention training, because I believe this department
25   has gotten much better and better outcomes because of

Page 118

1    that training, but again, not everybody can take the
2    training all at one time, so it's not a make-or-break
3    thing, even with that.
4        Q   Now, during the promotional process, was there
5    effort by your office to enlarge the applicant pool,
6    let's say, for the sergeants?
7            MR. COWNAN:  At what period of time, Greg?
8            MR. MULLANAX:  2017 to 2019.
9            THE WITNESS:  An effort to enlarge the
10   candidate pool, no.  I wouldn't say that is the case,
11   no.
12           MR. COWNAN:  May I belatedly object to the form
13   of the question.  It's vague and overbroad, but it's
14   been answered, so let's go to the next question.
15   BY MR. MULLANAX:
16       Q   There were some e-mails -- I won't bring them
17   up here because I don't think, Chief, you were involved
18   in the e-mail, but there were just some e-mails, I
19   think, DHR asking about was there an opportunity or was
20   it -- would there be an opportunity to enlarge the
21   applicant pool.
22           And my question surrounding that would be, is
23   there a reason why you would want to enlarge the
24   applicant pool?
25       A   Well --

Page 119

1            MR. COWNAN:  I'm going to object.  Object to
2    the form of the question.  Object that it assumes facts,
3    and it may call for the chief to speculate.
4            Chief, if you can answer and can answer, please
5    do so.
6            THE WITNESS:  Well, my understanding of what
7    you are asking me is that the -- the objective is not to
8    enlarge the candidate pool.  The objective is if we have
9    additional positions that are open while we're in this
10   process of promotion, I want to fill those positions.
11           The way we have done promotion since I have
12   been here, and my understanding is we have done it this
13   way for -- since we typically make these
14   promotions once a year.  There may be -- may have some
15   sometimes where it might have been twice a year, but
16   usually, once a year.
17           And when I arrived here, we had very high
18   vacancy rates in our promotional positions from sergeant
19   through academy.  Basically, all of the positions had
20   vacancies and a significant amount of them.
21           So in terms of filling these positions, the
22   objective is to fill the positions, if we can, while we
23   are making promotions, not for the purposes of
24   increasing the pool but for the purposes of filling the
25   vacant positions, if we can.



WILLIAM SCOTT III VOLUME II
Schiff vs San Francisco

October 18, 2021
120–123

Page 120

1  BY MR. MULLANAX:
2     Q   Chief, can you use like-work-like-pay to fill
3  in, let's say, a sergeant's position for any openings
4  that come up before the promotions are actually made?
5     A   I don't -- if you are asking, can you use
6  like-work-like-pay to fill a position, the answer is no.
7         Can you temporarily put somebody in a
8  like-work-like-pay to do the job if there is a vacancy,
9  the answer is yes.  That's not a permanent fix, nor is
10 it in the best interest of the department to do that on
11 a long-term basis, in my opinion.
12    Q   So most of those -- in a situation like where,
13 let's say, you have a sergeant position open because
14 someone got sick or whatever and the promotion is not
15 going to be made for another six months, you could put
16 someone in as an acting sergeant under
17 like-work-like-pay until the promotion process is done;
18 is that correct?
19        MR. COWNAN:  Let me object to the extent it
20 calls for an incomplete hypothetical.
21        Sir, you can answer.
22        THE WITNESS:  Well, that's correct, but let me
23 put some context in that.
24 BY MR. MULLANAX:
25    Q   Okay.

Page 121

1     A   If a person is working in a position -- let's
2  say, a police officer is working in the position of a
3  sergeant, per our memorandum of understanding or MOU,
4  they have to be paid for the work that they are doing,
5  so that is the rule.  It's not optional.  If they are
6  working in that position, they have to be paid for it.
7         That is not the ideal situation, though.  We do
8  it all out of necessity.  We do it because we have an
9  agreement between the department and the Police Officers
10 Association to pay people when they are performing a job
11 based on the duties they are performing, so it's the
12 right thing to do.  And that is not the ideal to fill
13 vacancies in that manner for substantial amounts of
14 time.  We do it because we have to.
15        MR. MULLANAX:  Okay.  Peter, I don't have a
16 whole lot left.  Do you mind if we take a 10-minute
17 break --
18        MR. COWNAN:  No.  Let's do that.
19        MR. MULLANAX:  -- and then come back?
20        MR. COWNAN:  Yes.
21        MR. MULLANAX:  Do you want to, say, come back
22 at 11:00?
23        MR. COWNAN:  Yes.  Let's do that.
24        MR. MULLANAX:  Okay.  Thank you.
25        We will go off the record.

Page 122

1         MR. COWNAN:  Off the record.
2         (A short break was taken.)
3  BY MR. MULLANAX:
4     Q   Thank you for the break.
5         Chief Scott, do you realize you are still under
6  oath?
7     A   Yes.
8     Q   Okay.  I just wanted to ask you a little bit
9  about the test, the process.
10        When you are -- when the police department
11 gives these promotional exams, these civil servant
12 exams, what is the purpose of those exams?
13        MR. COWNAN:  If you know.
14        THE WITNESS:  The purpose of the -- are you
15 talking about the written exam, if I can clarify the
16 question?
17 BY MR. MULLANAX:
18    Q   Yes, sir.
19    A   Yes.  The purpose of the exam is to determine
20 which candidates are -- are eligible for the position
21 that they are seeking.
22        So the exam has a score, of course, and if you
23 go below a score and fail the exam, you are not -- you
24 can't advance in the process or a candidate cannot
25 advance in the process, but as you read off earlier, you

Page 123

1  know, to -- part of this process is trying to determine
2  who has the skills that the department is looking for to
3  fill those positions.
4     Q   And the testing is supposed to help measure
5  whether the applicants have the skills necessary for
6  promotion?
7     A   Skills, knowledge, skills.  I mean, it's the
8  process between the written and the interview and the
9  secondary criteria.  All of that information is pulled
10 out, and from there we can make a decision on the
11 eligible candidates to promote or who is eligible for
12 promotion anyway.
13    Q   And the interview portion of the exam;
14 is that correct?
15    A   There is.
16    Q   The results of the interview, is that -- is
17 that combined with the written portion to come up with a
18 final score?
19    A   That is, yes, my understanding.
20        MR. COWNAN:  Belatedly to this string,
21 foundation.
22 BY MR. MULLANAX:
23    Q   Is that a similar procedure to what you all had
24 at the Los Angeles Police Department?
25    A   Similar -- not exactly the same but similar.



**Page 140**

1   don't, let me know.
2          Let's say you knew for the sergeants' exam that
3   you had 76 positions that you could promote.  Could you
4   figure out from before you started making any promotions
5   how far down on the list you could go?
6     A   It's a math equation, basically, so what --
7   however many your ranks that is plus nine for that
8   76, that's how far you can go, and depending on how many
9   people are in those ranks, that's how many people that
10  are in the eligible list.
11         MR. MULLANAX:  All right.  I have no further
12  questions.
13         MR. COWNAN:  Okay.
14         MR. MULLANAX:  We're off the record.
15         THE REPORTER:  Would you like to order a copy
16  of the transcript?
17         MR. MULLANAX:  Yes.
18         MR. COWNAN:  Yes.
19         (Whereupon the deposition of William Scott,
20  III, concluded at 11:35 A.M.)
21
22
23
24
25

**Page 141**

1   STATE OF CALIFORNIA           )
                                  )  SS:
2   CITY AND COUNTY OF SAN FRANCISCO  )
3
4              I, Michael Cundy, CSR No. 12271, a
5   Certified Shorthand Reporter of the State of California,
6   do hereby certify:
7              That the foregoing proceedings were
8   taken before me at the time and place herein set forth;
9   that any witnesses in the foregoing proceedings, prior
10  to testifying, were placed under oath; that a verbatim
11  record of the proceedings was made by me using machine
12  shorthand which was thereafter transcribed under my
13  direction; further, that the foregoing is an accurate
14  transcription thereof.
15             I further certify that I am neither
16  financially interested in the action nor a relative or
17  employee of any attorney or any of the parties.
18             IN WITNESS WHEREOF, I have this date
19  subscribed my name.
20
21  Dated:  October 28, 2021
22
23  _____
       Michael Cundy, CSR No. 12271
24
25

**Page 142**

1       DEPOSITION ERRATA SHEET
2
3
4   Our Assignment No.  J7435168
5   Case Caption:  Schiff
6   vs. City and County of San Francisco
7
8       DECLARATION UNDER PENALTY OF PERJURY
9       I declare under penalty of perjury
10  that I have read the entire transcript of
11  my Deposition taken in the captioned matter
12  or the same has been read to me, and
13  the same is true and accurate, save and
14  except for changes and/or corrections, if
15  any, as indicated by me on the DEPOSITION
16  ERRATA SHEET hereof, with the understanding
17  that I offer these changes as if still under
18  oath.
19       Signed on the _____ day of
20  _____, 20____.
21
22  _____
23       William Scott, III
24
25

**Page 143**

1       DEPOSITION ERRATA SHEET
2   Page No._____Line No._____Change to:_____
3   _____
4   Reason for change:_____
5   Page No._____Line No._____Change to:_____
6   _____
7   Reason for change:_____
8   Page No._____Line No._____Change to:_____
9   _____
10  Reason for change:_____
11  Page No._____Line No._____Change to:_____
12  _____
13  Reason for change:_____
14  Page No._____Line No._____Change to:_____
15  _____
16  Reason for change:_____
17  Page No._____Line No._____Change to:_____
18  _____
19  Reason for change:_____
20  Page No._____Line No._____Change to:_____
21  _____
22  Reason for change:_____
23
24  SIGNATURE:_____DATE:_____
25       William Scott, III

